UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF NEW YORK

**08 CV 7679**

NM HOMES ONE, INC.

                Plaintiff,

v.

JP MORGAN CHASE BANK, N.A. AND TODD
BROWN,

                Defendants.



ECF CASE

Case No. 08 CV 7679 (SWK)

COMPLAINT

RECEIVED
SEP 02 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff NM Homes One, Inc. ("NMH"), by and through its attorneys, Kobre &

Kim LLP, for its complaint against JP Morgan Chase Bank, N.A. and Todd Brown

(collectively "JPM") submits as follows:

### Introduction

1.    JPM's fraud, negligence and mismanagement of NMH's investment management

account caused NMH to suffer losses that currently stand at millions of dollars and

continue to mount.

2.    NMH approached JPM in October 2006 about opening an investment

management account.  NMH told JPM that it wanted to invest in safe, liquid securities

that had short-term maturities and that would operate to preserve the principal funds.  In

response, JPM sent NMH a description of their proposed strategy for investing NMH's

funds, dubbed the "enhanced cash strategy".  JPM touted its "enhanced cash strategy" as

one that focused on capital preservation.

3.    Based on JPM's tout of its "enhanced cash strategy", NMH opened an investment

1

management account (numbered A-81476-00-3) (the "Account" or the "Portfolio") with JPM in November 2006. NMH transferred approximately US $60 million to the Account for JPM to invest on behalf of NMH.

4.      When NMH opened the Account with JPM, NMH clearly expressed that it sought to invest in low-risk, short-term securities to ensure the preservation of capital. NMH also told JPM that it would be using the money in the Account for near-term development projects and thus it was clear NMH required a portfolio whose liquidity was consistent with such goals. JPM represented to NMH that it would invest NMH's fund accordingly. JPM also sent NMH a sample portfolio. That sample portfolio was comprised entirely of securities that matured within one to two years from the date of purchase.

5.      NMH vested JPM with full discretionary authority over the Account, and as such, JPM had a fiduciary duty to NMH to act in its best interests.

6.      JPM was required to invest the cash in the Account in accordance with the Discretionary Portfolio Mandate, which the parties executed in November 2006 upon opening the Account. The Discretionary Portfolio Mandate clearly set forth NMH's investment objectives, which was primarily the preservation of principal, with only a secondary emphasis on growth.

7.      As shall be explained in more detail below, in contravention of NMH's stated objective of capital preservation, JPM invested NMH in inappropriate and unsuitable securities collateralized with subprime loans and other types of mortgage loans as well as securities issued by financial institutions issuing and holding subprime-collateralized securities (hereinafter referred to as "Subprime-Linked Securities" or "Securities"). A listing of the Subprime-Linked Securities in the Account is attached hereto as Exhibit 1.

8.      Throughout the last quarter of 2006, the housing market weakened and inflationary pressures rose.  Despite NMH's desire for low-risk securities and against the backdrop of this weakening housing market, JPM breached its fiduciary duties to NMH and violated NMH's rights by investing NMH in unsuitable securities that were inextricably linked to subprime mortgages and that had long-term maturities.

9.      JPM further breached its duties and violated NMH's rights by continuing to invest in unsuitable Subprime-Linked Securities despite increasingly turbulent market conditions.

10.     JPM further disregarded its fiduciary duties to NMH when it failed to move NMH out of Subprime-Linked Securities throughout the first, second and third quarters of 2007, despite the growing market problems in that sector.  JPM started moving NMH out of the Subprime-Linked Securities in its Account only after the third quarter of 2007 when the valuations of those securities were already heavily marked-down, forcing NMH to incur substantial loss.

11.     As explained in more detail below, from the outset of its investment advisor relationship with NMH, JPM misrepresented the types of securities it would purchase for NMH and failed to disclose to NMH material information about the securities in the Account, despite being obligated to do so.

12.     JPM misrepresented its approach to NMH's investments after NMH raised concerns in March 2007 about the effect of the subprime mortgage crisis on securities in the Account.  In particular, Todd Brown of JPM, the fixed income portfolio manager for the Account, indicated that JPM would look to reduce the Account's Subprime-Linked positions.  Instead, JPM proceeded to purchase an additional approximately US $30

million of Subprime-Linked Securities for the Account.

13.     JPM's misrepresentations and failure to follow mutually agreed-upon investment approaches did not end there.  For example, JPM represented to NMH that it would purchase securities with short-term maturities.  Instead, JPM purchased securities with long-term maturities, in contravention of NMH's desire for short-term, liquid securities. JPM compounded this problem by failing to adequately disclose its purchase of long-term maturities of the securities in the Account.

14.     JPM also materially misrepresented the performance of the Account and its success in achieving NMH's investment objectives.  JPM assured NMH that the Portfolio was performing well.  But JPM in the course of making such affirmative statements omitted the fact that such assurances were based on a valuation of the securities that did not represent actual market prices.  Moreover, JPM failed to provide NMH with any information as to what the actual market prices were, thereby preventing NMH from assessing the performance of the Account.

15.     JPM also refused to provide NMH with specific information about the securities in NMH's Portfolio.  Upon information and belief, despite collecting substantial fees supposedly for investment advice and management services, JPM conducted little, if any, analysis with respect to the securities it purchased for the Account.  Indeed, JPM negligently disregarded market events when it purchased the unsuitable Subprime-Linked Securities in the midst of a credit crisis.

16.     By using NMH's money to purchase the Subprime-Linked Securities described herein, failing to sell those Securities before they were heavily marked down, and making false representations and omissions as described herein, JPM is liable for having: (1)

breached its contract with NMH, (2) breached its fiduciary duties owed to NMH, (3) violated Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder, (4) invested NMH's funds in numerous unsuitable securities, (5) made unauthorized purchases on behalf of NMH, (6) violated Section 20(a) of the Exchange Act, (7) made fraudulent misrepresentations and omissions to NMH upon which NMH relied, (8) made negligent misrepresentations and omissions to NMH upon which NMH relied, (9) negligently caused injury to NMH, and (10) committed gross negligence.

### Parties

17.    Plaintiff NMH is a home building company that is incorporated in Delaware and has its primary place of business in Calabasas, California.

18.    Defendant JP Morgan Chase Bank, N.A. is a national banking association that offers investment management services. Upon information and belief, JP Morgan Chase Bank, N.A. is incorporated in Delaware and headquartered at 270 Park Avenue, New York, New York, 10017.

19.    Defendant Todd Brown is the fixed income portfolio manager for NMH's cash management portfolio in New York, New York. Upon information and belief, Mr. Brown executed trades for the Account and served as the point of contact for NMH at JPM.

### Jurisdiction and Venue

20.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises out of the federal securities laws and the pendant state law claims arise from the same common nucleus of operative facts as the federal claims.

21.    New York, New York is a proper venue pursuant to 28 U.S.C. § 1391 because

Defendant JPM resides in New York, New York and a substantial part of the events giving rise to the claim took place in New York, New York.

**In the Course of Establishing the Account, NMH Fully Communicated and
JPM Fully Understood that NMH's Primary Investment Objective
Was to Preserve Principal.**

22.     In approximately October 2006, NMH began discussions with JPM regarding NMH's opening of an investment management account at JPM.

23.     From the outset of the relationship between NMH and JPM, NMH informed JPM that it wanted to preserve the capital in the Account and sought low-risk investments with short-term maturities.  NMH also told JPM that it was planning to utilize the cash in the Account in the near-term for future development projects and required a certain amount of liquidity to do so.

24.     In its initial pitch to NMH, JPM highlighted its firm's strong research infrastructure and, in particular, its commitment to determining appropriate valuation and managing risk.  Todd Brown of JPM described JPM's investment philosophy as "based on intent [sic] top-down and bottom-up analysis".

25.     JPM recommended its "enhanced cash strategy" to NMH.  On November 2, 2006, Clayton Shumway of JPM emailed Marika Erdely, the Chief Financial Officer of NMH, a set of guidelines outlining the "enhanced cash" investment strategy for NMH.  According to those JPM guidelines, the "enhanced cash strategy" would provide for the preservation of principal in accordance with NMH's investment goals and would "maximize returns while providing insulation from principal loss".

26.     JPM also represented to NMH that using the "enhanced cash strategy" would mean investing in securities with relatively short-term maturities.  In particular, Brown

explained to Michael Murr, Co-Chairman of NMH's Board of Directors, that the yield advantage component of the "enhanced cash strategy's" objective is "realized by investing the remaining funds in securities maturing modestly outside of the money market fund universe (usually between 13 and 24 months)".

27.    On October 25, 2006, Todd Brown emailed Mr. Murr the "enhanced cash strategy" guidelines and said that strategy was a "good fit at this juncture" for NMH.

28.    NMH ultimately selected the "enhanced cash strategy" in part because the short-term maturities meant the Portfolio would meet NMH's liquidity requirements.

29.    On or about October 25, 2006, JPM provided NMH with product guidelines for the "enhanced cash strategy" ("Product Guidelines"). The Product Guidelines described the "enhanced cash strategy" as seeking to "[p]rovide a high level of current income consistent with the preservation of principal". This objective was consistent with what NMH had communicated to JPM about its investment goals, and it is clear that JPM understood those goals.

30.    In addition, the Product Guidelines clearly set forth JPM's responsibilities with respect to the management of a discretionary account, in particular to "(1) determine and modify strategic and tactical asset allocation . . . given changing fundamentals and judgments concerning relative value", (2) actively manage the portfolio to enhance returns and control risk, and (3) select the most attractive individual securities within each sector.

31.    Todd Brown also provided NMH with a sample portfolio. That sample portfolio listed securities that all had maturity dates one to two years from the date of purchase, which was consistent with JPM's description of the "enhanced cash strategy".

32.    Using the sample portfolio and JPM's description of the "enhanced cash strategy", JPM led NMH to believe that its funds would be invested in safe, liquid, short-term securities.

33.    On November 6, 2006, based on the representations that Brown of JPM made to NMH about the way JPM would manage the Account and the investment strategy it would utilize, NMH executed the Discretionary Portfolio Mandate.  JPM executed the Discretionary Portfolio Mandate on November 8, 2006.  The Discretionary Portfolio Mandate is "an outline of the philosophy and investment principles that will guide the investment management of the Client's assets".

34.    Consistent with what NMH had conveyed to JPM about its investment objectives, the Discretionary Portfolio Mandate described the investment profile of the Account as having a capital preservation orientation: "This Discretionary Portfolio seeks income and principal stability with a secondary focus on real capital growth.  It has a below average level of risk, and may experience low to moderate levels of volatility in the short term."  The overall risk profile for the Account was described as "conservative".

35.    The Discretionary Portfolio Mandate also profiled NMH's risk tolerance in that it listed a number of investor concerns and rated them in terms of importance to NMH.  This "risk profile" indicated that NMH was particularly concerned about liquidity and sought an investment strategy that would preserve its ability "to purchase or sell assets in the Account at the desired time to realize gain or to prevent or minimize loss."

36.    On November 9, 2006, NMH wired US $60 million to JPM to fund the Account.  Over time, NMH transferred nearly US $130 million to JPM to invest.

37.    NMH has to date paid JPM a total of US $151,617.37 in investment management fees.

**Nevertheless, JPM Purchased Subprime-Linked Securities for NMH
That Were Wholly Unsuitable for the Account.**

38.    From the time that JPM began purchasing the Subprime-Linked Securities in the Account, those Securities were at a high risk of illiquidity and were unsuitable for a conservative investor like NMH who sought to preserve its principal through safe, short-term investments.

39.    One type of unsuitable Subprime-Linked Security that JPM purchased for NMH was a home equity loan asset backed security ("ABS-HEL"). An ABS-HEL is a type of debt security collateralized by loans which, in turn, are secured with residential real estate. The majority of ABS-HELs are collateralized with subprime mortgage loans, making these types of securities subprime-linked insofar as they are subprime collateralized. Even if an ABS-HEL is collateralized with non-subprime mortgage loans, the subprime market still has a significant effect on the home mortgage market as a whole because investor concerns with Subprime-Linked Securities and with the housing market create a risk aversion that spills into non-subprime collateralized ABS-HELs as well.

40.    Another type of unsuitable subprime-linked security that JPM purchased for NMH was a collateralized mortgage obligation ("CMO"). As with ABS-HELs, even if a CMO is collateralized with non-subprime mortgage loans, the subprime market still has a significant effect on the home mortgage market as a whole.

41.    Upon information and belief, many, if not all of the CMOs in the Account were backed by Alt-A mortgages. Alt-A mortgages are materially different than prime mortgages. An Alt-A borrower likely has a sufficient financial profile to qualify for a

9

Fannie Mae or Freddie Mac-guaranteed loan, but they have insufficient income verification documentation, a problematic credit history, or debt to income or loan to value ratios above agency limits and therefore do not qualify. Alt-A loans are less stringent than agency loans as to what documentation of assets or ability to pay is required. The default risk is high for Alt-A loans because they are often used for non-owner occupied, investment properties which people are more likely to abandon if they have financial difficulties.

42.     JPM also invested NMH in unsuitable floating-rate notes ("FRN"). A FRN is a bond, characterized by a variable coupon rate, which is reset periodically (usually quarterly) based on a reference rate, such as 10 basis points above LIBOR or the federal funds rate. The types of FRNs JPM purchased for NMH were unsecured and were linked to the subprime mortgage market. The FRNs JPM purchased with NMH's money are issued by financial institutions and are unsecured general obligations of holding companies for the financial institutions. This means, first, that there is no specific underlying collateral for the floating-rate notes so that the investor is relying on the general promise of the issuer to meet its obligations to the investor, making the corporate FRN inherently riskier than a similar note secured by actual definable assets. Second, the creditworthiness of the floating-rate note is, in essence, based on the performance and the investment holdings of the financial institution as a whole. Much of the holdings of these financial institutions included subprime-linked and subprime-backed securities, exposing the issuers and the investor to the volatility in the subprime mortgage market.

43.     From November 2006 to August 2007, the Subprime-Linked Securities comprised approximately half of NMH's Portfolio.

10

44.    The Subprime-Linked Securities in the Account resulted in millions of dollars of losses to date that continue to mount as the Securities' valuation continues to plummet.

**Despite the Collapsing Housing Market, JPM Invested NMH's Funds in Subprime-Linked Securities Throughout the Fourth Quarter of 2006 and the Beginning of 2007, Violating NMH's Objective to Preserve Capital.**

45.    As early as the last quarter of 2006, it was widely-reported in the financial news media that the once-booming U.S. housing market was beginning to slow down, with median house prices and home building rates declining for the first time in many years. One particular sector of the housing market, the mortgage sector, was succumbing to this housing market downturn.  Throughout the last quarter of 2006, it was widely reported that because of declining home prices, the values of mortgages were declining and the delinquency rates on mortgages were steadily rising.  For example:

   a.   On September 13, 2006, CNNMoney.com reported that "[f]aced with higher mortgage rates and deteriorating housing markets, more Americans are having trouble paying off their mortgages this year, according to the latest quarterly report on delinquencies from the Mortgage Bankers Association."

   b.   One month later, on October 28, 2006, the *New York Times* reported that "[c]hilled by a summer slowdown in the housing market, the economy was held to a growth rate of 1.6 percent in the third quarter, the lowest since early 2003, the government reported yesterday."

   c.   On November 17, 2006, just three days before JPM initiated the first purchase of Subprime-Linked Securities for the Account, the *International Herald Tribune* reported that "[h]ousing starts in the United States

tumbled in October to the lowest level in more than six years, the government said Friday, raising the prospect that the economy will be further weakened after growing last quarter at the slowest pace since 2003."

46.    JPM knew or should have known from the inception of the Account in November 2006 that the U.S. housing market was in the midst of a crisis and that purchases of the unsuitable Subprime-Linked Securities were inappropriate for NMH's account.

47.    JPM steadily invested NMH in unsuitable Subprime-Linked Securities. Those Securities presented a high risk of illiquidity to NMH's portfolio and their purchase was in direct contravention of NMH's investment objectives.

48.    As discussed more fully below, JPM misled NMH about the extent to which its Account was subprime-linked. Until late 2007, NMH was only aware that a small subset of the ABS-HELs was affected by the subprime crisis.

49.    From the inception of the account in November 2006 to January 31, 2007, JPM purchased approximately US $24.5 million of Subprime-Linked Securities for NMH. By the end of January 2007, approximately 57% of NMH's total Portfolio consisted of unsuitable Subprime-Linked Securities.

50.    JPM's investment of more than half of NMH's funds in the Account in Subprime-Linked Securities was a glaring failure to diversify the Account and disproportionately subjected NMH's portfolio to the risks of the declining housing market. JPM's failure to diversify the Account was inconsistent with the principal stability objective set forth in the Discretionary Portfolio Mandate.

51.    The housing market worsened throughout the first quarter of 2007. On February

7, 2007, HSBC, one of the largest subprime lenders, announced it had to set aside US $10.6 billion to cover expected losses. On February 8, 2007, California's New Century Financial Corporate—the third largest U.S. subprime lender—announced an expected loss for the fourth quarter 2006 and announced it would have to re-do nearly a year of accounting to reflect the depth of its losses. By this time, it was widely understood in the financial market that the housing bubble had indeed burst, and subprime mortgage default and delinquency rates were on the rise.

52. In February 2007, JPM knew or should have known that investing NMH's money in securities collateralized by housing loans or collateralized by institutions holding those loans presented a clear risk that was inappropriate for investors such as NMH with very conservative investment strategies. In complete disregard of those risks, and in breach of its fiduciary obligations to NMH, JPM purchased an additional approximately US $12 million of Subprime-Linked Securities throughout February and March of 2007.

53. On March 14, 2007, Michael Murr of NMH emailed Todd Brown of JPM and asked if there was any deterioration in the subprime asset backs owned by NMH—in other words, in the small subset of securities in the Account that NMH believed were subprime-linked. JPM failed to disclose that, in fact, more than half of the actively managed Portfolio consisted of Subprime-Linked Securities, far beyond the group of ABS-HELs Murr inquired about, were affected by the crashing housing market. Rather, Brown told Murr that JPM was "still comfortable" with NMH's high credit quality positioning and that JPM did not anticipate any issues with NMH's current holdings. Brown told Murr that JPM "may look to reduce even our high credit quality exposure should we receive good bid levels".

54.    Rather than look to reduce NMH's exposure to the subprime market as Brown had represented it would, JPM instead continued to purchase Subprime-Linked Securities for NMH even against the backdrop of a collapsing housing market and subprime mortgage crisis.

55.    JPM engaged in such activity even though in March 2007 JP Morgan's own analyst, Christopher Flanagan, global head of ABS and CDO research, predicted "a very severe correction (in the sub-prime market)" and further predicted that such correction "will last anywhere from six to 12 months, during which many of the lenders who have operated in this market will gradually get pushed out of business."

56.    Throughout the second and third quarters of 2007, the housing market continued its rapid decline. At the end of the first quarter 2007, the S&P/Case-Shiller house price index recorded the first year-over-year decline in nationwide house prices since 1991. In April 2007, New Century Financial filed for bankruptcy. Heavy markdowns in CMOs forced Brookstreet Securities, a California broker-dealer, to close in June 2007.

57.    In July 2007, the American Bankers Association reported that late payments on home equity loans were on the rise. That same month, two Bear Stearns subprime hedge funds collapsed. On July 25, 2007, the New York Times reported that "[b]ond ratings agencies have begun to downgrade and re-evaluate mortgage securities, which has virtually shut down the market for certain debt offerings that specialize in home loans."

58.    In the July 2007 "JP Morgan Q&A", J.P. Morgan Securities, Inc. addressed the "Subprime Meltdown". In that "Q&A", JP Morgan said that it expected "continued deterioration in subprime loan performance well into 2008". JP Morgan further wrote that "[i]f [its] analysis is correct, downgrades will be confronting both home-equity asset-

backed securities and ABS collateralized debt obligations (CDOs that own ABS tranches from AA down to BB). Downgrades will probably reach as high as the AA part of the capital structure in both sectors". JP Morgan itself acknowledged that "*[l]iquidity in the subprime sector has evaporated*".

59.     Also in July 2007, JP Morgan's own Chris Flanagan warned that the "worst is not over in the subprime mortgage market" and "home price declines such as we expect would lead to substantial increases in subprime mortgage defaults and losses [and that this] in turn would have significant negative implications for pricings and ratings of subprime securities and asset backed indices". According to Flanagan, "[w]e're on the cusp of a serious pullback in liquidity for this market".

60.     Nevertheless, *and despite the warnings of its own global head of ABS and CDO research*, JPM continued its dive into Subprime-Linked Securities, purchasing another US $3.5 million of those securities for NMH in July 2007.

61.     In August 2007, Countrywide, the biggest U.S. mortgage lender, drew down on its entire bank credit lines due to the mortgage crisis, national mortgage lender First Magnus was forced to suspend its operations, Accredited Home Lenders stopped taking loan applications and cut 1,600 jobs due to subprime market turmoil, American Home Investment closed in light of liquidity issues resulting from disruptions in the secondary mortgage market, and Lehman Brothers closed its subprime lender, BNC Mortgage.

62.     But those market events still did not deter JPM. In August 2007, JPM purchased another approximately US $4 million of Subprime-Linked Securities for NMH.

63.     At the end of August 2007, Todd Brown emailed Michael Murr and acknowledged that the "bond market is effectively shut down [and that] many securities

are priced at levels that reflect a lack of market liquidity". But Brown told Murr that JPM's "best assessment is that the ABS-HELs linked to subprime are most severely affected and the other securities [such as CMOs and FRNs] less so", wrongfully leading NMH to believe incorrectly that only the 10.3% of the actively managed portion of the Account tied to ABS-HELs would be affected, and not the other 52.4% of additional Subprime-Linked Securities in the actively managed portion of Account.

64.    In JPM's presentation to NMH's Board of Directors, Todd Brown admitted that, coming into 2007, a weakening housing market and inflationary pressures concerned the Fed and further admitted that the market learned of rising delinquencies in the subprime mortgage market as early as February 2007.

65.    Between March 2007, when NMH raised concerns about the effect of the subprime mortgage market on the Account, and August 31, 2007, JPM had purchased approximately US $30 million worth of Subprime-Linked Securities for NMH. By the end of August 2007, toxic and illiquid Subprime-Linked Securities comprised more than half of NMH's actively managed Portfolio.

**JPM Also Failed to Move NMH Out of Its Subprime-Linked Securities Positions Even Though It Knew or Should Have Known That Prices of Those Securities Would Continue to Fall.**

66.    Throughout the first and second quarters of 2007, JPM made no attempt to sell the Subprime-Linked Securities in the Account even though it knew or should have known that the value of those securities would continue to decline.

67.    In the first quarter of 2007, JPM knew or should have known that the housing market was rapidly declining, the subprime crisis was worsening, that the markets were not likely to rebound and that the prices for the Subprime-Linked Securities in NMH's

account would continue to fall. Nevertheless, JPM made no effort to move NMH out of its subprime-linked positions.

68.    JPM began to move NMH out of the Subprime-Linked Securities only in the beginning of the fourth quarter of 2007 and throughout 2008, when the market for those Securities was nearly non-existent and the prices for those Securities were heavily marked down.

69.    For example, in November 2006, JPM purchased Indymac INDX Mortgage Loan Trust securities for NMH at 100% of par value. JPM sold those securities in April 2008 at 68.125% of par value, and NMH incurred a realized loss of US $259,213.51. In February 2007, the Indymac INDX Mortgage Loan Trust securities were priced at 99.98% of par value. Had JPM sold the securities at that time, the loss NMH suffered would have been US $149.26.

70.    JPM's purchase of ARMT 2006-3 4A11 and failure to move NMH out of that investment in a timely manner is further illustrative of JPM's breach of its fiduciary obligations. JPM purchased those unsuitable Subprime-Linked Securities in December 2006 at 100.015% of par value for NMH. In February 2007, those securities were priced at 99.92% of par value. If JPM had sold the securities at that time, the loss would have been US $805.14. Instead, JPM sold ARMT 2006-3 4A11 in April 2008 at 68.125% of par value, resulting in a realized loss to NMH of US $225,260.16.

71.    JPM also breached its fiduciary duties by failing to move NMH out of CIT FRNs in the first quarter of 2007. JPM purchased those unsuitable Subprime-Linked Securities in November 2006 at 100.08% of par value. If JPM had sold those Securities in February 2007, when they were priced at 100.14% of par value, NMH would have realized a *gain*

of US $402.60.  Instead, JPM sold the CIT FRNS at 80.00% of par value in March of 2008, causing NMH to sustain a realized loss of US $120,455.40.

72.     JPM's failure to move NMH out of the Subprime-Linked Securities in February 2007 when it was clear that the subprime mortgage market was in crisis was a breach of its fiduciary duty and a violation of NMH's rights.  JPM's failure caused NMH to sustain significant losses and was clearly in contravention of NMH's stated desire to preserve the principal in the Account.

### JPM Breached its Fiduciary Duties to NMH and Violated NMH's Rights by Failing to Disclose the Extent to Which the Securities in the Account Were Subprime-Linked.

73.     From the inception of JPM's investment advisor relationship with NMH, JPM failed to provide NMH with accurate information about the Securities in the Account. JPM failed to disclose to NMH how much of its Portfolio was backed by subprime mortgages.  JPM also failed to disclose that the CMOs, ABS-HELs and FRNs, though not all technically subprime-backed, were subprime-linked.

74.     JPM knew or should have known that the Subprime-Linked Securities in the Account were just as risky and volatile as the smaller subset of subprime-backed ABS-HELs.

75.     As its investment advisor, JPM had the obligation to inform NMH that approximately half of its actively managed Portfolio, though not all subprime-backed, *were* subprime-linked and at a high risk of illiquidity.  JPM failed to make such disclosure, even as the values of those Securities plummeted.  For example, in August 2007, NMH requested that JPM sell the subprime-backed securities in the Account.  JPM should have advised NMH that its Subprime-Linked Securities—comprising more than

half of the actively managed Portfolio—were also rapidly losing value as a result of the subprime mortgage crisis.

76.    Not only did JPM fail to disclose to NMH the extent to which the subprime mortgage crisis impacted the Portfolio, JPM misled NMH into believing that many of its Subprime-Linked Securities were not at risk. For example, in the fall of 2007, Todd Brown told NMH that its CMO positions were all prime-mortgage backed and indicated that it need not worry about those securities with respect to the subprime crisis. But JPM knew or should have known that even prime-backed CMOs were rapidly declining in value.

77.    Moreover, Todd Brown's representation that the CMOs were backed by prime-mortgages was not accurate. Upon information and belief, many of the CMOs in the Account were backed by Alt-A mortgages, which, as explained above, are materially different from prime mortgages because the borrowers have an insufficient financial profile to qualify for a prime mortgage. Upon information and belief, Alt-A CMOs have a delinquency rate that is just as high as subprime CMOs. Brown's assurance that the CMOs in the Account were prime-backed was materially false and misleading.

**JPM Breached its Fiduciary Duties to NMH and Violated NMH's Rights by Purchasing Unsuitable Securities with Maturities As Long As 40 Years in the Future, Even Though NMH Sought Short-Term Maturities, and Misled NMH With Respect to the Maturities of the Securities in the Account.**

78.    JPM's misrepresentations extended beyond what type of securities were in the Account. JPM also misled NMH about the long-term nature of those Securities. In particular, JPM made misleading statements about the concepts of maturity and duration and about the maturities of the Securities in the Account.

79.    Maturity indicates the length of time until the principal amount of a bond must be

returned to an investor, whereas duration is a measure of interest rate sensitivity. Although both maturity and duration measure the degree of liquidity of a particular investment, maturity indicates how liquid the principal amount of the security is and duration indicates how liquid the interest payments on the security are. In particular, duration is a measure of the sensitivity of the price of a fixed income investment to a change in interest rate. A security can have a short duration but the principal amount may not be repaid for many years, rendering the principal amount of the security relatively illiquid.

80.     NMH clearly communicated its investment goals to JPM. Although NMH did not specify a particular, technical liquidity requirement, NMH told JPM at the inception of the Account that it would be utilizing the funds in the Account for future development projects in the near-term, that capital preservation was the primary objective and that NMH had no appetite for credit or maturity risk. JPM advised NMH that the "enhanced cash strategy" would be well-suited to those objectives and Todd Brown provided Michael Murr with a description of the "enhanced cash strategy". That description, on which NMH relied when it opened the Account, states that aside from floating rate securities, the funds in the portfolio would be invested in "securities maturing modestly outside of the money market fund universe (usually between 13 and 24 months)."

81.     Brown also gave NMH a sample portfolio that contained securities which all matured within one to two years from the date of purchase. Although the sample portfolio showed securities with maturity dates ranging from one day to just over two years and durations ranging from 0.00 to 1.86 years, JPM provided no explanation distinguishing the two related concepts. Instead, JPM misled NMH because the

"enhanced cash strategy" description and sample portfolio indicated that the cash in the Account would be invested in low-risk, short-term maturity securities with high levels of liquidity. NMH relied on JPM's representations in opening the Account and thereafter, and reasonably believed that the securities in which JPM would invest NMH's funds would provide the desired level of principal preservation and liquidity needed to satisfy their business development goals.

82.     When NMH expressed its desire for liquid, short-term securities to JPM, JPM should have invested in securities with both short durations and short maturities or ensured that NMH was clear about the difference between the two indicators and consulted NMH on whether to invest in short-term or long-term maturity securities. JPM did neither.

83.     Instead, JPM loaded the portfolio with securities that had maturities of *more than a decade*, locking NMH into investments that did not fit with their investment goals or strategy. For example, in May 2007, JPM purchased two FRNs, one from Lehman Brothers and one from Goldman Sachs, that had maturity dates of 2049, more than 40 years from the date of purchase.

84.     Upon information and belief, JPM refers to the type of long-term securities in NMH's Account as "perpetuals".

85.     JPM failed to disclose the maturities of the securities in which it invested NMH, but it did not stop there. JPM also affirmatively misrepresented the liquidity of the Account. In March 2007, Marika Erdely of NMH asked Todd Brown to confirm which of the securities held in the NMH account would qualify as cash equivalents. Brown wrote a letter to Erdely affirming that the entire NMH account was classified as a cash

equivalent account and that *both* the average duration *and* the average maturity of the Account was 0.1 year. A portfolio with an average maturity of 0.1 year would obviously be highly liquid. But in fact, contrary to JPM's misrepresentation, the average maturity of the Account in March 2007 was more than a decade.

86.     No matter how one calculates the maturity, Brown's representation was false. The average maturity of the securities in NMH's portfolio (including cash) in March 2007 was sixteen years; the average maturity of the actively managed portion of the Account was nearly twenty years. Brown's representation is also false when the average maturity of the securities in the Account is weighted to reflect each investment's relative value. The weighted average maturity of the entire Portfolio was eleven years, and the weighted average maturity of the actively managed portion of the Portfolio was more than seventeen years. Under any calculation, Brown's misrepresentation that the average maturity of the Portfolio in March 2007 was false by a factor of ten.

87.     Moreover, on March 9, 2007, Todd Brown emailed Michael Murr an investment management account review, and the maturity dates provided in that review were false. According to the March 2007 review, almost all of the Securities matured within one year from the date of purchase. In fact, and again contrary to what JPM explicitly misrepresented to NMH, the actively managed Portfolio was comprised of "perpetuals"—long-term, illiquid positions—with an average maturity of nearly twenty years. Indeed, two securities in the Portfolio, while listed with maturity dates of one year, actually matured *forty-two* years from the date of purchase.

88.     The monthly statements that JPM provided were misleading with respect to the maturity dates of the Securities held in the Account. The maturities for the Securities in

the Account were not clearly marked on the statements and were sometimes excluded entirely from the portfolio updates that JPM provided.

89.    Upon information and belief, JPM omitted the maturities of the Securities in the Account on the account statements that Todd Brown provided to NMH's Board of Directors in August 2007 to obfuscate the long-term (and thus illiquid) nature of the Portfolio.

90.    As NMH's investment advisor, vested with discretionary authority over the Account, JPM had a duty to clearly communicate to NMH all relevant characteristics of its Portfolio, including the time frame within which the Securities would mature and the risk associated with them. JPM knew that NMH would be relying on the information and recommendations provided to it and JPM misled NMH as to the characteristics of the Portfolio's future holdings, and in particular, with respect to the liquidity of the Securities in the Account.

### JPM Breached Its Fiduciary Duties to NMH and Violated NMH's Rights by Engaging In Deceptive Valuation Practices That Misled NMH as to the Growing Illiquidity of the Account.

91.    Throughout the lifetime of the account, NMH relied exclusively on its fiduciary JPM for information material to the pricing of Securities in its portfolio and for fair and accurate assessments about the Portfolio's overall performance. In violation of its fiduciary duties and NMH's rights, JPM misrepresented the price of the Securities in the Account and then used those prices as the basis for assuring NMH that its Portfolio was performing well and in accordance with NMH's objective of capital preservation.

92.    Every month, JPM provided NMH with an account statement. For each security, a value was assigned under a column entitled "price". NMH reasonably relied on those

values as reflecting the price at which the security could be sold in the market.

93.     Upon information and belief, JPM used the marks listed in the account statements as its basis for representing to NMH that the Securities in the Account were retaining close to their par value, if not full par value.  Particularly if JPM were going to tout its supposedly good performance as an investment manager based on such marks, JPM had a duty to disclose that those assurances were based on marks that did not accurately reflect the real price of the Securities.  JPM made no such disclosure.  Instead, JPM continued to represent that the Account was performing well, even though the prices at which the Securities in the Account could be sold were substantially below par value.

94.     Because of JPM's reliance on the prices listed in the account statements, NMH also reasonably relied on those inaccurate marks as well in assessing the value of its Portfolio.

95.     Upon information and belief, JPM failed to disclose that its analysis was based on inaccurate marks because doing so would have required it to write-down those Securities across all JPM-managed portfolios, resulting in a catastrophic effect on the return in those portfolios, and indeed, a catastrophic effect on the return of JP Morgan's own holdings.

96.     In April 2007, JP Morgan Chase & Co. issued a press release detailing its first quarter financial results for the 2007 fiscal year.  JP Morgan Chase & Co. downplayed the impact the subprime crisis would have on the company, referring to JP Morgan's exposure as "manageable".  In that press release, the Chairman and Chief Executive Officer Jamie Dimon commented that the company was "very pleased with our record results this quarter" and that the "strong results include some benefit from the generally favorable credit environment".

97.    In October 17, 2007, JP Morgan Chase & Co. issued a press release detailing its third quarter results for the 2007 fiscal year. JP Morgan Chase & Co. admitted that it had "markdowns of $1.3 billion (net of fees) on leveraged lending funded and unfunded commitments and markdowns of $339 million (net of hedges) on collateralized debt obligation (CDO) warehoused and unsold positions".

98.    Then, on January 16, 2008, JP Morgan Chase & Co. disclosed the full extent of its exposure to the subprime mortgage crisis. Specifically, JP Morgan Chase & Co.'s third quarter write-down was not nearly large enough, and it announced it would have to write down another $1.3 billion due to exposure to subprime loans. JP Morgan Chase & Co.'s net income fell 21% compared to the same quarter the previous year.

99.    In an e-mail dated May 15, 2007, Todd Brown represented to NMH that "in the context of the broader portfolio we have generated positive returns and are performing quite well". On March 20, 2007, Brown represented that "we don't anticipate any issues with our current holdings." Based on these assurances from JPM, NMH believed that its Account was liquid and was generally performing well.

100.    In or about September 2007, after Todd Brown's presentation to the NMH Board of Directors where he finally acknowledged the growing subprime crisis, NMH instructed JPM to sell the subprime material in its portfolio at the marks listed in its account statements. At the time of NMH's directive, the Securities which JPM eventually sold ranged in marks (as set forth on the account statements) from 96.26% of par value to 100.08% of par value.

101.    Despite this instruction from its customer, JPM did not sell the Securities at the marks listed in the account statements.[1] Indeed, upon information and belief, JPM could

not do so because the marks in the account statements (which JPM had touted as evidence of its good performance as an investment manager) did not represent real prices. Instead, from October 2007 to July 2008, despite NMH's instructions, JPM sold twelve of the Subprime-Linked Securities at marks ranging from 51.00% to 96.80% of par value, far below the price JPM had led NMH to believe it could obtain for the Securities and far below the prices that NMH had authorized for JPM as a selling point.

102.    Below is a chart which compares the August 2007 marks for the Securities sold with their realized sale marks:

| Security Sold | August 2007 Mark | Actual Realized Sale Mark |
|---|---|---|
| Countrywide Alternative Loan Trust SER 2006-OC11 CL 2A2A | 98.75% of par | 51.00% of par |
| Indymac INDX Mortgage Loan Trust SER 2006-AR41 CL A3 | 99.29% of par | 67.50% of par |
| IndyMac Indx Mortgage Loan Trust 2006-AR35 2A1A | 99.29% of par | 68.125% of par |
| Adjustable Rate Mortgage Loan Trust 2006-3 4A11 | 100.02% of par | 68.125% of par |
| Bear Stearns Co. Inc. Medium-Term Floating Rate Notes (2/23/2010) | 96.49% of par | 70.00% of par |
| Bear Stearns Co. Inc. Medium-Term Floating Rate Notes (5/18/2010) | 96.26% of par | 70.00% of par |
| Long Beach Mortgage Loan Trust 2006-11 2A3 | 93.67% of par | 70.031% of par |
| Washington Mutual Asset-Backed Certificates 2007-HE1 | 96.41% of par | 72.00% of par |
| CIT Group Inc. Medium-Term Floating Rates Notes (8/17/2009) | 100.08% of par | 80.00% of par |
| Washington Mutual Floating Rate Notes (11/6/2009) | 97.63% of par | 86.50% of par |
| Securities Asset Backed Receivables 2006-3 | 97.23% of par | 90.437 % of par |
| Suntrust Bank Certificate of Deposit Floating Rate Notes (1/29/2007) | 99.18% of par | 96.80% of par |

103.    JPM was unable to sell the Securities at the listed marks because the marks did not represent actual prices.  As the difference between the realized sale marks and the marks listed in the account statements makes clear, the marks on the account statements

did not represent actual prices (even though they were clearly listed under "price" on each account statement).

104.    As NMH's investment advisor, JPM had a duty to clearly disclose to NMH all information relevant to the performance of its Portfolio. Included within this duty is the obligation to disclose to NMH that JPM's repeated affirmative assurances of the Account's performance and liquidity were made utilizing values that did not represent the actual price of the Securities.

105.    Because of JPM's deceptive and misleading practice of reassuring NMH that its Account was performing well, while simultaneously failing to disclose that the prices upon which it based those claims did not reflect the market value of the Securities, NMH was misled to believe throughout most of 2007 that its Portfolio was performing better than it really was and that the Securities had retained close to par value. Consequently, NMH was unable to make an informed evaluation of their Portfolio.

106.    JPM listed the unrealized loss for a given month on each Account Statement provided to NMH. As JPM reported:

| Time Period | Unrealized Loss Reported |
| --- | --- |
| January through June 2007 | Nominal loss (US $4,280.40) |
| July 2007 | (US $55,175.48) |
| August 2007 | (US $794,564.94) |
| September 2007 | (US $943,701.77) |
| October 2007 | (US $1,067,722.43) |
| November 2007 | (US $2,005,920.78) |
| December 2007 | (US $2,650,333.16) |

Because, however, the marks on which JPM based its unrealized loss calculation did not represent the actual prices of the Securities, JPM led NMH to believe that the Account's

unrealized loss was much lower than it actually was. It was not until August 2007 that it became apparent to NMH, based on the unrealized loss JPM reported, that the Portfolio's value had been significantly impaired, and, even then, the loss reported in September and October of 2007 only marginally increased the total loss position. Only in November, when JPM began to mark down the Securities to their "real price", did it finally begin to make clear the magnitude of NMH's loss, when indeed, the Subprime-Linked Securities in the Portfolio had been impaired long before then.

107.    Furthermore, had JPM disclosed to NMH that its performance evaluations were not based on real prices, NMH would have been able to obtain actual mark-to-market values for the Securities in question and make a properly informed decision regarding the sale of the Subprime-Linked Securities in the Account.

108.    As a direct result of JPM's misleading assurances about the performance of the Account, NMH has sustained significant losses.

### JPM Breached Its Fiduciary Duties to NMH and Violated NMH's Rights by Refusing to Provide NMH with Security-Specific Analysis.

109.    In breach of its fiduciary duties and in violation of NMH's rights, JPM has resisted NMH's attempts to obtain security-specific information and has refused to provide NMH with any analysis performed either before the purchase of the Subprime-Linked Securities or with respect to JPM's decision to hold those Securities throughout most of 2007 as the market for those Securities collapsed.

110.    In its pitch materials that Todd Brown sent to NMH in October 2006, JPM highlighted its supposed "top-down and bottom-up analysis". JPM represented that it dedicates "40% of our time and resources to the top-down aspect of our approach, which we define as formulation of the macro-economic backdrop and determining strategic

29

duration and sector positioning. Thorough bottom-up analysis commands approximately 60% of the group's time and resources". A "top down" analysis is when an investment strategy is based first on an evaluation of different investment sectors and then different companies are evaluated within those sectors. A "bottom up" analysis is when first the companies are evaluated, based on the merit of those individual companies, without reference to the general industry trends. Both aspects of the analysis are integral to strategic investment. NMH relied on JPM's representations with respect to the quality and depth of its security-specific analysis when it selected JPM as its investment advisor.

111.    In November 2007, Michael Murr contacted JPM and requested a "short write-up on every security/position in the portfolio and what the current thinking is on the credit". NMH sought this credit analysis to determine whether any of the Securities in the investment portfolio had been permanently impaired for accounting purposes. Todd Brown, however, informed Mr. Murr that he could "share with [Murr] the broader insights of [JPM's] most recent market analysis but security specific research is not available". Murr reiterated to Brown that he was interested in summaries on NMH's account portfolio positions, including JPM's current thinking on the Securities' creditworthiness, and that he was not as interested in JPM's investment process as he was in the specifics of the securities that JPM purchased on NMH's behalf.

112.    Eventually, JPM provided only a printout from Bloomberg that gave a brief sketch of each security in the Portfolio. JPM continued to refuse to provide NMH the security-specific creditworthiness analysis it requested. Moreover, when Ms. Erdely asked JPM to explain the Bloomberg printouts, JPM refused.

113.    In May 2008, NMH requested that JPM provide the prospectuses for each of the

securities currently held in the account. Stacey Solomon of JPM refused to provide that information, and instead told NMH to find it itself.

114.    NMH continued to press JPM for security-specific analysis and for JPM's internal ratings on the securities in the Account throughout the summer of 2008. On August 12, 2008, John Duffy, the Vice-Chairman of JPM, called Michael Murr. Duffy told Murr that JPM will not provide NMH with any individual security analysis of the securities in the Account. Duffy suggested that most of the material is from outside sources and not organized in any way.

115.    Upon information and belief, JPM's security selection relied primarily upon rating agency ratings and JPM itself performed little or no credit analysis of the securities in NMH's portfolio prior to purchase. JPM abdicated its own responsibilities to research the securities it purchased for NMH—services for which it charged an investment management and advisory fee. To the extent any analysis existed, JPM breached its fiduciary duties to NMH by refusing to provide an assessment of the securities' creditworthiness.

### The Foreseeability of Market Conditions is Not Relevant

116.    Plaintiff's claims are not based on the fact that Defendants failed to predict market conditions. Defendants should never have invested so much of Plaintiff's funds in Subprime-Linked Securities when it was widely reported that the housing market was weakening and inflationary pressures were rising, and the long-term maturities of those Securities were inappropriate for Plaintiff, a conservative investor concerned with liquidity. Moreover, once the breadth of the crisis was apparent, Defendants failed to heed market events. It continued to invest Plaintiff in Subprime-Linked Securities and

failed to take any action to mitigate Plaintiff's loss by selling those Securities before they were so heavily marked down.

## JPM's Conduct Was Egregious

117.    JPM acted recklessly by purchasing millions of dollars of subprime-linked securities for the Account against the backdrop of a plummeting subprime mortgage market.

118.    Upon information and belief, JPM recklessly failed to move NMH out of the Subprime-Linked Securities, despite NMH's explicit direction to do so, so as to avoid taking write-downs across all of its clients' portfolios. Moreover, upon information and belief, JPM recklessly failed to move NMH out of the Subprime-Linked Securities and failed to provide NMH with the actual prices of the Securities in the Account, in order to avoid taking write-downs on its own holdings.

119.    As described above, JPM's misconduct as described herein was outrageous, oppressive and intentional and was designed to protect its own financial performance over the interests of its clients and contrary to its clients' best interests.

120.    JPM acted in wanton disregard of NMH's rights—and the duties it owed to its client—by investing NMH's funds in long-term, illiquid and high-risk securities in contravention of NMH's stated objective of preserving its principal through short-term, liquid positions.

121.    JPM's conduct adversely affected the public interest. Upon information and belief, JPM's conduct with respect to the NMH Account is representative of a malignant pattern in the investment management industry, whereby investment managers vested with full discretion ignored market warning signs, relied on little or no actual market

analysis, and loaded the portfolios of conservative investors with highly illiquid Subprime-Linked Securities, and then failed to act responsibly in moving the investors out of those positions in order to preserve the bank's appearance of its own bottom-line. Where, as here, the staggering losses investors have suffered are the result of irresponsible and reckless investment decisions motivated by a concern with the bank's own financial performance at the expense of the investor, the public has a substantial interest in the responsible investment managers—who hold themselves out to be experts in financial advising and are trusted with full discretion over millions of dollars—being held responsible for such egregious and intentional conduct.

**First Count**
**<u>Breach of Contract</u>**
**(Against Defendant JP Morgan Chase Bank N.A.)**

122.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

123.    In opening the cash management Account at issue, NMH and JPM executed a Discretionary Portfolio Mandate and gave JPM discretion to invest the Account, subject to the investment principles which the parties agreed to in that Mandate.

124.    The Discretionary Portfolio Mandate expressly listed the preservation of capital and flexibility to withdraw funds as guidelines by which JPM was to abide in its investment decisions.

125.    Plaintiff performed its obligations under the Discretionary Portfolio Mandate.

126.    Defendant JP Morgan Chase Bank N.A. breached the Discretionary Portfolio Mandate by investing the Account in a manner that clearly contradicted the investment objectives and wholly disregarded the risk profile set forth therein.

127.    As a direct and proximate result of said breach of contract, Plaintiff has suffered and continues to suffer damages as alleged herein.

128.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.

## Second Count
## Breach of Fiduciary Duty

129.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

130.    By reason of the fact that Defendants managed the Account on a discretionary basis, Defendants owed fiduciary duties to Plaintiff, including but not limited to:  (1) the duty of loyalty; (2) the duty to act fairly and honestly; and (3) the duty to act in good faith and in the best interests of Plaintiff.  Defendants also owed a fiduciary duty to Plaintiff with respect to specific transactions and other acts, including discretionary acts that Defendants engaged in with or on behalf of Plaintiff.

131.    Defendants breached their fiduciary duties and failed to act in the best interests of Plaintiff by investing heavily in securities which were contrary to Plaintiff's stated objectives and wholly unsuitable for the Account and by failing to sell those securities when their declining value and illiquidity in the marketplace became apparent.

132.    Defendants also breached their fiduciary duty and failed to act fairly and honestly with Plaintiffs by failing to disclose material facts regarding the securities purchased.

133.    Defendants breached their fiduciary duty to Plaintiff by misrepresenting the value and maturity date of the securities held in the Account, as well as misrepresenting the effect of market events on the securities in the Account, as delineated herein.

134.    Finally, Defendants breached their duty of care by failing to adequately supervise

their employees and those working under Defendants' supervision. For example, Defendants failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in the Account.

135.    As a direct and proximate result of said breach of fiduciary duty, Plaintiff has suffered and continues to suffer damages as alleged herein.

136.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.

### Third Count
### Violation of 10(b) and Rule 10b-5 of the Securities Exchange Act

137.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

138.    Defendants, among other things, represented to Plaintiff that they would be investing Plaintiff's funds in safe, liquid, sort-term securities. In particular, Defendant told Plaintiff that it would employ an "enhanced cash strategy" that would achieve Plaintiff's capital preservation goals and consist of "funds in securities maturing modestly outside of the money market fund universe (usually between 13 and 24 months)". Plaintiff reasonably relied on that representation.

139.    Defendants' representation was false because Defendants instead invested Plaintiffs' funds in Subprime-Linked Securities that were highly illiquid, some of which had maturities more than forty years after the date of purchase. It is clear that the Defendants' representation was false when made, because it was within a very short time thereafter, and immediately upon receipt of Plaintiff's funds that Defendants invested in the illiquid Subprime-Linked Securities (during a collapse of the housing market),

contrary to their representations. In any case, the representation became false sometime prior to Defendants' investments in such securities, and Defendants had a duty to disclose this fact to Plaintiff. They never did.

140.    Defendants knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Plaintiff's funds, by which time Defendants had a duty to disclose that the representation that they would be investing Plaintiff's funds in liquid, short-term securities was no longer true.

141.    Defendants also told Plaintiff that it would seek to reduce the subprime-linked materials in the account. This representation was false because immediately thereafter, Defendants purchased almost US $30 million of Subprime-Linked Securities, despite the collapsing market. Defendants had a duty to disclose to Plaintiff that it was continuing to invest heavily in Subprime-Linked Securities, and they never did.

142.    Defendants knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Plaintiff's funds, by which time Defendants had a duty to disclose that the representation that they would seek to reduce the subprime-linked material in the Account was no longer true.

143.    Defendants had a duty to disclose to Plaintiff that those representations were false. They never did.

144.    Defendants represented to Plaintiff that the average maturity of the Securities in the Account was .1 year. This representation was false because the average maturity of more than twenty securities in the Account at that time was actually thirty years, the average maturity of the Portfolio at that time was almost twenty years, and the weighted average was over a decade. Plaintiff reasonably relied on Defendants' representations as

to the maturity of the securities in the Account.

145.    Defendants undertook to monitor the portfolio and the market on behalf of Plaintiff, while failing to disclose certain material facts that they had a duty to disclose. Defendants had a duty to disclose to Plaintiff certain material facts, including that Defendants were investing Plaintiff's cash in Subprime-Linked Securities at a time when the subprime mortgage market was in crisis and which violated Plaintiff's clearly articulated investment objectives of safety of principal and liquidity of the Account. Defendants also had the duty to communicate the material fact that the Subprime-Linked Securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Plaintiff's behalf and further failed to disclose the extent to which the Account was subprime-linked.  Defendants failed to disclose these material facts.  From those failures, it is manifest that Defendants intended to defraud Plaintiffs and allow them to believe the securities that were being purchased were in accordance with their investment objectives.

146.    Plaintiff reasonably relied on Defendants' fraudulent misrepresentations and omissions and continued to allow Defendants to exercise complete discretionary authority over the Account.

147.    As a direct and proximate result of said fraudulent misrepresentations and omissions and Plaintiff's justifiable reliance on said misrepresentations and omissions, Plaintiff suffered and continues to suffer damages as alleged herein.

148.    Plaintiff reserves the right to expand upon or amend their account of damages suffered.

**Fourth Count**
**Unsuitability, Misrepresentations and Omissions**
**Violation of 10(b) and Rule 10b-5 of the Securities Exchange Act**

149.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

150.    Defendants were aware of NMH's investment objectives to invest in safe, short-term, liquid securities and its goal to preserve the principal in the Account. Nevertheless, Defendants purchased Subprime-Linked Securities that were at a high and immediate risk of illiquidity.

151.    Those Subprime-Linked Securities were unsuited to the buyer's needs.

152.    Defendants knew or reasonably should have known that the Subprime-Linked Securities were unsuited to Plaintiff's needs because NMH had clearly expressed an investment objective of low-risk, short-term securities to ensure the preservation of capital, and that objective was set forth in the Discretionary Portfolio Mandate. Defendants knew or reasonably should have known that the Subprime-Linked Securities were unsuited to that objective because the turmoil in the subprime mortgage market was widely reported at the time that the Securities were purchased. Defendants purchased the unsuitable Subprime-Linked Securities for NMH anyway. The Securities JPM purchased were further unsuitable because they were not short-term; some had maturity dates more than 40 years from the date of purchase and were securities that JPM itself referred to as "perpetuals".

153.    Defendants had a duty to disclose to Plaintiff certain material facts about the unsuitability of the investments, including the fact that the securities in which it was investing were closely linked to the collapsing subprime market and which violated

NMH's clearly-articulated investment objectives of preserving principal and maintaining liquidity in the Account.  Defendants also had the duty to communicate the material fact that the Subprime-Linked Securities in the Account posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Plaintiff's behalf.

154.    From these failures to disclose, it is manifest that Defendants intended to defraud Plaintiff and perpetuate Plaintiff's belief that the Defendant was purchasing, and had purchased, securities in accordance with Plaintiff's investment objectives.

155.    On March 14, 2007, Plaintiff asked Defendant Brown if there was any deterioration in the asset backed securities backed by subprime mortgages.  JPM failed to disclose that it was not just the ABS-HELs that were subprime backed that the collapsing market affected.  JPM failed to disclose that other, not subprime backed securities were subprime-linked, and that those Subprime-Linked Securities comprised approximately half of the Account.  Instead, Brown informed Plaintiff that JPM "did not anticipate any issues with our current holdings".  This representation was false, in light of the market turmoil already widely reported in the subprime mortgage market.  Brown also told Plaintiff that JPM "may look to reduce even our high credit quality exposure".  This was false because rather than look to reduce the subprime exposure in the Account, Defendants purchased an additional US $29 million of Subprime-Linked Securities.

156.    On or about March 15, 2007, Defendant Brown wrote a letter to Plaintiff informing it that the average maturity of the securities in the Account was 0.1 year.  This was false because, at that time, the average maturity of the securities in the Account was almost twenty years and the weighted average was over a decade.  Indeed, the Account contained 22 different securities with maturities of more than 30 years.

157.    Defendants had a duty to disclose to Plaintiff that the representations described above were false.  They never did so.

158.    Plaintiff reasonably relied upon Defendant's fraudulent misrepresentations and omissions.

159.    As a direct and proximate cause of said fraudulent misrepresentation, Plaintiff has suffered and continues to suffer damages as alleged herein.

160.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.

**Fifth Count**
**Unauthorized Trading, Misrepresentations and Omissions**
**Violation of 10(b) and Rule 10b-5 of the Securities Exchange Act**

161.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

162.    Defendants had a responsibility to Plaintiff to purchase only those securities that were in accordance with the investment objectives and risk tolerance of Plaintiff, as outlined in the Discretionary Portfolio Mandate.  Prior to executing any trades contrary to those objectives, Defendants were required to obtain from Plaintiff formal written authorization of a switch in investment strategy.

163.    Nevertheless, Defendants conducted transactions on behalf of Plaintiff to purchase securities that were contrary to stated investment objectives without seeking authorization.  In particular, Defendants purchased Subprime-Linked Securities that fell far outside the Plaintiff's liquidity and principal preservation investment objectives.

164.    Having represented to Plaintiff that they would abide by the Discretionary Portfolio Mandate and invest the Account primarily in liquid, safe, short-term securities

that would preserve the Account's principal, Defendants instead invested approximately half of the Account in Subprime-Linked Securities that were at a high and immediate risk of illiquidity.

165.    After engaging in the unauthorized purchase of Subprime-Linked Securities, Defendants misled Plaintiff about the nature of the securities in the Account in order to conceal those securities' illiquidity, and thereby acted with the intent to defraud Plaintiff.

166.    As a direct and proximate cause of said unauthorized trading, Plaintiff has suffered and continues to suffer damages as alleged herein.

167.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.


**Sixth Count**
**Violation of Section 20(a) of the Exchange Act**
**(Against Defendant JP Morgan Chase Bank N.A.)**


168.    Plaintiff incorporates by reference the foregoing paragraphs as if set forth herein.

169.    JP Morgan Chase Bank, N.A., by virtue of its function as the employer of Defendant Todd Brown, and others, acted as a Controlling Person of its employees, including Defendant Todd Brown, within the meaning of Section 20 of the Exchange Act.

170.    As alleged above, Defendant Todd Brown of JPM, violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act, by, *inter alia*, fraudulently failing to disclose the unsuitability of the Subprime-Linked Securities purchased for the Account, fraudulently misrepresenting the maturities of the Securities in the Account, and fraudulently misrepresenting the way in which JPM would manage the Account.

41

171.    Defendant JP Morgan Chase Bank N.A., at all times relevant, did employ Defendant Todd Brown.    Defendant JP Morgan Chase Bank N.A. had the power, influence and authority to cause, and did cause, Todd Brown to engage in the wrongful conduct described herein.

172.    In particular, Defendant JP Morgan Chase Bank N.A. was consciously reckless with respect to its implementation or enforcement of supervisory and compliance procedures among its employees responsible for making and recommending purchases in the Account.    Moreover, Defendant JP Morgan Chase Bank N.A., through its accepted practices or policies, recklessly enabled Defendant Todd Brown to rely on valuations that did not reflect real prices in making affirmative assurances as to the performance of the Account, and further enabled Defendant Todd Brown to misrepresent the maturity of the securities in the Account.    Defendant JP Morgan Chase Bank N.A., upon information and belief, was also reckless in representing to its clients, including NMH, an intense research infrastructure, and then failing to adequately research or require research of the securities purchased for the Account.    Defendant JP Morgan Chase Bank N.A. was thus a culpable participant in the fraud committed by Defendant Todd Brown.

173.    As a direct and proximate cause of said violation of Section 20(a) of the Exchange Act, Plaintiff has suffered and continues to suffer damages as alleged herein.

174.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.

**Seventh Count**
**Fraudulent Misrepresentations and Omissions**

175.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

176.   Among other things, Defendants represented to Plaintiff that they would be investing Plaintiff's funds in safe, liquid, sort-term securities. Plaintiff reasonably relied on that representation.

177.   Defendants' representation was false because Defendants instead would invest Plaintiffs' funds in Subprime-Linked Securities that were highly illiquid, some of which had maturities more than forty years after the date of purchase. It is clear that the representation was false when made, because it was within a very short time thereafter, and immediately upon receipt of Plaintiff's funds that Defendants invested in the illiquid Subprime-Linked Securities (during a collapse of the housing market), contrary to their representations. In any case, the representation became false sometime prior to Defendants' investments in such securities, and Defendants had a duty to disclose this fact to Plaintiff. They never did.

178.   Defendants knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Plaintiff's funds, by which time Defendants had a duty to disclose that the representation that they would be investing Plaintiff's funds in liquid, short-term securities was no longer true.

179.   Defendants also told Plaintiff that it would seek to reduce the subprime-linked materials in the account. This representation was false because immediately thereafter, Defendants purchased almost US $30 million of Subprime-Linked Securities, despite the collapsing market. Defendants had a duty to disclose to Plaintiff that it was continuing to

invest heavily in Subprime-Linked Securities, and they never did.

180.    Defendants knew, or were at least reckless in not knowing, that the representation was false either when made or at least prior to their investment of Plaintiff's funds, by which time Defendants had a duty to disclose that the representation that they would seek to reduce the subprime-linked material in the Account was no longer true.

181.    Defendants had a duty to disclose to Plaintiff that those representations were false. They never did so.

182.    Defendants undertook to monitor the portfolio and the market on behalf of Plaintiff, while failing to disclose certain material facts that they had a duty to disclose. Defendants had a duty to disclose to Plaintiff certain material facts, including that Defendants were investing Plaintiff's cash in Subprime-Linked Securities at a time when the subprime mortgage market was in crisis, and which violated Plaintiff's clearly articulated investment objectives of safety of principal and liquidity of the Account. Defendants also had the duty to communicate the material fact that the Subprime-Linked Securities posed significant risks of long-term illiquidity and loss of principal prior to making the purchases on Plaintiff's behalf. Defendants failed to disclose these material facts. From those failures, it is manifest that Defendants intended to defraud Plaintiffs and allow them to believe the securities that were being purchased were in accordance with their investment objectives.

183.    Plaintiff reasonably relied on Defendants' fraudulent misrepresentations and omissions and continued to allow Defendants to exercise complete discretionary authority over the Account.

184.    As a direct and proximate result of said fraudulent misrepresentations and

omissions and Plaintiff's justifiable reliance on said misrepresentations and omissions, Plaintiff suffered and continues to suffer damages as alleged herein.

185.    Plaintiff reserves the right to expand upon or amend their account of damages suffered.

### Eighth Count
### Negligent Misrepresentations and Omissions

186.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

187.    Defendants and Plaintiff had a special relationship such that the Defendants owed a duty to Plaintiff not to negligently misrepresent material facts or fail to disclose material facts.  Among other things, Defendants and Plaintiff had privity of contract and Defendants served as Plaintiff's fiduciary and investment advisor.

188.    Defendants represented to Plaintiff, *inter alia*, that they would be investing Plaintiff's funds in safe, liquid, short-term securities.  Defendants were aware that Plaintiff would rely upon the sample portfolio and description of the enhanced cash strategy, and Plaintiff did in fact reasonably rely on Defendants' statements in deciding to invest US $120 million with Defendants.

189.    Defendants' representation was false because Defendants instead invested Plaintiffs' funds in Subprime-Linked Securities that were highly illiquid, some of which had maturities more than forty years after the date of purchase.  Defendants failed to inform Plaintiff about the toxicity of the Securities it was investing in and did not adequately inform them of the long-term maturity dates of the securities in the Portfolio.

190.    Defendants also told Plaintiff that it would seek to reduce the subprime-linked materials in the account.  This representation was false because immediately thereafter,

Defendants purchased almost US $30 million of Subprime-Linked Securities, after it made that representation and despite the collapsing market.

191.    Due to their relationship and otherwise, Defendants had a duty to disclose this information to Plaintiffs.  Defendants were aware the Plaintiff would rely on its representations and omissions in investing their funds in the Account and managing that Account and Defendants knew, or were at least negligent, grossly negligent, or reckless in not knowing, that the representation was false either when made or at least prior to their investment of Plaintiff's funds, by which time Defendants had a duty to disclose that the representation that they would be investing Plaintiff's funds in liquid, short-term securities was no longer true.   Plaintiff relied upon Defendants' representations and omissions and was fully entitled to do so because Defendants were vested with discretionary authority over the Account.  By their conduct and the agreements between the parties, Defendants clearly understood that Plaintiff was relying upon its representations and omissions.

192.    As a direct and proximate cause of said negligent misrepresentation, Plaintiff has suffered and continues to suffer damages as alleged herein.

193.    Plaintiff reserves the right to expand upon or amend its account of damages suffered.

**Ninth Count**
**Negligence**

194.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

195.    As Plaintiff's investment account managers, Defendants owed Plaintiff a duty of

care.

196.    Defendants breached that duty of care by negligently purchasing unsuitable and unauthorized Subprime-Linked Securities on Plaintiff's behalf in the midst of a collapse of the housing market and then negligently failed to sell those securities at a time when it could have recovered substantial value for the securities.

197.    Defendants also breached their duty of care to Plaintiff by failing to adequately supervise their employees and those working under Defendants' supervision.    For example, Defendants failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in the Account.    Had Defendants implemented and enforced protocols for the review of purchases made by its employees, Defendants would have been forced to further document the fact that the unsuitable securities were purchased, that those securities were not sold in time to mitigate Plaintiff's losses, that material facts were not disclosed, that fiduciary duties were breached, that securities regulations were violated, and that the account was managed in violation of Plaintiff's investment objectives. It is manifest that Defendants failed to maintain and enforce a proper system of internal supervision over team members and that failure fell below the industry standard of care.    Defendants negligently failed to provide adequate instruction with regard to supervision of transactions in securities executed by its representatives.

198.    Plaintiff has been injured and has sustained damages thereby as alleged herein.

199.    Defendants' negligence was the direct and proximate cause of Plaintiff's injuries and damages.

200.    Plaintiff reserves the right to expand upon or amend their account of damages suffered.

## Tenth Count
### Gross Negligence

201.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

202.    In injuring Plaintiff as described herein, Defendants not only acted carelessly, but they were so careless that it was equivalent to recklessness.

203.    Defendants' conduct evidences a reckless disregard for the rights of Plaintiff.

204.    As such, Defendants committed gross negligence.

205.    Plaintiff has been injured and has sustained damages thereby as alleged herein.

206.    Defendants' gross negligence was the direct and proximate cause of Plaintiff's injuries and damages.

207.    Plaintiff reserves the right to expand upon or amend their account of damages suffered.

### Prayer for Relief

208.    WHEREFORE, Plaintiff requests the following relief:

a.    An order declaring that Defendants mismanaged Plaintiff's account and violated the investment objectives and compelling Defendants to purchase from Plaintiff all currently illiquid securities at par value plus accrued interest; and

b.    An order rescinding the Agreement between NMH and JPM and returning to NMH the principal it initially invested in the Account;

c.    Disgorgement of any and all investment management fees that NMH paid to JPM; and

d.    An award against Defendants for:

    i.    Damages in an amount to be determined at trial for the losses incurred by NMH;

    ii.    Interest;

    iii.    Reasonable attorneys' fees and costs of suit;

    iv.    Punitive damages; and

    v.    Such other relief as is just, fair and equitable.

Dated:  September 2, 2008
       New York, New York

Respectfully submitted,

KOBRE & KIM LLP

Michael S. Kim (MK-0308)
Steven W. Perlstein (SP-7841)
Carrie A. Tendler (CT-7920)

800 Third Avenue
New York, New York 10022
Tel: 212.488.1200
Fax: 212.488.1220

*Attorneys for*
*NM Homes One, Inc.*

# EXHIBIT 1

| Security | Buy Date | Classification |
|---|---|---|
| Citigroup Mortgage Loan Trust Inc SER 2007-AHL2 CL A3A (5/25/37) | 5/16/2007 | ABS-HEL |
| Countrywide Asset-Backed Certs SER 2007-8 CL 2A1 (11/25/37) | 5/21/2007 | ABS-HEL |
| Equifirst Loan Securitization Trust SER 2007-1 CL A2A (4/25/37) | 6/21/2007 | ABS-HEL |
| Master Asset Backed Securities Trust SER 2006-HE5 CL A3 (11/25/36) | 12/6/2006 | ABS-HEL |
| Merrill Lynch First Franklin Mgt Ln 2007-3CL A2B (6/25/37) | 5/23/2007 | ABS-HEL |
| Nationstar Home Equity Loan Trust SER 2007-C CL 2AV2 (6/25/37) | 5/23/2007 | ABS-HEL |
| Option One Mortgage Loan Trust SER 2007-6 CL 2A2 (7/25/37) | 5/17/2007 | ABS-HEL |
| Wells Fargo Home Equity Trust SER 2006-3 CL A2 (1/25/37) | 12/5/2006 | ABS-HEL |
| Long Beach Mortgage Loan Trust SER 2006-11 CL 2A3 (12/25/36) | 12/8/2006 | ABS-HEL |
| Securitized Asset Backed Receivables LLC SER 2006-WM3 CL A2 (10/25/36) | 11/21/2006 | ABS-HEL |
| SVHE 2007-NS1 M2 (1/25/2037) | 3/2/2007 | ABS-HEL |
| Adjustable Rate Mortgage Trust SER2007-1 CL 5A31 (3/25/37) | 2/23/2007 | CMO |
| Banc of America Funding Corporation SER 2007-A CL 2A1 (2/20/47) | 1/26/2007 | CMO |
| Bear Stearns Mortgage Funding Trust SER 2007-AR5 CL 2A1 (6/25/37) | 6/22/2007 | CMO |
| Countrywide Alternative Loan Trust SER 2006-OA2 A1 (5/20/46) | 6/25/2007 | CMO |
| Countrywide Alternative Loan Trust SER 2006-OC11 CL 2A2A (1/25/37) | 12/15/2006 | CMO |
| Countrywide Alternative Loan Trust SER 2007-OA10 CL 2A1 (9/25/47) | 7/25/2007 | CMO |
| Countrywide Alternative Loan Trust SER 2007-OH1 CL A1D (4/25/47) | 5/22/2007 | CMO |
| Fannie Mae SER 2006-115 CL BF (12/25/36) | 11/15/2006 | CMO |
| Greenpoint Mortgage Funding Trust SER 2006-OH1 CL A1 (1/25/37) | 12/21/2006 | CMO |
| Harborview Mortgage Loan Trust SER 2005-13 CL 2A11 (2/16/36) | 8/9/2007 | CMO |
| Harborview Mortgage Loan Trust SER 2006-14 CL 2A1A (3/29/38) | 12/5/2006 | CMO |
| Harborview Mortgage Loan Trust SER 2007-1 CL 2A1A (4/19/38) | 2/14/2007 | CMO |
| Harborview Mortgage Loan Trust SER 2007-5 CL A1A (9/19/37) | 6/26/2007 | CMO |
| HVMLT 2007-1 2A1A CMTMT (3/25/2037) | 2/14/2007 | CMO |
| HVMLT 07-05 2A1 CMTMT (7/25/2037) | 6/26/2007 | CMO |
| INDX 2006-FLX1 A1 (10/25/36) | 3/7/2007 | CMO |

| Security | Buy Date | Classification |
|---|---|---|
| INDX 2006-FLX1 A1 (10/25/36) | 5/17/2007 | CMO |
| Indymac INDX Mortgage Loan Trust SER 2006-AR41 CL A3 (2/25/37) | 12/22/2006 | CMO |
| Residential Accredit Loans Inc SER 2007-QH1 CL A1 (2/25/37) | 1/25/2007 | CMO |
| Residential Accredit Loans Inc SER 2007-Q01 CL A1 (12/31/49) | 1/23/2007 | CMO |
| Residential Accredit Loans, Inc. SER 2007-QH2 CL A1 (3/25/37) | 2/16/2007 | CMO |
| TMST 2006-A1 ABS SER 2006-6 A1 FRN (11/25/11) | 11/17/2006 | CMO |
| Wamu Mortgage Pass-Thru Certificates SER 2005-AR17 CL A1A1 (12/25/45) | 8/9/2007 | CMO |
| Adjustable Rate Mortgage Trust SER 2006-3 CL 4A11 (8/25/36) | 12/5/2006 | CMO |
| Indymac INDX Mortgage Loan Trust SER 2006-AR35 CL 2A1A (1/25/37) | 11/28/2006 | CMO |
| Washington Mutual Asset-Backed Certificates SER 2007 HE1 CL 2A3 (1/25/37) | 1/11/2007 | CMO |
| Bank of America NA Floating Rate Notes (2/27/09) | 2/22/2007 | FRN |
| Bank of America NA Floating Rate Notes (6/12/09) | 6/5/2007 | FRN |
| Bear Stearns Co. Inc Medium Term Floating Rate Notes (2/23/10) | 2/20/2007 | FRN |
| Bear Stearns Co. Inc Medium Term Floating Rate Notes (5/18/10) | 5/15/2007 | FRN |
| Calyon NY Certificate of Deposit Floating Rate Note (2/22/10) | 2/15/2007 | FRN |
| Capital One Bank FSB Certificate of Deposit Floating Rate (3/13/09) | 3/28/2007 | FRN |
| CIT Group Inc Medium Term Floating Rate Notes (8/17/09) | 11/21/2006 | FRN |
| Citigroup Funding Inc Medium Term Floating Rate Notes (6/26/09) | 6/22/2007 | FRN |
| Citigroup Inc Floating Rate SR Notes (8/13/10) | 8/6/2007 | FRN |
| Credit Suisse FB USA Inc SR Notes Floating Notes (12/9/08) | 1/17/2007 | FRN |
| Credit Suisse USA Inc Floating Rate Notes (11/20/09) | 11/15/2006 | FRN |
| Goldman Sachs CAP III Floating Rate Notes (2049) | 5/8/2007 | FRN |
| Goldman Sachs Group Inc Floating Rate Notes (12/23/09) | 12/20/2006 | FRN |
| Goldman Sachs Group Inc Floating Rate Notes (12/23/09) | 2/7/2007 | FRN |
| HSBC Finance Corp Floating Rate Notes (3/12/10) | 3/8/2007 | FRN |
| HSBC Finance Corp Floating Rate Notes (10/21/09) | 11/15/2006 | FRN |
| Lehman Bros. HLDG CP VIII Floating Rate Notes (2049) | 5/8/2007 | FRN |

| Security | Buy Date | Classification |
|---|---|---|
| Lehman Bros. Holdings Medium Term Floating Rate Notes (11/10/09) | 11/21/2006 | FRN |
| Lehman Bros. Holdings Medium Term Floating Rate Notes (12/23/08) | 12/18/2006 | FRN |
| Merrill Lynch & Co. Medium Term Floating Rate Notes (12/4/09) | 6/15/2007 | FRN |
| Morgan Stanley Floating Rate SER GMTN (2/9/2009) | 1/17/2007 | FRN |
| Morgan Stanley Dean Witter Medium Term SR Floating Rate Notes (1/2010) | 1/11/2007 | FRN |
| Morgan Stanley Dean Witter Medium Term SR Floating Rate Notes (2/9/09) | 6/28/2007 | FRN |
| PNC Bank NA Certificate of Deposit Floating Rate Notes (1/27/09) | 7/24/2007 | FRN |
| PNC Funding Corp Floating Rate Notes (6/12/09) | 6/7/2007 | FRN |
| Suntrust Bank Certificate of Deposit Floating Rate Notes (1/29/10) | 1/24/2007 | FRN |
| UBS AG Stamford CT Floating Rate SR Notes (7/23/09) | 7/18/2007 | FRN |
| Wachovia Bank NA Floating Rate Notes (2/23/09) | 2/20/2007 | FRN |
| Washington Mutual Bank Floating Rate Notes (11/6/09) | 11/30/2006 | FRN |
| Wells Fargo Co Medium Term Notes (6/18/10) | 6/12/2007 | FRN |