UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x
                                              :
                                              :
NM HOMES ONE, INC.                            :
                                              :
                    Plaintiff,                :    08 CV 7679 (SWK)
                                              :
v.                                            :    ECF CASE
                                              :
JP MORGAN CHASE BANK, N.A. AND TODD           :
BROWN,                                        :
                                              :
                    Defendants.               :
                                              :
                                              :
————————————————————— x

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

KOBRE & KIM LLP
Michael S. Kim
Steven W. Perlstein
Carrie A. Tendler

800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

*Attorneys for Plaintiff NM Homes One Inc.*

**Table of Contents**

Page

Preliminary Statement ........................................................................................................ 1

Statement of Facts ............................................................................................................. 4

    I.      JPM AND NMH AGREED ON A CONSERVATIVE INVESTMENT
          STRATEGY .............................................................................................. 4

    II.     AFTER THE HOUSING MARKET WAS ALREADY IN
          SUBSTANTIAL DECLINE, JPM FILLED NMH'S PORTFOLIO
          WITH SECURITIES THAT WERE LINKED TO THE SUBPRIME
          MORTGAGE MARKET WITHOUT ANY PRUDENT
          DIVERSIFICATION. ................................................................................ 5

    III.    AS THE HOUSING MARKET WORSENED, JPM CONTINUED
          INVESTING NMH IN SUBPRIME-LINKED SECURITIES .................. 6

    IV.    JPM REPEATEDLY MISLED NMH IN ORDER TO COVER-UP
          ITS RECKLESS AND UNSUITABLE INVESTMENTS. ...................... 8

          A.      JPM Misrepresented The Average Maturity Of The Portfolio. ...... 8

          B.      JPM Misrepresented The Content Of NMH's Account. ................. 8

          C.      JPM Misrepresented The Value And Performance Of NMH's
                Account. ........................................................................................ 9

    V.     JPM REFUSED TO SHARE BASIC INFORMATION ABOUT
          THE SECURITIES IN THE ACCOUNT. ............................................. 10

Argument ........................................................................................................................ 11

    I.      JPM'S MOTION TO DISMISS NMH'S NON-FRAUD BASED
          CLAIMS SHOULD BE DENIED BECAUSE JPM'S
          ARGUMENTS IN SUPPORT OF DISMISSAL ARE
          WITHOUT MERIT. ............................................................................... 11

          A.      The New York State Martin Act Does Not Bar Plaintiff's
                Non-Fraud Based Tort Claims Because Those Claims
                Are Not Based On Dishonesty Or Deception. ............................... 11

B.      JPM Cannot Hide Behind An Exculpatory Clause When It Materially Breached The Contract Containing The Clause And Also When It Is Plaintiff's Fiduciary Managing Its Account On A Discretionary Basis. .............................................. 16

        1.     A Party That Materially Breaches A Contract Cannot Benefit From That Contract's Terms. ................. 16

        2.     The Exculpatory Clause Does Not Shield JPM From Liability Because JPM Agreed To Manage The Account On A Discretionary Basis. .................................. 17

C.      Plaintiff's Breach Of Fiduciary Duty Claim Should Not Be Dismissed Because The Breach Of Fiduciary Duty Claim Is Not Duplicative Of The Breach Of Contract Claim. ............... 19

II.    THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER BECAUSE JPM'S MISREPRESENTATIONS ABOUT THE MATURITY, PERFORMANCE AND CONTENT OF THE ACCOUNT EVIDENCE CONSCIOUS MISBEHAVIOR OR RECKLESSNESS. .................................................................... 22

A.      Contrary To Providing "Complete and Accurate" Information, JPM Lied To NMH About The Maturity Of The Account. ............................................... 23

B.      JPM Invested NMH In Unsuitable Securities And Then Misrepresented The Nature Of The Securities It Purchased For The Account. ......................................... 26

C.      JPM Misrepresented The Performance Of The Account. ............. 28

III.   BECAUSE OF THE DOCUMENT-INTENSIVE NATURE OF THIS CASE AND BECAUSE MOST OF THE RELEVANT DOCUMENTS ARE IN THE EXCLUSIVE POSSESSION OF DEFENDANTS, DISMISSAL OF NMH'S CLAIMS IS UNWARRANTED. ................................................................. 30

Conclusion ...................................................................................... 32

## Table of Authorities

**Cases**                                                             **Page(s)**

*380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199 (S.D.N.Y. 2008) .......... 31

*In re Allegheny Int'l, Inc.*, 100 B.R. 244 (W.D. Pa. 1989) ................................ 17

*Ash v. New York Univ. Dental Center*, 564 N.Y.S.2d 308 (1990) .............................. 17-18

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................. 11

*Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc.*, 729 N.Y.S.2d 142
   (2nd Dep't. 2001) ........................................................................ 21

*Bolt Elec. Inc. v. City of New York*, 53 F.3d 465 (2d Cir. 1995) ...................................... 11

*Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) .......................... 13-14

*Champion Home Builders Co. v. ADT Sec. Servs, Inc.*, 179 F. Supp. 2d 16
   (N.D.N.Y. 2001) ........................................................................ 18

*Concha v. London*, 62 F.3d 1493 (9th Cir. 1995) ............................................. 31

*Consol. Risk Serv., Inc. v. Automobile Dealers WC Self Ins. Trust*,
   No. 1:06-CV-871 (FJS/RFT), 2007 WL 951565 (N.D.N.Y. 2007) .............................. 20

*Cornell v. T.V. Dev. Corp.*, 215 N.E.2d 349 (N.Y. 1966) ................................ 16

*Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2498 (DLC), 2001 WL 1112548
   (S.D.N.Y. Sept. 19, 2001) ............................................................... 12

*Davis v. Dime Savings Bank of New York*, 557 N.Y.S.2d 775 (3rd Dep't. 1990) ............ 21

*Dimsey v. Bank of New York*, No. 600391/2006, 2006 WL 3740349
   (N.Y. Sup. Aug. 24, 2006) ............................................................... 21

*In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 (S.D.N.Y 1991) .................... 18

*Fanta v. Muriel Siebert & Co., Inc.*, No. 114837/06, 2008 WL 3521334
   (N.Y. Sup. July 11, 2008) ............................................................... 21

*Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205 (2d Cir. 2004) ..................................... 11

*Gross v. Diversified Mortgage Investors,* 438 F. Supp. 190 (S.D.N.Y. 1977) ................ 31

*Gross v. Sweet*, 400 N.E.2d 306 (N.Y. 1979) ................................................. 17

**Page(s)**

*Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704 (S.D.N.Y. 2008) ..................... 22

*In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189 (S.D.N.Y. 2004) ......... 29, 30

*Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269 (S.D.N.Y. 2008) ........... 24

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 461 F. Supp. 951
    (E.D. Mich. 1978) ........................................................................ 20, 22

*Louros v. Kreicas*, 367 F. Supp. 2d 572 (S.D.N.Y. 2005) ................................. 13

*Malik v. Toss 29, Inc.*, No. SP 135/07, 2007 WL 926297
    (N.Y. Dist. Ct. Mar. 29, 2007) ................................................ 16

*Mandelblatt v. Devon Stores, Inc.*, 521 N.Y.S.2d 672 (1st Dep't. 1987) ....................... 19

*In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143 (D. Conn. 2001)............. 24

*Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 84 N.Y.2d 430 (1994).......... 18

*Meyers v. Waverly Fabrics*, 479 N.E.2d 236 (N.Y. 1985) ............................... 19

*Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000)........................................ 24, 29

*Obremski v. Image Bank, Inc.*, 816 N.Y.S.2d 448 (1st Dep't 2006) ............................. 18

*In re Philips Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463 (S.D.N.Y. 2004) ................... 23

*Pietrangelo v. NUI Corp.*, No. Civ. 04-3223(GEB), 2005 WL 1703200
    (D.N.J. 2005)............................................................................. 31

*Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB),
    2008 WL 2275902 (S.D.N.Y. 2008)................................................. 20

*Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (4th Dep't 2001)........................ 12

*Sergeants Benevolent Assoc. Annuity Fund v. Renck*, 796 N.Y.S.2d 77
    (1st Dep't. 2005) ...................................................................... 20

*Shernoff v. Schimel*, 112 N.Y.S.2d 333 (1952)................................................. 16

*Stewart v. Jackson & Nach*, 976 F.2d 86 (2d Cir. 1992) ................................... 11

**Page(s)**

*Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) ................................................... 18

*In re Sunpoint Sec. Inc.*, 377 B.R. 513 (E.D. Tex. 2007) ................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499 (2007) ......................... 28-30

*Travelers Indem. Co. of Conn. v. Losco Group Inc.*, 136 F. Supp. 2d 253
   (S.D.N.Y. 2001) ..................................................................................... 18

*U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*,
   554 F. Supp. 2d 523 (S.D.N.Y. 2008)...................................................... 29

*Williams v. J.P. Morgan & Co. Inc.*, 248 F. Supp. 2d 320 (S.D.N.Y. 2003).............. 16-17

**<u>Statutes</u>**

N.Y. Gen. Bus. Law § 352-c(1) ...................................................................... 12

**<u>Rules</u>**

Fed. R. Civ. P. 15(a) ..................................................................................... 31

Plaintiff NM Homes One, Inc. ("NMH") respectfully submits this memorandum of law in opposition to Defendants JP Morgan Chase Bank, N.A.'s and Todd Brown's (together, "JPM") motion to dismiss the Second through Tenth Counts of the NMH's complaint, dated September 2, 2008 (the "Complaint").

## Preliminary Statement

The allegations in the Complaint—taken as true for the purpose of defendants' motion to dismiss—demonstrate a simple but troubling course of recent events:  JPM, who had discretionary trading authority over NMH's account and who was acting as NMH's investment manager, recklessly disregarded a declining housing market and warnings supplied by its own analysts about the market, ignored its client's stated trading goals (such as to preserve capital) and made irresponsible investment decisions (such as failing to diversify NMH's holdings and purchasing improper securities) in breach of its fiduciary, contractual and other obligations.   JPM then misrepresented (either intentionally or recklessly) the content, liquidity and performance of NMH's account in order to cover-up its irresponsible and imprudent behavior.   Now, defendants seek to avoid all responsibility for their misdeeds by pointing to supposedly unpredictable and unknowable "market forces" as the root of all evil.

This is not a case about "20/20 hindsight", as defendants would have the Court believe.  This case is about JPM ignoring its obligations to its client and providing false information that prevented NMH from remedying JPM's recklessness until after NMH had already incurred substantial losses and effectively lost access to its capital due to illiquidity of the securities at issue.  Importantly, JPM invested NMH in securities linked to subprime mortgages <u>after</u> it was widely known that the housing market was in a severe

decline and <u>JPM's own analysts</u> warned that the market was in serious trouble and would decline further.

Then, apparently having wholly failed to pay any attention whatsoever to the investment warnings circulating in the financial community about the toxicity of the mortgage market—including those warnings issued by its own analysts—JPM misrepresented critical facts to NMH.   For example, JPM informed NMH that the average maturity of the securities in the account was 0.1 year when it was, at least, *over a decade*.  JPM also falsely downplayed NMH's exposure to the declining housing market, misrepresented the performance of the account, and refused to provide basic analytical information.   Even setting aside the issue whether JPM should have known it was purchasing unsuitable securities, there is no excuse for JPM's failure to diversify the account, failure to provide accurate information about the account, and JPM's failure to keep its client properly informed about the contents of the account.

JPM sets forth a number of grounds on which it seeks to avoid liability:  (1) preemption under the Martin Act of NMH's non-fraud state-law claims; (2) an exculpatory clause for JPM's negligence found in the agreement between the parties; (3) allegedly duplicative contract and fiduciary duty claims; and (4) a purported lack of scienter with respect to the fraud claims.  All of JPM's arguments are without merit and should be rejected.

<u>First</u>, defendants argue that New York's Martin Act applies to bar NMH's non-fraud common law claims.  But those claims are outside of the Martin Act's purview because the allegations underlying those claims are not based on dishonesty or deceit and case law makes clear that only non-fraud claims based on dishonesty or deceit are barred

by the Martin Act.  Here, NMH's claims based on JPM's failure to preserve NMH's capital, follow the trading strategy outlined in the documents provided to NMH, diversify NMH's holdings, provide information about the securities in the account, and supervise its employees, have nothing to do with deception or dishonest conduct and, thus, are not preempted.  (*Infra* Part I.A)

Second, defendants seek to rely on contractual language that purports to exculpate JPM for its own negligence.  But a party that materially breaches a contract, such as JPM in this case, cannot then seek to take advantage of the terms of that agreement.  In any event, even if it otherwise could avail itself of the contract (and it cannot) JPM, a fiduciary of NMH managing its account on a discretionary basis, cannot, as a matter of public policy, contract-out of responsibility for its negligence.  (*Infra* Part I.B)

Third, NMH's breach of contract and breach of fiduciary duty claims are not duplicative, as defendants suggest, because the same conduct can be alleged in support of both causes of action where JPM's contractual duties are separate and distinct from its fiduciary duties as investment manager of a discretionary account.  Defendants also neglect to mention that NMH did not assert a breach of contract claim against defendant Brown, making this argument inapplicable to him.  (*Infra* Part I.C)

Fourth, defendants argue that plaintiff failed to allege scienter because the allegations in the complaint establish that JPM provided NMH with "complete and accurate" information.  Nowhere, however, do defendants offer any non-fraudulent explanation for its clear misrepresentations, and in particular, for its outright lie to NMH that the average maturity (a critical indicator of liquidity) of NMH's account in March 2007 was 0.1 year, when in fact, the average maturity of the securities in the account was

more than a decade.  Defendants also fail to address how those statements by JPM about NMH's exposure to the mortgage market or the account's performance, which NMH alleges were false, were "complete and accurate."  (*Infra* Part II)

Fifth, dismissal of NMH's claims here would be unwarranted.  This is a document-intensive case, and, in particular, the questions of JPM's diligence and intent while it was managing NMH's account and making material misrepresentations and omissions to NMH are document-intensive ones and most, if not all, of the relevant documents are in JPM's exclusive possession.  (*Infra* Part III)

### Statement of Facts

## I.   JPM AND NMH AGREED ON A CONSERVATIVE INVESTMENT STRATEGY.

In the fall of 2006, NMH began discussions with JPM about opening an investment management account.  (Compl. ¶2)  NMH was clear about its investment objectives:  It sought low-risk investments with short-term maturities and liquidity so that it could utilize the funds for near-term development projects.  (*Id.* ¶23)  JPM represented that its "enhanced cash strategy" was suited to accomplish those objectives and that the "enhanced cash strategy" would preserve NMH's principal while maximizing returns. (*Id.* ¶¶25, 29)  In particular, JPM told NMH that the funds would be invested in securities maturing "modestly outside of the money market fund universe (usually between 13 and 24 months)" and provided a sample portfolio to NMH.  (*Id.* ¶¶26, 31; Rosen Decl. Ex. A at 4.)[1] JPM also touted the intensive analysis it supposedly conducts as a basis for its investment decisions.  (*Id.* ¶24)

---

[1] In the Complaint NMH provided that the sample portfolio contained securities which matured between one day and just over two years.  (Compl. ¶81; *see also id.* ¶31)  While in fact it was not 100% of the securities with those maturities, approximately 97% of the sample portfolio had such short maturities.  In

In November 2006, based on JPM's representations as to how it would manage NMH's funds, the parties executed a Discretionary Portfolio Mandate, which supplied JPM with control over NMH's investments, and opened an investment management account (the "Account" or the "Portfolio"). (Compl. ¶33)  The Mandate recognized that NMH was a conservative investor that wanted an investment strategy that would preserve its ability to "purchase or sell assets in the Account at the desired time to realize gain or to prevent or minimize loss" (i.e., preserve liquidity) and that would "seek income and principal stability".  (*Id.* ¶¶34-35; Rosen Decl. Ex. B at 1.)  NMH eventually transferred US $130 million to JPM for it to invest consistent with the strategy agreed to by the parties.  (Compl. ¶36)

II.   **AFTER THE HOUSING MARKET WAS ALREADY IN SUBSTANTIAL DECLINE, JPM FILLED NMH'S PORTFOLIO WITH SECURITIES THAT WERE LINKED TO THE SUBPRIME MORTGAGE MARKET WITHOUT ANY PRUDENT DIVERSIFICATION.**

Even before NMH opened its investment management Account with JPM, news outlets such as CNNMoney.com, the New York Times and the International Herald Tribune were reporting (as early as September 2006) that the once-booming U.S. housing market was slowing down and that, as a result, the values of mortgages were declining and the delinquency rates on mortgages were steadily rising.  (*Id.* ¶45)  That declining market rendered securities that were backed by or linked to subprime mortgages particularly risky.  (*Id.* ¶¶46-47)

---

any event, the Portfolio contained within NMH's Account was not consistent with either the sample portfolio or the other documents related to the Account such as the description of the enhanced cash strategy, discretionary portfolio mandate, JPM's March 2007 letter and the March 2007 investment management account review.  (Compl. ¶¶25-35, 83-90)

But in reckless disregard of market conditions, its own "enhanced cash strategy", NMH's investment objectives and the prudence of diversification, JPM invested more than US $24.5 million of NMH's funds in securities that were collateralized with subprime loans and other types of mortgage loans, as well as securities issued by financial institutions issuing and holding subprime-collateralized securities ("Subprime-Linked Securities" or "Securities") throughout November, December and January.  (*Id.* ¶49)  By the end of January 2007, nearly 60% of NMH's actively managed portfolio was linked not only to the rapidly declining housing market but also to the riskiest sector of that declining market—subprime mortgages.  (*Id.*)

### III.    AS THE HOUSING MARKET WORSENED, JPM CONTINUED INVESTING NMH IN SUBPRIME-LINKED SECURITIES.

The housing market continued to worsen, and that worsening market continued to be widely reported:

- In February 2007, the largest U.S. subprime lenders were announcing unprecedented losses.  (*Id.* ¶51)

- In March 2007, JPM's own analyst, Chris Flanagan, its global head of ABS and CDO research, predicted a "very severe correction (in the sub-prime market)" and further predicted that such correction "will last anywhere from six to 12 months, during which many of the lenders who have operated in this market will gradually get pushed out of business." (*Id.* ¶55)

Nevertheless, JPM continued to purchase Subprime-Linked Securities for the Account— US $12 million worth—in February and March 2007.  (*Id.* ¶52)

July of 2007 did not bring any better news for the subprime market.  For example, in July 2007:

- Two Bear Stearns subprime hedge funds collapsed;

- The American Bankers Associate reported that late payments on home equity loans were on the rise;

- The *New York Times* reported that bond ratings agencies were downgrading mortgage securities; and

- JP Morgan itself stated that it expected "continued deterioration in subprime loan performance well into 2008" and that "[l]iquidity in the subprime sector has evaporated".

(*Id.* ¶¶57-58)  Incredibly, undeterred, JPM purchased US $3.5 million of Subprime-Linked Securities for NMH in July 2007.  (*Id.* ¶60)

And then in August 2007:

- Lehman Brothers closed its subprime lender;

- Countrywide, the biggest U.S. mortgage lender, drew down its entire bank credit lines due to the mortgage crisis;

- Mortgage lender First Magnus suspended operations;

- Accredited Home Lenders stopped taking loan applications and cut 1,600 jobs as a result of the subprime crisis; and

- American Home Investment closed in light of liquidity issues resulting from disruptions in the secondary mortgage market.

(*Id.* ¶61)  But JPM purchased another US $4 million of Subprime-Linked Securities for NMH's Account.  (*Id.* ¶61).

Throughout all of the above, even as the market fell, and even as JP Morgan's own analysts predicted that the market would continue to decline, JPM made no effort whatsoever to move NMH out of its Subprime-Linked Securities positions even though it had agreed to pursue an investment strategy designed to preserve NMH's principal.  (*Id.* ¶¶66-72)  On the contrary, JPM continued to purchase Subprime-Linked Securities contrary to the objectives of its client and inconsistent with sound investment strategy such as diversification.

IV.     **JPM REPEATEDLY MISLED NMH IN ORDER TO COVER-UP ITS RECKLESS AND UNSUITABLE INVESTMENTS.**

Both during and after its nearly ten-month dive into the sinking mortgage market with NMH's money, JPM misrepresented critical facts about the maturity, content and value of the Account and omitted material information so as to cover up its reckless investment decisions and lack of analysis.

A.      **JPM Misrepresented The Average Maturity Of The Portfolio.**

JPM lied to NMH about the maturity of the securities in the Account in order to disguise how illiquid the Portfolio really was.  (*Id.* ¶¶78-90)   For example, in March 2007, NMH asked Todd Brown to confirm which of the securities in the Account would qualify as cash equivalents so that it could verify the liquidity of the Portfolio for accounting purposes.  (*Id.* ¶85)  Brown responded, by letter, that *all* of the securities in the Account were cash equivalents and that the average maturity of the Account was 0.1 year.  (*Id.*)   That was blatantly false.  The average maturity of the Account in March 2007 was *more than a decade*.  (*Id.* ¶¶85-86.)

B.      **JPM Misrepresented The Content Of NMH's Account.**

JPM also failed to disclose to NMH the extent to which its Account was linked to the subprime mortgage market and misled NMH into believing that many of its Subprime-Linked Securities were not at risk.  (*Id.* ¶¶73-77)  For example, in the fall of 2007, even after he finally acknowledged that the "bond market is effectively shut down", Todd Brown told NMH that its CMO positions were all prime-mortgage backed and indicated that NMH need not worry about those securities with respect to the subprime crisis.  (*Id.* ¶63)  But at that time, even prime-backed CMOs were rapidly declining in value.  (*Id.* ¶76)  Moreover, Brown's representation that the CMO positions

were prime-backed was simply untrue.  (*Id.* ¶77)  In fact, many of those CMOs are backed by Alt-A mortgages—mortgages where the borrowers have an insufficient financial profile to qualify for prime mortgages—that had delinquency rates just as high as subprime-mortgages.  (*Id.*)

**C.     JPM Misrepresented The Value And Performance Of NMH's Account.**

Further, as liquidity evaporated from the market for NMH's investments, JPM misrepresented the value of the Securities in the Account.  (*Id.* ¶¶91-108)  On each month's account statement, JPM assigned a value to each security in the column labeled "price" based on certain "marks" to market.  (*See id.* ¶¶92, 102)  A "mark" is simply the price of a security designed to reflect its current market value.  NMH reasonably relied on those values as reflecting the price at which each security could be sold in the market.  (*Id.*)  JPM failed to disclose to NMH that those marks did not actually represent real prices, a fact which NMH discovered only after it instructed JPM to sell the securities at the marks listed—prices that JPM was unable to get for the securities in the market.  (*Id.* ¶¶100-103)  JPM also repeatedly used those inaccurate marks, or values, as the basis for assuring NMH of its Account's positive performance and continued liquidity.  (*Id.* ¶¶93-95)

## V.     JPM REFUSED TO SHARE BASIC INFORMATION ABOUT THE SECURITIES IN THE ACCOUNT.

At every turn, JPM frustrated NMH's reasonable attempts to review JPM's analysis of the securities in the Account and refused to provide any of the "intent [sic] top-down and bottom-up analysis" that JPM had advertised supposedly "command[ed] approximately 60% of the group's time and resources" in its sales pitch materials.  (*Id.* ¶¶24, 110; Rosen Decl. Ex. A)

In November 2007, NMH requested a "short write-up" on the positions in the Portfolio and "what the current thinking is on the credit".  (Compl. ¶111)  JPM refused to provide any such write-up. Instead, JPM provided only a print-out from Bloomberg, a commonly available financial news and information service, which gave only a brief sketch of each security.   (*Id.* ¶¶111-112.)   When NMH asked JPM to explain the printouts, JPM refused.  (Compl. ¶112)

In May 2008, NMH requested the prospectuses for each of the securities currently held in the Account.   (*Id.* ¶113)  JPM refused.  (*Id.*)

Throughout the summer of 2008, NMH asked for JPM's internal ratings on the securities in the Account.  (*Id.* ¶114)  JPM refused.  (*Id.*)

During the relevant time period, NMH was still JPM's client.  These refusals were neither consistent with truthful and accurate disclosure nor its fiduciary and contractual obligations to NMH.

**Argument**

For the purpose of the defendants' motion to dismiss, this Court accepts as true all of the facts alleged in the Complaint, s*ee e.g.*, *Bolt Elec. Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995), and draws all reasonable inferences in favor of NMH, *see e.g., Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004).  The plaintiff is only required to show "enough facts to state a claim to relief that is plausible on its face".  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).  "[U]nless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief", the defendants' motion to dismiss must be rejected.  *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir. 1992) (internal quotations omitted).

I.    **JPM'S MOTION TO DISMISS NMH'S NON-FRAUD BASED CLAIMS SHOULD BE DENIED BECAUSE JPM'S ARGUMENTS IN SUPPORT OF DISMISSAL ARE WITHOUT MERIT.**

JPM makes three arguments to dismiss NMH's non-fraud based claims, i.e., breach of fiduciary duty (Second Count), negligent misrepresentations and omissions (Eighth Count), negligence (Ninth Count) and gross negligence (Tenth Count).  Those arguments are based on: (i) the Martin Act, (ii) the contract and (iii) duplicity.  As discussed below, each argument is deficient and does not require dismissal of the claims.

A.    **The New York State Martin Act Does Not Bar Plaintiff's Non-Fraud Based Tort Claims Because Those Claims Are Not Based On Dishonesty Or Deception.**

Although defendants concede that NMH's fraud claims are not barred by the Martin Act, they argue that the Martin Act pre-empts all of NMH's non-fraud state law claims.  But this argument suffers from one faulty, critical assumption that defendants apparently hope this Court will overlook:  Those claims do not fall within the purview of

the Martin Act.  Because the allegations underlying NMH's breach of fiduciary duty, negligence and gross negligence claims arise from conduct that is on its face not based on fraud/deceit theories, those claims are outside the scope of the Martin Act.  In particular, the complaint alleges that JPM is liable for complete mismanagement of the Account, failure to conduct a diligent analysis on its buy and sell decisions for that Account, and failure to properly supervise its employees —allegations that on its face are not grounded on fraud or deceit.[2]

As relevant here, the Martin Act prohibits:

(a)    Any <u>fraud, deception, concealment, suppression, false pretense</u> or fictitious or pretended purchase or sale;

(b)    Any <u>promise or representation</u> as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(c)    Any <u>representation or statement which is false</u>, where the person who made such representation or statement:  (i) knew the truth; or (ii) with reasonable effort could have known the truth; or (iii) made no reasonable effort to ascertain the truth; or (iv) did not have knowledge concerning the representation or statement made.

N.Y. Gen. Bus. Law § 352-c(1)(emphasis added).

The reach of the Martin Act is not unlimited, and is not so expansive, as defendants suggest, as to reach any kind of securities-related claim.  (Def. Br. at 6) (stating that the Martin Act "equips the State with sweeping authority to investigate and prosecute securities claims in the State").  Rather, a claim "that involves securities but does not allege any kind of dishonesty or deception implicates neither the plain language

---

[2] Although it is not necessarily the case that the Martin Act precludes negligent misrepresentation claims, *see Cromer Fin. Ltd. v. Berger*, No. 00 Civ. 2498 (DLC), 2001 WL 1112548 at *4 (S.D.N.Y. Sept. 19, 2001) (holding that the Martin Act does not preempt state law negligence claims) *and Scalp & Blade, Inc. v. Advest, Inc.*, 722 N.Y.S.2d 639 (4th Dep't 2001) (holding that the Martin Act does not preempt state law negligent misrepresentation claims), plaintiff withdraws its negligent misrepresentation claim.

of the [Martin Act] nor its policies".  *Louros v. Kreicas*, 367 F. Supp. 2d 572, 595-96 (S.D.N.Y. 2005).

In *Louros*—a case on which defendants rely—Judge Kaplan held that the Martin Act did *not* preclude breach of fiduciary duty and negligence claims brought by an investor against a trader making investments on the investor's behalf.  The plaintiff there brought three types of claims arising from the mismanagement of his investment account—fraud claims, non-fraud claims that were based on dishonest conduct and claims that were not based on fraud or any type of dishonest conduct.  While precluding the non-fraud claims based on dishonest conduct, the Court held that the plaintiff could proceed on both its fraud claims <u>and</u> non-fraud claims that were not based on dishonest conduct, such as his negligence and breach of fiduciary duty claims, because the Martin Act does not preclude claims that do not "allege deception, deliberate or otherwise."[3]  *Id.* at 596.

The cases on which defendants rely are not contrary to *Louros* because the factual underpinning of the claims that were ultimately dismissed on Martin Act grounds in those cases—unlike the non-fraud claims NMH asserts here—all arose from alleged dishonesty or deception.  For example, in *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001) (Def. Br. at 6-7), the common law non-fraud actions were based upon

---

[3] The plaintiff in *Louros* brought claims under the federal securities laws, and New York state law claims of negligence and breach of fiduciary duty. Louros alleged that his trader, Kreicas, breached his fiduciary duty to manage the account in a way that comported with his needs and to keep him informed about the market and the trades in the account.  The Court held that the Martin Act did not preclude that claim because it did not "allege deception, deliberate or otherwise".  Louros also alleged negligence based on (1) the same misrepresentations alleged in the securities and common law fraud claims and (2) the same failures to manage his account and keep him informed about the market as alleged in his breach of fiduciary duty claim.  The Court concluded that part (1) deals with deception and comes within the purview of the Martin Act but that part (2) does not, and therefore allowed Louros to proceed on his negligence claim so long as it rested on part (2), i.e., the failure to manage the account and keep the investor informed about the market—the factual allegations that are not based on dishonesty or deception.

plaintiff's allegations that the defendant company for whom plaintiff worked and had negotiated a resignation package with concealed a planned leveraged recapitalization from the plaintiff during those negotiations in order to extract a more favorable agreement. *Id.* at 174-77. Noting that the Martin Act prohibited "various fraudulent and deceitful practices", the Court found the plaintiff's non-fraud based claims, which arose solely from the company's dishonest concealment, preempted. *Id.* at 190. In this case, by contrast, NMH's non-fraud claims are based on allegations of conduct that do not involve dishonesty or deceit.[4]

Here, even a cursory review of NMH's allegations reveal that it sufficiently alleges a factual basis to support its common law claims—allegations that do not rest on dishonesty or deception in any way—and therefore are not preempted by the Martin Act. For example:

- JPM disregarded its fiduciary duties to NMH and NMH's goal of preserving capital when it failed to move NMH out of Subprime-Linked Securities throughout the first, second and third quarters of 2007, despite the growing market problems in that sector. JPM started moving NMH out of the Subprime-Linked Securities in its Account only after the third quarter of 2007 when the

---

[4] The other cases upon which defendants rely are equally unavailing. *See, e.g., Berk v. Moore, Clayton & Co.*, No. 06 Civ. 2716 (LLS), 2006 WL 3616961 (S.D.N.Y. Dec. 11, 2006) (false representations and materially misleading omissions about planned merger activity); *Sedona Corp. v. Ladenburg Thalmann & Co, Inc.*, No. 03 Civ. 3120 (LTS), 2005 WL 1902780 (S.D.N.Y. 2005) (stock price manipulation); *Pro Bono Investments Inc. v. Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 2429787 (Sept. 30, 2005) (misrepresentations); *Marcus v. Frome*, 329 F. Supp. 2d 464 (S.D.N.Y. 2004) (misrepresentations); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt.*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) (concealment and misrepresentations); *Nairobi Holdings, Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230 (LMM), 2002 WL 31027550 (S.D.N.Y. Sept. 10, 2002) (misrepresentations); *Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, No. 99 Civ. 1944 (NRB), 2000 WL 709006 (S.D.N.Y. June 1, 2000) (materially false and misleading statements); *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F.Supp.2d 275 (S.D.N.Y. 1998) (misrepresentations); *Independent Order of Foresters v. Donaldson, Lufkin & Jenrette Inc.*, 919 F. Supp. 149 (S.D.N.Y. 1996) (false statements); *Whitehall Tenants Corp. v. Estate of Olnick*, 623 N.Y.S.2d 585 (1st Dep't 1995) (information withheld and misrepresented); *Rego Park Gardens Owners, Inc., v. Rego Park Gardens Assocs.*, 595 N.Y.S.2d 492, (2d Dep't 1993) (failure to disclose material information); *Eagle Tenants Corp. v. Fishbein*, 582 N.Y.S.2d 218, 219 (2d Dep't 1992) (concealed material information); *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 275 (1987) (false projections of revenues, operating expenses and profits to purchaser of subsidiary).

valuations of those securities were already heavily marked-down, forcing NMH to incur substantial loss.  (Compl. ¶¶10, 66-72)

- JPM's investment of more than half of NMH's funds in the Account in Subprime-Linked Securities was a glaring failure to diversify the Account and disproportionately subjected NMH's portfolio to the risks of the declining housing market.  (*Id.* ¶50)

- JPM failed to follow the investment strategy outlined in documents provided to NMH, such as the "enhanced cash strategy" guidelines and sample portfolio.  (Compl. ¶¶ 80-81; Rosen Decl. Ex. A.)

- In breach of its fiduciary duties and in violation of NMH's rights, JPM resisted NMH's attempts to obtain security-specific information and refused to provide NMH with any analysis performed either before the purchase of the Subprime-Linked Securities or with respect to JPM's decision to hold those Securities throughout most of 2007 as the market for those Securities collapsed. (*Id.* ¶109)  Upon information and belief, JPM's security selection relied primarily upon rating agency ratings and JPM itself performed little or no credit analysis of the securities in NMH's portfolio prior to purchase.   JPM abdicated its own responsibilities to research the securities it purchased for NMH—services for which it charged an investment management and advisory fee.  To the extent any analysis existed, JPM breached its fiduciary duties to NMH by refusing to provide an assessment of the securities' creditworthiness.  (*Id.* ¶¶110-115)

- JPM also breached its duties of care by failing to adequately supervise its employees and those working under Defendants' supervision.  For example, Defendants failed to either implement or enforce supervisory and compliance procedures among its employees responsible for making and recommending purchases in the Account.  Had Defendants implemented and enforced protocols for the review of purchases made by its employees, Defendants would have been forced to further document the fact that the unsuitable securities were purchased, that those securities were not sold in time to mitigate Plaintiff's losses, that fiduciary duties were breached and that the account was managed in violation of Plaintiff's investment objectives.  It is manifest that Defendants failed to maintain and enforce a proper system of internal supervision over team members and that failure fell below the industry standard of care.  Defendants negligently failed to provide adequate instruction with regard to supervision of transactions in securities executed by its representatives.  (*See id.* ¶197)

Accordingly, NMH's Second, Ninth and Tenth Counts are outside the scope of the Martin Act and should not be dismissed.

> **B.   JPM Cannot Hide Behind An Exculpatory Clause When It Materially Breached The Contract Containing The Clause And Also When It Is Plaintiff's Fiduciary Managing Its Account On A Discretionary Basis.**

Defendants' reliance on the limitation of liability clause contained in the fine print of the "General Terms for Accounts and Services" in order to evade responsibility for their negligence is misplaced where they materially breached the agreement that they are now seeking to enforce and where they are a fiduciary of NMH managing its Account on a discretionary basis.

> **1.   A Party That Materially Breaches A Contract Cannot Benefit From That Contract's Terms.**

Dismissal of NMH's negligence claim at this time, prior to a determination as to whether JPM breached the contract, is premature.   NMH alleges that JPM materially breached the agreement containing the exculpatory clause.   Where, as here, a party materially breaches an agreement, the breaching party cannot reap any of the benefits of the agreement to which it otherwise would be entitled.   *See Malik v. Toss 29, Inc.*, No. SP 135/07, 2007 WL 926297, *4 (N.Y. Dist. Ct. Mar. 29, 2007) ("The Court of Appeals has held that a breaching party waives its right to enforce a contractual provision in its (his/her) favor when that party is responsible for the breach" (citing *Cornell v. T.V. Dev. Corp.*, 215 N.E.2d 349 (N.Y. 1966)); *Shernoff v. Schimel*, 112 N.Y.S.2d 333, 348 (1952) (breaching party cannot enforce alleged rights).

In any event, issues relating to the exculpatory clause are not appropriate for determination on this motion to dismiss.   In determining whether a party can insulate itself from liability arising from its own negligence, the Court should consider not only the agreement itself but also the "surrounding facts and circumstances".   *See Williams v.*

*J.P. Morgan & Co. Inc.*, 248 F. Supp. 2d 320, 326 (S.D.N.Y. 2003).  Those facts and circumstances—for example, whether JPM breached the agreement at issue and whether JPM abused its position as a fiduciary by including the exculpatory provision—cannot be conclusively determined without the benefit of discovery.

> 2.    The Exculpatory Clause Does Not Shield JPM From Liability Because JPM Agreed To Manage The Account On A Discretionary Basis.

In New York, "the law frowns upon contracts intended to exculpate a party from the consequences of his own negligence" and although those provisions can be enforceable, they are "subject to close judicial scrutiny".  *Gross v. Sweet*, 400 N.E.2d 306, 308-09 (N.Y. 1979).  Even "an agreement that clearly and unambiguously attempts to exempt a party only from liability for ordinary negligence" will not be enforced if it violates public policy or because it constitutes an abuse of a special relationship, or both. *See Ash v. New York Univ. Dental Center*, 564 N.Y.S.2d 308, 310 (1990); *see also Gross*, 400 N.E.2d at 309.  Here, when the party seeking exculpation is a fiduciary providing a professional service on a discretionary basis, in a highly regulated industry (as JPM was to NMH due to the discretionary nature of the investment management account), particular public policy concerns are raised.  Indeed, in the context of a professional relationship, "a provision avoiding liability is peculiarly obnoxious".  *Ash*, 564 N.Y.S.2d at 311 (quoting 15 *Williston on Contracts* [3[rd] ed. 1972] § 1751); *see also In re Allegheny Int'l, Inc.*, 100 B.R. 244, 247 (W.D. Pa. 1989) ("holding a fiduciary harmless for its own negligence is <u>shockingly inconsistent</u> with the strict standard of conduct for fiduciaries.").

Allowing JPM to escape liability from its own negligence in performing the very service for which it was hired and the service for which it holds itself out to the public as

capable of performing is particularly troublesome to public policy.  Although there may be some cases in which a fiduciary may be able to shield itself from negligence liability, where a fiduciary is managing an account on a discretionary basis—and that is all it is retained to do—such a rule would not be in the public interest.  "The court expects that such professionals would be especially diligent in making sure that they meet the standard of care for exercising their expertise in their work in this case.  Indemnification is not consistent with professionalism."  *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13, 27 (S.D.N.Y 1991) (discussing work in bankruptcy context) (internal quotation and citation omitted); *cf. In re Sunpoint Sec. Inc.*, 377 B.R. 513, 555 (E.D. Tex. 2007) (auditor should not escape liability when it was negligent in the tasks that were the core of what it was hired to do).

The cases defendants rely on are inapposite because none of those cases involves fiduciaries managing investment accounts on a discretionary basis.  (Def. Br. at 9-10 (citing *Travelers Indem. Co. of Conn. v. Losco Group Inc.*, 136 F. Supp. 2d 253 (S.D.N.Y. 2001) (property owner and architect); *Obremski v. Image Bank, Inc.*, 816 N.Y.S.2d 448 (1st Dep't 2006) (photographer and supplier); *Champion Home Builders Co. v. ADT Sec. Servs, Inc.*, 179 F. Supp. 2d 16 (N.D.N.Y. 2001) (property owner and alarm services provider); *Sommer v. Federal Signal Corp.*, 79 N.Y.2d 540 (1992) (same); *Metropolitan Life Ins. Co. v. Noble Lowndes Intern., Inc.*, 84 N.Y.2d 430, 438 (1994) (health insurance provider and software developer))).

   C.   **Plaintiff's Breach Of Fiduciary Duty Claim Should Not Be Dismissed Because The Breach Of Fiduciary Duty Claim Is Not Duplicative Of The Breach Of Contract Claim.**

Defendants' argument that NMH's breach of fiduciary duty claim (Second Count) should be dismissed as duplicative of the breach of contract claim (First Count) is without merit.

_First_, NMH brings its breach of contract action solely against defendant JP Morgan Chase Bank, N.A. and not against Todd Brown—a fact notably absent from defendants' argument.   The breach of fiduciary duty claim, therefore, cannot be dismissed as against Todd Brown based on duplicity.

_Second_, that the same allegations support both causes of action does not render the claims duplicative because JPM's contractual duty is separate and distinct from its fiduciary duty.  As the New York Court of Appeals explained:

> "[I]t is plain that a contracting party may be charged with a separate tort liability arising from a breach of duty distinct from, or in addition to, the breach of contract, as when it springs from extraneous circumstances, not constituting elements of the contract as such although connected with and dependent upon it, and born of that wider range of legal duty which is due from every man to his fellow, to respect his rights of property and person, and refrain from invading them by force or fraud".

_Meyers v. Waverly Fabrics_, 479 N.E.2d 236, 239 n.2 (N.Y. 1985) (internal citations omitted); _see also Mandelblatt v. Devon Stores, Inc.,_ 521 N.Y.S.2d 672, 676 (1st Dep't. 1987) ("It is well settled that the same conduct which may constitute the breach of a contractual obligation may also constitute the breach of a [fiduciary] duty arising out of the relationship created by contract but which is independent of the contract itself." ).

19

The fiduciary duty that JPM owed to NMH as its investment advisor in a discretionary account, although created by the contract, is independent of JPM's contractual duties:

> "Unlike the broker who handles a non-discretionary account, the broker handling a discretionary account becomes the fiduciary of his customer in a broad sense. Such a broker, while not needing prior authorization for each transaction, must (1) manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers or as apparent from the customer's investment and trading history; [citation omitted] (2) keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests; [citation omitted] (3) keep his customer informed as to each completed transaction; and [(4)] explain forthrightly the practical impact and potential risks of the course of dealing in which the broker is engaged."

*Leib v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 461 F. Supp. 951, 953 (E.D. Mich. 1978), *affirmed*, 647 F.2d 165 (6th Cir. 1981).  In a case where, as here, the plaintiff sufficiently pleads a duty separate from that imposed by the contract, he can also maintain other tort claims.  *Consol. Risk Serv., Inc. v. Automobile Dealers WC Self Ins. Trust*, No. 1:06-CV-871 (FJS/RFT), 2007 WL 951565 (N.D.N.Y. 2007) (citing *Sergeants Benevolent Assoc. Annuity Fund v. Renck*, 796 N.Y.S.2d 77 (1st Dep't. 2005)).

Defendants' reliance on *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902 (S.D.N.Y. 2008), (Def. Br. at 10-11) is misplaced. There, the contract between the parties did not give rise to any special fiduciary duty; rather, it was a "conventional business relationship".  *Id*. at *3.  Here, JPM had discretionary authority.  The "higher trust" established as a result of the discretionary relationship gives rise to fiduciary duties that are distinct from the parties' agreement.[5]

---

[5] As defendants note, *Robin Bay* relies on *Brooks v. Key Trust Co. Nat'l Ass'n*, 809 N.Y.S.270 (3d Dep't

Defendants contend that a plaintiff has an obligation to plead different facts in support of a fiduciary duty claim than pleaded in support of its breach of contract claim. (Def. Br. at 11).  That is wrong.  *See Bender Ins. Agency, Inc. v. Treiber Ins. Agency, Inc.*, 729 N.Y.S.2d 142, 145 (2nd Dep't. 2001); *see also Davis v. Dime Savings Bank of New York*, 557 N.Y.S.2d 775, 776 (3rd Dep't. 1990).[6]  For example, *Dimsey v. Bank of New York*, No. 600391/2006, 2006 WL 3740349 (N.Y. Sup. Aug. 24, 2006), arose from a management agreement for the defendant Bank to act in a discretionary capacity.  *Id.* at *1.  The plaintiff alleged that the Bank failed to follow the terms of the agreement, and sued the Bank for, *inter alia*, breach of contract and breach of fiduciary duty.  *Id.* at **2-3.  The Bank argued, as JPM does here, that the plaintiff could not bring its breach of fiduciary duty claim unless it was independent of the contract claim.  *Id.* at *3  The Court denied the Bank's motion to dismiss and recognized that "at this pre-discovery phase of the proceedings, [plaintiff] may plead alternative theories".  *Id.*  Similarly, dismissal here is premature.

<u>Third</u>, even assuming, *arguendo*, that plaintiff is required to plead different factual allegations in support of its breach of contract and breach of fiduciary duty

---

2006).  (Def. Br. at 11) But the Court in *Brooks*, while noting that the financial advisor had discretionary authority over the account, also noted that the parties' relationship involved allegations of improper loans extended by the defendants.  That rendered the relationships commercial as well.  In any event, unlike the defendants in *Brooks*, here defendants assert that the contract did not cover the entire relationship.  For example, defendants claim that they had no obligation to invest in short-term, liquid securities because there was no specific liquidity requirement contained in the contract.  (Def. Br. at 16-18)  On the other hand, NMH maintains that even assuming, *arguendo*, that obligation was outside of the terms of the agreement, JPM nevertheless had a fiduciary duty to abide by and invest the Portfolio in a manner consistent with NMH's clearly expressed investment objectives.  (*See* Compl. ¶¶4, 23, 80; *see also infra* at pg. 22.)

[6] The same conduct, at least at the pleading stage, may constitute both a breach of contract and a breach of a fiduciary duty.  *See Fanta v. Muriel Siebert & Co., Inc.*, No. 114837/06, 2008 WL 3521334 *3 n.1 (N.Y. Sup. July 11, 2008) (although plaintiff's "breach of contract claim may arise from the same facts as its negligence claim . . . the causes of action have different elements . . . and at the pleading stage neither claim will be dismissed as duplicative of the other").

claims, NMH has done so here.  *See Indep. Asset Mgmt. LLC v. Zanger*, 538 F. Supp. 2d 704, 710 n.4 (S.D.N.Y. 2008) (requiring that the facts be only "slightly different").  For example, defendants argue in their brief that there was no contractual limit on the maturity dates of the investments in the Account and no explicit liquidity requirement. (Def. Br. at 16-17)  Assuming, without conceding that liquidity and maturity limits were outside the terms of the contract, NMH has still alleged that JPM breached its fiduciary duty by filling the Account with long-term securities that were at a high risk of illiquidity. JPM described its "enhanced cash strategy" as containing securities maturing "modestly outside of the money market fund universe (usually between 13 and 24 months)". (Compl. ¶36; Rosen Decl. Ex. A at 3.)  NMH also clearly expressed to JPM that it sought short-term securities and that it required a certain degree of liquidity for near-term development projects.  (*Id.* ¶4)  JPM's investment in long-term, illiquid securities was not consistent with its fiduciary duties as a discretionary account manager to "manage the account in a manner directly comporting with the needs and objectives of the customer" and to "keep informed regarding the changes in the market which affect his customer's interest and act responsively to protect those interests".  *See Leib*, 461 F. Supp. at 953. Accordingly, dismissal is not appropriate here.

## II.    THE COMPLAINT SUFFICIENTLY ALLEGES SCIENTER BECAUSE JPM'S MISREPRESENTATIONS ABOUT THE MATURITY, PERFORMANCE AND CONTENT OF THE ACCOUNT EVIDENCE CONSCIOUS MISBEHAVIOR OR RECKLESSNESS.

Defendants' argument on scienter with respect to Counts Three, Four, Five, Six and Seven, while filled with boilerplate recitations of law, ignores critical facts alleged in the Complaint that considered either individually or collectively support an inference of fraudulent intent.  As discussed in detail below, JPM purchased the Subprime-Linked

Securities after the housing market was in severe decline and then misrepresented and omitted material facts about those investments' unsuitability, the extent to which the Account was subprime-linked and misrepresented the liquidity and performance of the Account in order to disguise its initial reckless investment decisions.  On each occasion of misrepresentation, JPM knew its statements were false, had access to the information demonstrating those statements' falsity, or ignored information that as a result of its fiduciary duty to NMH, it had a duty to monitor.  *See In re Philips Serv. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 473-75 (S.D.N.Y. 2004).  Those allegations support an inference of fraudulent intent.

### A.   Contrary To Providing "Complete and Accurate" Information, JPM Lied To NMH About The Maturity Of The Account.

Nowhere in its twenty-page brief do defendants offer any explanation for JPM's false statement that in March 2007 the average maturity of the Account was 0.1 year, when in fact, the average maturity of the Account at that time was more than a decade. (Compl. ¶85)

Importantly, Brown's representation that the average maturity of the Account was 0.1 year in March 2007 was false under any calculation.  The average maturity of the securities in NMH's portfolio (including cash) in March 2007 was sixteen years; the average maturity of the actively managed portion of the Account was nearly twenty years.  (Compl. ¶86)  Brown's representation is also false when the average maturity of the securities in the Account is weighted to reflect each investment's relative value.  The weighted average maturity of the entire Portfolio was eleven years, and the weighted

average maturity of the actively managed portion of the Portfolio was more than seventeen years. (*Id.* ¶86)[7]

JPM's representation to NMH about the maturity of the Account was off by a factor of more than one hundred. This fact alone is likely sufficient to establish conscious misbehavior and it easily satisfies the recklessness standard. *See Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (the magnitude of the alleged fraud provides additional circumstantial evidence of scienter); *see also In re Mercator Software, Inc. Sec. Litig.,* 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (finding scienter where defendants misstated figures by a magnitude of nearly 100%). Defendants concede, as they must, that recklessness is a sufficiently culpable mental state in the securities fraud context. *See Novak v. Kasaks,* 216 F.3d 300, 308-09 (2d Cir. 2000). Recklessness is established when the plaintiff alleges that the defendant "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Id.* at 311.

Defendants' argue that because the terms of the Discretionary Portfolio Mandate did not contain a limitation on the liquidity or maturity dates of the investments in the Account, there is "no cogent motive" for JPM to hide the liquidity or maturity dates of the investments. (Def. Br. at 16-17) Even assuming for the purpose of this motion that

---

[7] Maturity is a direct reflection of liquidity and NMH clearly told JPM at the inception of the Account that it would be utilizing the funds in the Account for future development projects in the near-term, that capital preservation was the primary objective and that NMH had no appetite for credit or maturity risk. (Compl. ¶80) The documents that JPM provided to NMH when it pitched its "enhanced cash strategy" stated that the funds in the portfolio would be invested in "securities maturing modestly outside of the money market fund universe (usually between 13 and 24 months)". (*Id.* ¶¶80-81) Rather than purchase safe, short-term, liquid securities as JPM had represented to NMH that it would, JPM loaded the Portfolio with securities that had maturities of *more than a decade*, some as many as more than 40 years from the date of purchase, locking NMH into investments that did not fit with their investment goals or strategy, and then failed to disclose this departure from the previously discussed and mutually agreed upon investment strategy. (*Id.* ¶¶83, 85)

the contract did not have any limitation on maturity, JPM's argument is misguided as JPM's *contractual* duty is not the only duty that is applicable.  As a fiduciary, JPM had an obligation, among other things, to invest the Account in a manner consistent with NMH's clearly expressed desire for short-term, liquid securities and to manage the investments in a way consistent with NMH's investment goals and the market environment at any given time.  Because JPM breached its fiduciary duties (and possibly the contract as well), JPM's attempt to disguise those breaches is sufficient motive to give rise to an inference of scienter.

Defendants claim that the "most compelling inference" from NMH's allegations, taken as true for the purpose of this motion, is that the defendants "provid[ed] complete and accurate information to plaintiff regarding liquidity and maturity" (Def. Br. at 18). That argument is patently wrong.  JPM has neither offered any explanation to show how its ".1" statement was "complete and accurate", nor offered a single non-fraudulent explanation for Brown's blatant misrepresentation in March 2007 about the maturity and liquidity of the Account.  Making false statements in response to direct and simple question by your client, as Brown did, is inconsistent with an effort to provide complete and accurate information.  That misrepresentation is even more egregious here because Brown knew that NMH sought that information for the purposes of its corporate accounting.  (*See* Compl. ¶85)

Moreover, plaintiff here alleged defendants repeatedly failed to provide any security-specific or analytical information requested by NMH throughout the lifetime of the investment advisory relationship.  While this is a clear breach of JPM's fiduciary and contractual duties, and is not asserted to be deceitful conduct based on the evidence

presently within plaintiff's control, it certainly refutes the notion that the defendants provided "complete and accurate information" and together with the evidence of false statements supports an inference of "guilty knowledge" which suggests intentional misconduct in the first place.

### B.    JPM Invested NMH In Unsuitable Securities And Then Misrepresented The Nature Of The Securities It Purchased For The Account.

JPM's assertion that "defendants purchased securities that were suitable at the time of purchase" (Def. Br. at 14) is untenable.  In fact, widely reported market events that preceded JPM's purchase of the unsuitable Securities directly contradict defendants' argument.  (*supra* pgs. 5-7)  The more compelling inference from the facts alleged is that JPM knew or was reckless in not knowing that the Securities were unsuitable when purchased, an inference made more compelling as prior to the purchase of some of those securities <u>JP Morgan itself</u> acknowledged the complete lack of liquidity in the subprime market and warned that the mortgage market would continue to plummet.  (Compl. ¶¶55, 58-59)

After purchasing those unsuitable securities, JPM misled NMH about the extent to which its Account was linked to the volatile and illiquid subprime market.  From the inception of the investment advisor relationship, and in particular, as the subprime mortgage market deteriorated, JPM failed to disclose that the CMOs, ABS-HELs and FRNs in the Account, though not all subprime-backed, were subprime-linked.  (*Id.* ¶73) Although an investor would likely know that asset backed securities that are specifically backed by subprime mortgages would be affected, it would not be obvious that CMOs

and FRNs were also indirectly linked to the subprime market.   JPM obviously knew, but failed to disclose the same to NMH.

NMH asked on more than one occasion about the market's effect on the subprime asset-backs, clearly flagging that it did not appreciate the extent to which its Portfolio was linked to the subprime market.  (*Id.* ¶¶53, 75)  Nevertheless, JPM failed to inform NMH that the Subprime-Linked Securities in the Account were just as risky and volatile as the smaller subset of subprime-backed ABS-HELs, and failed to inform NMH that approximately half of its actively managed portfolio was directly tied to the subprime market, and therefore at a high and immediate risk of illiquidity.  (*Id.* ¶¶74-75)

JPM's argument that the Securities purchased were suitable for the Account because those types of Securities were contemplated in the Investment Guidelines, (Def. Br. at 14-15), is unavailing.  NMH does not argue that purchasing CMOs, ABS-HELs and FRNs is not appropriate in <u>any</u> circumstance, but rather that it was inappropriate in <u>these particular</u> circumstances—<u>i.e.</u>, as (and after) the market for those securities evaporated.  An investment advisor has the responsibility to assess what investments are prudent at a particular time, in light of the market forces, not in a vacuum.  For example, just because an investment advisor theoretically <u>could</u> purchase Lehman Brother's securities in October 2008 under an account's investment guidelines do not mean that those securities would have been a suitable purchase <u>at that time</u>.

### C.   JPM Misrepresented The Performance Of The Account.

The Complaint is also replete with allegations of how JPM repeatedly misrepresented the performance of the Securities in the Account and downplayed the impact of the subprime crisis on NMH's holdings.  For example:

- In March 2007, Todd Brown told NMH that JPM did not anticipate any issues with NMH's current holdings, even when JPM knew that the market for those securities was rapidly losing liquidity.  (*See* Compl. ¶53)

- In an e-mail dated May 15, 2007, Todd Brown represented to NMH that "in the context of the broader portfolio we have generated positive returns and are performing quite well".  (*Id.* ¶99)  But Brown's assessment of the Account's performance was based on values that did not reflect the prices that could be obtained in the market, and Brown failed to disclose the growing illiquidity of the Securities.  (*See id.* ¶¶104-108)

- At the end of August 2007, Todd Brown emailed Michael Murr of NMH and acknowledged that the "bond market is effectively shut down [and that] many securities are priced at levels that reflect a lack of market liquidity".  But Brown told Murr that JPM's "best assessment is that the ABS-HELs linked to subprime are most severely affected and the other securities [such as CMOs and FRNs] less so", wrongfully leading NMH to believe incorrectly that only the 10.3% of the actively managed portion of the Account tied to ABS-HELs would be affected, and not the other 52.4% of additional Subprime-Linked Securities in the actively managed portion of the Account.  (*Id.* ¶63)  Indeed, the Securities comprising that "other" 52.4% were also inextricably linked to the subprime mortgage market, and like the subprime-backed ABS-HELs, were also at a high and immediate risk of illiquidity.  (*See id.* ¶¶39-43)

- Then, in the fall of 2007, Todd Brown told NMH that its CMO positions were all backed by prime mortgages and indicated that those securities would not be affected by the subprime crisis, even though Brown knew or was reckless in not knowing that prime-backed CMOs were also rapidly declining in value, and in any event, many of the CMOs were backed by Alt-A, rather than prime, mortgages.  Alt-A mortgages are for borrowers that have an insufficient financial profile to qualify for prime mortgages and those mortgages had delinquency rates just as high as subprime mortgages.  (*Id.* ¶¶76-77)

That JPM misrepresented how the Account was performing to cover-up its reckless dive into the subprime mortgage market is "at least as compelling as any opposing inference".  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2510

(2007); *see U.S. Commodity Futures Trading Comm'n v. Amaranth Advisors, L.L.C.*, 554 F. Supp. 2d 523 (S.D.N.Y. 2008) (allegations of false statements "issued to cover up illicit activities" meet heightened pleading requirement for fraud under Rule 9(b)).

Importantly, NMH had no way of knowing that JPM's representations were false at the time.  First, the marks of the Securities listed on the account statements did not represent real market prices so NMH had no accurate, independent way of assessing its Portfolio's performance.  (Compl. ¶¶91-108)  Second, JPM never disclosed to NMH that its assessments of the Account's performance were based on marks that JPM knew to be inaccurate.  (*Id.*)  Third, JPM refused to provide NMH with any security-specific analysis, despite NMH's repeated requests.  (*Id.* ¶¶109-115)

*        *        *

JPM's repeated misrepresentations about the Account's liquidity, performance and content, as described above, support a compelling inference that, at the very least, JPM knew facts or had access to information suggesting that their statements were not accurate and/or that JPM failed to check information that it had a duty to monitor.  *See Novak*, 216 F.3d at 311.  Indeed, JPM's repeated misrepresentations are sufficient to support an inference not only of recklessness, but of conscious misbehavior as well.  *See In re Initial Public Offering Sec. Litig.*, 358 F. Supp. 2d 189, 216 (S.D.N.Y. 2004) (plaintiffs adequately pled conscious misbehavior where, as here, the truth was "well within [defendant's] purview" and was either known, therefore, to the defendant or so obvious that the defendant must have been aware of it).

Regardless, NMH has pled substantial allegations that support an inference of scienter and defendants have failed to meet their burden to demonstrate that the

allegations give rise to an inference of non-culpable conduct that is stronger than the inference of scienter.  *See Tellabs*, 127 S.Ct. at 2504-05.  JPM has failed to offer any non-fraudulent explanation for many of its misrepresentations, and in particular, JPM has failed to offer <u>any</u> non-fraudulent explanation for Todd Brown's representation of the Account's maturity that was incorrect by a factor of one hundred based on any possible calculation.

Because the Complaint alleges facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, as well as motive and opportunity to commit fraud, defendants' motion to dismiss the fraud-based claims should be denied.

### III.   BECAUSE OF THE DOCUMENT-INTENSIVE NATURE OF THIS CASE AND BECAUSE MOST OF THE RELEVANT DOCUMENTS ARE IN THE EXCLUSIVE POSSESSION OF DEFENDANTS, DISMISSAL OF NMH'S CLAIMS IS UNWARRANTED.

As demonstrated by the documents cited in the Complaint, and the documents relied on by the defendants in this motion, NMH's asserted claims are document-intensive and should proceed through discovery so that the parties can determine whether JPM complied its with contractual and fiduciary obligations and JPM's true motives and intent can come to light.  *See IPO*, 358 F. Supp. 2d at 215 (question of motive can be highly fact-intensive and in certain circumstances cannot be decided on a motion to dismiss).  For example, JPM claims that it did its due diligence in selecting securities for NMH.  But JPM refused to give NMH any evidence of its analysis.  The evidence of JPM's maturity calculation and the evidence of JPM's security selection will bear heavily on the question of intent, and discovery will force those documents to come to light.  As the Complaint makes clear, and as defendants' own motion to dismiss with its numerous

attachments makes clear, documentary evidence in this case is critical.  And it is the defendants who have control of that critical documentary evidence.

Defendants' motion to dismiss should be denied especially where, as here, most if not all of the relevant documentation on critical factual points is in the defendants' exclusive possession.  *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct. These facts will frequently be in the exclusive possession of the breaching fiduciary.  Even in cases where fraud is alleged, we relax pleading requirements where the relevant facts are known only to the defendant."); *see also Pietrangelo v. NUI Corp.*, No. Civ. 04-3223(GEB), 2005 WL 1703200, *5 & n.9 (D.N.J. 2005).

In the alternative, NMH respectfully requests the opportunity to replead its claims.  Generally, leave to amend should be freely given. Fed. R. Civ. P. 15(a).  This is particularly true where a plaintiff, like NMH here, "has not had extensive access to the records of defendants".  *See Gross v. Diversified Mortgage Investors,* 438 F. Supp. 190, 194 (S.D.N.Y. 1977).  Indeed, complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend.  *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 235 (S.D.N.Y. 2008).

**Conclusion**

For the foregoing reasons, the defendants' motion to dismiss should be denied.


Dated: November 21, 2008
      New York, New York

                                                Respectfully submitted,

                                                KOBRE & KIM LLP


                                                __/s/ Michael S. Kim_____
                                                Michael S. Kim
                                                (michael.kim@kobrekim.com)

                                                Steven W. Perlstein
                                                (steven.perlstein@kobrekim.com)

                                                Carrie A. Tendler
                                                (carrie.tendler@kobrekim.com)

                                                800 Third Avenue
                                                New York, New York 10022

                                                Tel: 212.488.1200
                                                Fax: 212.488.1220

                                                *Attorneys for*
                                                *NM  Homes One, Inc.*