UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NM HOMES ONE, INC., <br><br> Plaintiff, <br><br> v. <br><br> JP MORGAN CHASE BANK, N.A. and TODD BROWN, <br><br> Defendants. | 08 Civ. 7679 (SWK) <br><br> ECF CASE |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, NY  10019
212-373-3000 (Phone)
212-757-3990 (Fax)

*Attorneys for defendants JP Morgan Chase Bank, N.A. and Todd Brown*

# **TABLE OF CONTENTS**

Table of Authorities ...................................................................................................................ii

Preliminary Statement................................................................................................................1

I.    PLAINTIFF'S NON-FRAUD TORT CLAIMS SHOULD BE DISMISSED ....................1

        A.    The Martin Act Applies to Plaintiff's Non-Fraud Tort Claims ..............................1

                1.    The Martin Act Preempts All Non-Fraud Common Law Tort Claims in the Securities Context..................................................................2

                2.    Louros's Interpretation of the Scope of Martin Act Preemption Contradicts the Weight of Authority..............................................................3

                3.    Even Applying Louros's Standard, Plaintiff's Claims Are Preempted ......................................................................................................4

        B.    In Accordance With the Parties' Express Agreement, The Exculpatory Clause Should be Given Full Force and Effect.........................................................5

        C.    Plaintiff's Breach of Fiduciary Duty Claim is Duplicative of its Breach of Contract Claim......................................................................................................7

II.    PLAINTIFF FAILS ADEQUATELY TO ALLEGE SCIENTER ......................................9

        A.    Defendants Made No Misrepresentations Regarding the Maturity of the Account..................................................................................................................9

        B.    Plaintiff Fails Adequately to Allege that the Purchased Securities Were Unsuitable at the Time of Purchase .....................................................................12

CONCLUSION..........................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Allegheny Int'l, Inc.*,
   100 B.R. 244 (W.D. Pa. 1989) ...................................................................................... 6

*Bankruptcy Trust of Gerard Sillam* v. *Refco Group, LLC*,
   No. 05 Civ. 10072 (GEL), 2006 WL 2129786 ............................................................ 15

*In re Bayou Hedge Fund Litig.*,
   534 F. Supp. 2d 405 (S.D.N.Y 2005) ................................................................. 4, 5, 14

*Bellikoff* v. *Eaton Vance Corp.*,
   481 F.3d 110 (2d Cir. 2007) ....................................................................................... 14

*Brooks* v. *Key Trust Co. Nat'l Ass'n*,
   809 N.Y.S.2d 270 (3d Dep't 2006) .............................................................................. 8

*Brown* v. *E.F. Hutton Group, Inc.*,
   991 F.2d 1020 (2d Cir. 1993) ..................................................................................... 11

*Champion Home Builders Co.* v. *ADT Sec. Servs., Inc.*,
   179 F. Supp. 2d 16 (N.D.N.Y. 2001) ........................................................................... 5

*Chill* v. *General Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996) ....................................................................................... 14

*Consol. Risk Servs., Inc.* v. *Auto. Dealers WC Self Ins. Trust*,
   06 Civ. 871 (FJS), 2007 WL 951565 (N.D.N.Y. Mar. 27, 2007) ................................ 7

*Dimsey* v. *Bank of New York*,
   No. 600391/2006, 2006 WL 3740349 (N.Y. Sup. Aug. 24, 2006) .............................. 8

*In re Eaton Vance Mut. Funds Litig.*,
   403 F. Supp. 2d 310 (S.D.N.Y. 2005) ........................................................................ 14

*Granite Partners, L.P.* v. *Bear, Stearns & Co.*,
   17 F. Supp. 2d 275 (S.D.N.Y. 1998) ............................................................................ 2

*Kaminsky* v. *FSP, Inc.*,
   773 N.Y.S.2d 292 (1st Dep't 2004) ............................................................................. 8

*Leib* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   461 F. Supp. 951 (E.D. Mich. 1978) ........................................................................... 7

*Louros* v. *Kreicas*,
   367 F. Supp. 2d 572 (S.D.N.Y. 2005) ......................................................................... 3

*Malik* v. *Toss 29, Inc.*,
  NO. SP 135/07, 2007 WL 926297 (N.Y. Dist. Ct. Mar. 29, 2007) ........................................... 6

*Masters* v. *Wilhelmina Model Agency, Inc.*,
  No. 02 Civ. 4911 (HB), 2003 WL 1990262 (S.D.N.Y. Apr. 29, 2003) ................................... 14

*Nanopierce Techs., Inc.* v. *Southridge Capital Mgmt.*,
  No. 02 Civ. 0767 (LBS), 2003 WL 22052894 (S.D.N.Y. Sept. 2, 2003) ................................. 2

*Piercy* v. *Citibank, N.A.*,
  424 N.Y.S.2d 76 (1978), *aff'd*, 48 N.Y.2d 900 (1979) ............................................................ 5, 6

*Robin Bay Assocs., LLC* v. *Merrill Lynch & Co.*,
  No. 07 Civ. 376 (JMB), 2008 WL 2275902 (S.D.N.Y. 2008) ...................................................... 8

*Sedona Corp.* v. *Ladenburg Thalmann & Co., Inc.*,
  No. 03 Civ. 3120 (LTS), 2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) ..................................... 3

*State Trading Corp. of India, Ltd.* v. *Assuranceforeningen Skuld*,
  921 F.2d 409 (2d Cir. 1990) ..................................................................................................... 15

*Trumball Invs., LTD* v. *Wachovia Bank*,
  No. 05 Civ. 15 (GBL), 2005 WL 6148880 (E.D. Va. Apr. 15, 2005) ................................... 5, 6

**OTHER AUTHORITY**

*Heitman Cap. Mgmt., LLC*,
  SEC No-Action Letter, 2007 ........................................................................................................ 6

FRANK J. FABOZZI & STEVEN V. MANN, FLOATING-RATE SECURITIES
  (Frank J. Fabozzi Assocs. 2000) ............................................................................................... 10

**Preliminary Statement**

Plaintiff's opposition to defendants' motion to dismiss makes significant express or tacit concessions:

- Plaintiff does not dispute that New York's state and federal courts, with near unanimity, have held that the Martin Act preempts non-fraud common law tort claims and does not contend that any of those cases are wrongly decided (Opp. Brief at 11-13; Defs. Brief at 5-9);

- Plaintiff concedes that the "same allegations support both" its breach of contract claim and breach of fiduciary duty claim (Opp. Brief at 19);

- Plaintiff does not dispute that defendants' purchases of the three types of securities at issue here were within the scope of the Guidelines negotiated by the parties and, thus, were expressly authorized (*id.* at 27; Defs. Brief at 4-5, 14);

- Plaintiff does not dispute that the underlying agreements between the parties do not provide for any limitation on the maturity or liquidity of the securities purchased (Defs. Brief at 16-18);

- Plaintiff does not dispute that it received monthly account statements that accurately disclosed each security in the portfolio and its final maturity (*id.* at 19); and

- Plaintiff does not dispute that defendants generated fees based on a percentage of assets under management, and, thus, defendants' economic incentive was aligned with plaintiff's. (*Id.*)

## I. PLAINTIFF'S NON-FRAUD TORT CLAIMS SHOULD BE DISMISSED

Based on a mischaracterization of its own complaint and the case law, plaintiff contends that its non-fraud common law tort claims – with the exception of negligent misrepresentations and omissions (Eighth Count), which it has conceded is precluded by the Martin Act (Opp. Brief at 12 n.2) – should not be dismissed. Plaintiff's arguments are without merit.

### A. The Martin Act Applies to Plaintiff's Non-Fraud Tort Claims

While conceding that the Martin Act has a preemptive effect, plaintiff insists, based on a single decision, that the Act preempts only common law claims that are "based on"

allegations of "dishonesty or deception." (Opp. Brief at 11-15.) Plaintiff then maintains that its remaining common law claims – breach of fiduciary duty, negligence, and gross negligence – "do not rest on dishonesty or deception in any way." (*Id.* at 14.) But, courts have repeatedly held that the preemptive scope of the Martin Act encompasses the very claims that plaintiff has filed, and the complaint's own factual allegations belie the distinction plaintiff seeks to draw.

### 1. The Martin Act Preempts All Non-Fraud Common Law Tort Claims in the Securities Context

A plaintiff may, consistent with the Martin Act, pursue a fraud claim in the securities context. But, any common law claims that do not *require* proof of intentional deceit as an element of plaintiff's prima facie case – such as breach of fiduciary duty, negligence, and gross negligence – are preempted by the Act. *See Nanopierce Techs., Inc.* v. *Southridge Capital Mgmt.*, No. 02 Civ. 0767 (LBS), 2003 WL 22052894, at *4 (S.D.N.Y. Sept. 2, 2003). As Judge Sand has explained:

> courts [that] allow[] common law fraud claims to proceed while dismissing negligent misrepresentation claims and breach of fiduciary duty claims . . . offer[] a persuasive justification for so doing: ***the latter two causes of action, like the Martin Act itself, do not require proof of deceitful intent***; common law fraud, however, does. Courts concerned with preserving the Attorney General's exclusive domain therefore preclude claims which essentially mimic the Martin Act, but permit common law fraud claims, ***which require an additional element***.

*Id.* (emphasis added). Thus, courts permit "common law fraud claims to proceed because such claims require a plaintiff to prove intent or scienter," "while simultaneously dismissing negligent misrepresentation and breach of fiduciary duty claims." *Granite Partners, L.P.* v. *Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 291 n.8 (S.D.N.Y. 1998); *see also* (Defs. Brief at 7 n.9, at 8 n.10 (collecting cases)).

### 2. Louros's *Interpretation of the Scope of Martin Act Preemption Contradicts the Weight of Authority*

In *Louros* v. *Kreicas*, the court explained:

> The New York Court of Appeals has held that there is no private right of action under the Martin Act, and the vast majority of New York courts to consider the issue, as well as the Second Circuit, have extended that holding to preclude common law actions for breach of fiduciary duty and negligent misrepresentation where the alleged misdeeds fall within the purview of the Martin Act . . . .

367 F. Supp. 2d 572, 595 (S.D.N.Y. 2005).  Although the court went on to hold plaintiff's negligence claim preempted to the extent the claim "deals with deception and therefore comes within the purview of the Martin Act," the court did not dismiss the breach of fiduciary duty claim or the remaining portion of the negligence claim because the particular factual allegations did not assert that defendants had acted deceptively.  *Id.*

Apart from *Louros*, however, plaintiff offers no other support for limiting preemption under the Martin Act in this way.  (Opp. Brief at 11-15.)  That is because the weight of authority holds that the Act preempts ***all non-fraud tort claims*** in the securities context, without consideration of the factual allegations underlying the claims.  (*See* Defs. Brief at 7 n.9, at 8 n.10 (collecting state and federal decisions, none of which consider preempted claims' underlying factual allegations).).  For example, in *Sedona Corp.* v. *Ladenburg Thalmann & Co., Inc.,* the plaintiff asserted analogous claims of an investment advisor's failure "to monitor trading activities, . . . advise [plaintiff] regarding those activities," and "provide the investment and advisory services detailed in its engagement letter."  No. 03 Civ. 3120 (LTS), 2005 WL 1902780, at *21-22 (S.D.N.Y. Aug. 9, 2005).  After explaining that "causes of action related to a plaintiff's securities fraud claim that do not include scienter as an essential element are typically preempted," Judge Swain dismissed plaintiff's claims for breach of fiduciary duty and negligence "as precluded by the Martin Act."  *Id.* at *22-23.

3

In fact, *In re Bayou Hedge Fund Litigation* rejects the decision's narrow interpretation of the Act; Judge McMahon found persuasive the prevailing view that any non-fraud tort claim in the securities context is preempted: "Moreover, I concur with the analysis set forth in *Castellano*, *Nanopierce* and a host of other state and federal decisions finding breach of fiduciary duty in the securities context to be preempted by the Martin Act. This analysis is consistent with the statute's broad reach and purpose." 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2005).

### 3. *Even Applying* **Louros's** *Standard, Plaintiff's Claims Are Preempted*

Nevertheless, even under *Louros*, plaintiff's claims for breach of fiduciary duty, negligence, and gross negligence would not be saved because they clearly "deal[] with deception and therefore come[] within the purview of the Martin Act." 367 F. Supp. 2d at 596. The complaint's pervasive theme is that defendants were deceptive. The introduction alleges: "*[F]rom the outset of its investment advisor relationship with NMH, JPM misrepresented the types of securities it would purchase for NMH and failed to disclose to NMH material information about the securities in the Account*." (Compl. ¶ 11 (emphasis added); *see also, e.g.*, *id.* ¶ 48 ("JPM *misled* NMH about the extent to which its Account was subprime-linked"); ¶ 89 ("*obfuscated* the liquidity of account"); ¶ 91 ("In violation of its fiduciary duties . . . , JPM *misrepresented* the price of Securities in the Account"); ¶ 105 ("*deceptive and misleading* practice of reassuring NMH that its Account was performing well"); ¶ 119 ("JPM's misconduct [] was *outrageous, oppressive and intentional* "); ¶ 132 ("breached their fiduciary duty . . . by *failing to disclose* material facts regarding the securities purchased"); ¶ 133 ("*misrepresenting* the value and maturity date of the securities held in the Account, as well as *misrepresenting* the effect of market events on the securities in the Account").

4

In *In re Bayou*, Judge McMahon explained that a plaintiff who, as NM Homes does here, "relies exclusively on *Louros* . . . to support its contention that the . . . Act does not preempt its breach of fiduciary duty claim," cannot avoid preemption if allegations of deception are "part and parcel of plaintiff's claim."  534 F. Supp. 2d at 422 ("Unlike the claim in *Louros*, South Cherry's breach of fiduciary duty does allege deception. . . .  This allegation is part and parcel of plaintiff's claim, and South Cherry's claim is therefore distinguishable from the claim discussed in *Louros*.").

> **B.  In Accordance With the Parties' Express Agreement, The Exculpatory Clause Should be Given Full Force and Effect**

Plaintiff does not dispute that the agreement between the parties provides that defendants' liability is limited to defendants' "gross negligence or willful misconduct."  (*See* Rosen Decl. Ex. E, at 4 (emphasis added);[1] Defs. Brief at 9-10.)  Plaintiff's primary argument is that the clause should not be enforced because defendants were managing NM Homes' account "on a discretionary basis," and thus enforcement of the clause is "troublesome to public policy."[2]  (Opp. Brief at 17-18.)  Yet, courts have in fact considered exculpatory clauses contained in discretionary management agreements limiting liability to gross negligence, like the one at issue

---

[1] Copies of all documents cited herein were submitted as exhibits to the Declaration of Richard A. Rosen, dated November 7, 2008 (the "Rosen Decl."), or are being submitted herewith as exhibits to the Reply Declaration of Richard A. Rosen, dated December 9, 2008 (the "Rosen Reply Decl.").

[2] Plaintiff's other (unsupported) argument – that "issues relating to the exculpatory clause are not appropriate for determination on a motion to dismiss" – is meritless.  (Opp. Brief at 16-17.)  First, courts regularly rule on the applicability of such clauses at the motion to dismiss stage.  *See, e.g.*, *Piercy* v. *Citibank, N.A.*, 424 N.Y.S.2d 76 (1978), *aff'd*, 48 N.Y.2d 900 (1979); *Trumball Invs., LTD* v. *Wachovia Bank*, No. 05 Civ. 15, 2005 WL 6148880 (GBL) (E.D. Va. Apr. 15, 2005); *Champion Home Builders Co.* v. *ADT Sec. Servs., Inc.*, 179 F. Supp. 2d 16, 23-24 (N.D.N.Y. 2001).  Second, the opposition brief's insinuation that defendants may have "abused [their] position as a fiduciary by including the exculpatory provision," but that this "cannot be conclusively determined without the benefit of discovery," (Opp. Brief at 16-17), is nowhere to be found in plaintiff's 49-page complaint, and is not even supported by a factual allegation in its brief.

5

here, and have consistently found them to be enforceable.  Revealingly, plaintiff does not address, let alone distinguish, this line of authority.

For example, in *Trumball Investments, LTD* v. *Wachovia Bank*, an investor sued Wachovia Bank under a discretionary investment management agreement with an exculpatory clause that mirrors the one at issue here:  "you shall be liable only for losses caused by ***gross negligence management or intentional wrongdoing***."  2005 WL 6148880, at *4 (emphasis in original).  The court held that "the exculpatory clauses [in discretionary investment agreements] are agreements between sophisticated parties to allocate the risk of negligence in the management of discretionary accounts and therefore do not offend the public interest. . . . [Thus,] [c]ourts regularly enforce exculpatory clauses in discretionary investment accounts."  *Id.* (listing cases).³

The two cases on which plaintiff relies to support the proposition that an exculpatory provision will not be enforced when it violates public policy are inapposite because both involve ***blanket*** waivers of liability for ***personal injuries***.⁴  (*See* Opp. Brief at 17.)⁵  Accordingly, NM Homes may not assert a negligence claim in contravention of its contract.

---

3   *See also Piercy*, 424 N.Y.S.2d at 77 (dismissing negligence claim where discretionary investment contract limited liability to "willful misconduct"); *Heitman Cap. Mgmt., LLC*, SEC No-Action Letter, 2007 WL 789073, at *3 (Feb. 12, 2007) (confirming that investment advisor's use of exculpatory clause, limiting liability to gross negligence, is not per se violation of Investment Advisors Act).

4   *Ash* v. *New York Univ. Dental Ctr.*, involves personal injuries suffered as a result of aspiration, during dental treatment, of two dental crowns that became lodged in plaintiff's right lung and required surgical removal.  564 N.Y.S.2d 308, 310 (1st Dep't 1990) (holding that release of all liability in specific context of medical or dental malpractice violates public policy).  And, in *Gross* v. *Sweet*, involving serious personal injuries due to the negligence of a parachute instructor during a parachuting attempt, the court found that the release did not "express clearly" the waiver of all liability as it "nowhere expresses[d] any intention to exempt the [parachuting school] from liability for injury or property damages."  49 N.Y.2d 102, 105 (1979).  Notably, the court in *Gross* distinguished the release of personal injury liability from exculpatory clauses, "negotiated at arm's length between sophisticated business entities," and which can be viewed as merely "allocating the risk."  *Id.* at 108.

5   Plaintiff's reliance on decisions involving fiduciary duties in the bankruptcy context are equally inapplicable.  *See, e.g.*, *In re Allegheny Int'l, Inc.*, 100 B.R. 244, 247 (W.D. Pa. 1989) (holding that "court can alter the terms

6

C. **Plaintiff's Breach of Fiduciary Duty Claim is
   <u>Duplicative of its Breach of Contract Claim</u>**

Plaintiff concedes that "the same allegations support both" its breach of fiduciary duty claim and its breach of contract claim, but argues that the claims are not "duplicative because [defendants'] contractual duty is separate and distinct from [their] fiduciary duty."[6] (Opp. Brief at 19.)  Plaintiff fails, however, to point to any purported separate duties owed by defendants to NM Homes that "spring from circumstances *extraneous to, and not constituting elements of, the contract*." *Consol. Risk Servs., Inc.* v. *Auto. Dealers WC Self Ins. Trust*, 06 Civ. 871 (FJS), 2007 WL 951565, at *3 (N.D.N.Y. Mar. 27, 2007) (citation omitted) (emphasis added); (*see also* Opp. Brief at 20 (citing *Consol. Risk*)).  Plaintiff claims that defendants' "independent" fiduciary duties as NM Homes' "investment advisor in a discretionary account" were to:  "(1) manage the account in a manner directly comporting with the needs and objectives of the customer as stated in the authorization papers," and "(2) keep [NM Homes] informed regarding the changes in the market which affect [NM Homes'] interest and act responsively to protect those interests."  (Opp. Brief at 20, 22 (quoting *Leib* v. *Merrill Lynch, Pierce, Fenner &*

---

and conditions of [contracts with bankruptcy professionals]" due to "broad equitable powers under [] Bankruptcy Code"); (*see also* Opp. Brief at 18).  In addition, *Malik* v. *Toss 29, Inc*., NO. SP 135/07, 2007 WL 926297, at *4 (N.Y. Dist. Ct. Mar. 29, 2007), which plaintiff cites for the proposition that a party that materially breaches an agreement cannot benefit from that agreement, is clearly distinguishable.  There, the appellate court held that it would be inequitable to allow a landlord to enforce a lease provision permitting immediate termination of a tenant's lease upon filing suit against the landlord.  *Id.* at *5.  The trial court had already issued a judgment in favor of the tenant, ruling that the landlord showed "callous disregard" and materially breached his duty to repair a sewer line that resulted in sewage and waste flowing into the tenant's business over some years.  *Id.*

6   Plaintiff's alternative argument, that in fact it has alleged different factual allegations in support of these claims, is unconvincing.  (*See* Opp. Brief at 21-22.)  Plaintiff claims that, even if "liquidity and maturity limits were outside the terms of the contract, NMH has still alleged that [defendants] breached [their] fiduciary duty by filling the Account with long-term securities that were at high risk of illiquidity."  (*Id.* at 22.)  But plaintiff neither identifies the source of such duty, nor alleges any *facts* to support its assertion that NM Homes "clearly expressed" its desire for "short-term securities."  (*Id.*)

7

*Smith, Inc.*, 461 F. Supp. 951, 953 (E.D. Mich. 1978)).) These duties clearly "constitute elements of" the parties' agreements.

In *Brooks* v. *Key Trust Co. Nat'l Ass'n*, 809 N.Y.S.2d 270, 273 (3d Dep't 2006), in which investment advisors were sued for, among other things, breach of contract and breach of fiduciary duty, the appellate court held that plaintiff's breach of fiduciary duty claim "is based on the same facts and theories as his breach of contract claim and was properly dismissed as duplicative":

> [D]efendants' role as [plaintiff's] financial advisor with discretionary authority to manage his investment accounts created a fiduciary duty. [However,] [t]he allegations underlying plaintiff's fiduciary duty claim . . . ***are all either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith***. As such, plaintiff has not set forth allegations that apart from the terms of the contract, the parties created a relationship of higher trust than would arise from their contracts alone, so as to permit a cause of action for breach of a fiduciary duty independent of the contractual duties.

*Id.* at 273 (cited in *Robin Bay Assocs., LLC* v. *Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *3 (S.D.N.Y. 2008)).[7]

Here, the first supposed "independent" duty – to "comport[] with the needs and objectives of the customer as stated in the authorization papers" – is plainly based on the contract itself.[8] In its complaint, plaintiff admits that the Mandate "clearly set forth NMH's investment

---

[7] Plaintiff reliance on *Dimsey* v. *Bank of New York*, No. 600391/2006, 2006 WL 3740349 (N.Y. Sup. Aug. 24, 2006), an unreported New York Supreme Court decision, is overstated. (Opp. Brief at 21.) There, without explanation or support, the court merely held that "at this pre-discovery phase of proceedings, [plaintiff] may plead alternative theories." 2006 WL 3740349, at *3. Of course, courts have regularly found that claims are duplicative, thus warranting dismissal, at the motion to dismiss stage. *See, e.g.*, *Brooks*, 809 N.Y.S.2d 270; *Kaminsky* v. *FSP, Inc.*, 773 N.Y.S.2d 292 (1st Dep't 2004); *accord Robin Bay*, 2008 WL 2275902 (ruling on pre-discovery 12(c) motion).

[8] The "authorization papers" here are the executed Discretionary Portfolio Mandate and the attached Investment Guidelines, which were "intended to be meaningful in outlining the objectives and constraints for this Discretionary Portfolio." (Rosen Decl. Ex. B, at 1.)

8

objectives," (Compl. ¶ 6), and, in support of its breach of contract claim, plaintiff in fact alleges that defendants breached the "Mandate by investing the Account in a manner that clearly contradicted the investment objectives and wholly disregarded the risk profile set forth therein." (*Id.* ¶ 126.)

Similarly, the second duty – to keep a client "informed regarding the changes in the market" – is encompassed within the Mandate and the Guidelines, which set forth defendants' duties in that regard.[9]  Accordingly, plaintiff's breach of fiduciary duty claim is duplicative of its breach of contract claim and should be dismissed.

## II.  PLAINTIFF FAILS ADEQUATELY TO ALLEGE SCIENTER

Plaintiff's opposition argues that the complaint sufficiently alleges scienter because defendants (i) "outright lie[d]" about the maturity of the account, and (ii) invested in "unsuitable" securities for the account.  But, the underlying documents – including the March 2007 letter and the monthly account statements – fully disclosed the maturity of the account and, thus, cannot satisfy the strict standards of *Tellabs*.  And, plaintiff's arguments that the purchased securities were "unsuitable" are based entirely on hindsight, which cannot support an inference of scienter.

### A.  Defendants Made No Misrepresentations Regarding the Maturity of the Account

As discussed in defendants' opening brief, plaintiff's assertion that defendants intended to misrepresent or conceal the maturity dates of the securities in the account is contradicted by the underlying documents.  (*See* Defs. Brief at 16-18.)  Referring repeatedly to a

---

[9] The Guidelines provide, in relevant part:  "If at any time due to major fluctuations in market prices [or] abnormal market conditions . . . there shall be a deviation from the specific guidelines described herein, . . . JP Morgan Chase Bank may . . . make a written recommendation to the Client on the most appropriate way to deal with the deviation."  (Rosen Decl. Ex. B, last page.)  The Mandate provides, among other things:  "From time to time the Advisor may deem it prudent to add or reduce risk and adjust the allocation to a particular asset class based on estimated valuations, cyclical considerations and other market oriented judgments."  (*Id.* at 4.)

9

one-page March 15, 2007, letter from Todd Brown to NM Homes' Chief Financial Officer, plaintiff nevertheless insists that defendants "lied to NMH about the maturity of the account." (Opp. at 23; *see also id.* at 2, 3-4, 8, 23-26, 30.)  But the letter, on its face, flatly belies plaintiff's characterization of its contents.

In the letter, Mr. Brown provides several bullet points summarizing the "salient characteristics of the portfolio" – including, "Average maturity:  0.1 year" – and,  in the very next paragraph, he explains exactly what this means:

> Although the floating rate securities for ABS, CMOs and Corporates may have final maturity dates longer [than] the one or three month coupon reset periods, we deem that the interest rate risk of these securities is commensurate with the coupon res[e]t period and not the final maturity. Additionally, this classification is consistent with how other clients of JPMorgan view similar portfolios.

(Rosen Reply Decl. Ex. A.)  The letter could not be any clearer:  for the purpose of this analysis, defendants were measuring the account's average maturity by "the coupon res[e]t period and ***not the final maturity***."  Mr. Brown even highlights this distinction, noting that the securities – the very ones that plaintiff is challenging here (*see* Compl. ¶¶ 39, 40, 42) – "may have final maturity dates ***longer*** [than] the one or three month coupon reset periods."  Importantly, the time remaining to the next coupon reset date is an industry recognized indicator of price sensitivity for floating rate securities.[10]

Moreover, plaintiff completely ignores the fact that the monthly statements expressly listed NM Homes' investments "by Maturity" – *i.e.*, in order of final maturity date, with the final maturity date noted next to the name of each individual security.  (*See, e.g.*, Rosen

---

[10]   *See* FRANK J. FABOZZI & STEVEN V. MANN, FLOATING-RATE SECURITIES 11 (Frank J. Fabozzi Assocs. 2000) ("The longer the time to the next coupon reset date, the greater a floater's potential for price fluctuation. Conversely, the less time to the next coupon reset date, the smaller the floater's potential price fluctuation.").

10

Decl. Exs. F-H.) And, if that was not clear enough, the statements also provided a "Summary by Maturity" just before the list of securities:

**IMAGE REDACTED FOR CONFIDENTIALITY –
TO BE FILED UNDER SEAL PENDING APPROVAL OF THE COURT**

Thus, in this example from NM Homes' March 2007 account statement – the very same month as the letter – defendants disclose that approximately **[FIGURE REDACTED FOR CONFIDENTIALITY]** of the securities in the account had a maturity of "greater than 20 years." (Rosen Reply Decl. Ex. B.) The statement also notes that the first two securities listed had maturity dates of December 20, 2054.

These account statements, like the March 2007 letter, therefore, do not provide any basis for a plausible or cogent inference of defendants' fraudulent intent.[11] In fact, disclosing

---

[11] In addition, plaintiff cannot justifiably rely on the alleged misrepresentation that the average maturity is 0.1 year when the letter and account statements contain explanatory language to the contrary. *See Brown* v. *E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993) (rejecting Section 10(b) claim where investors relied on oral representations by broker that contradicted written offering materials). The written materials provided plaintiffs "full and objective disclosure of non-misleading factual information. That is all they were entitled to receive." *Id.*

11

how the average maturity was calculated in the letter and listing the final maturity date for each security in the account statement are wholly *inconsistent* with an intent to mislead or deceive.

### B. Plaintiff Fails Adequately to Allege that the Purchased Securities Were Unsuitable at the Time of Purchase

Plaintiff's argument that it has adequately alleged scienter because the complaint alleges that defendants purchased unsuitable securities and then misled NM Homes as to the nature of these securities is similarly flawed. (*See* Opp. Brief at 26-27.) Plaintiff does not contest that the securities at issue – "CMOs, ABS-HELs and FRNs" – were expressly authorized by the Guidelines or that purchasing them was appropriate in some circumstances. Instead, plaintiff argues that purchasing these securities "was inappropriate in *these particular* circumstances." (*Id.* at 27 (emphasis in original).) Yet, plaintiff fails to plead facts to support an inference that, when these securities were purchased, it was foreseeable that they would go down in value. This is merely fraud by hindsight, which, as discussed in defendants' opening brief, cannot support an inference of scienter. (Defs. Brief at 15-16.)

Thus, for example, plaintiff faults defendants for having purchased FRNs, which, as described by plaintiff, are "general obligations of holding companies" for some of the largest financial institutions in the world – Bank of America, Citigroup, Lehman Brothers, Merrill Lynch, Morgan Stanley, and Wachovia, to name a few. (Compl. ¶ 42, Ex. A.) Plaintiff further alleges that the "creditworthiness of [FRNs] is . . . based on the performance and the investment holdings of the financial institution as a whole." (*Id.* ¶ 42.) But, even though all of these institutions have suffered significant losses in value because of their own exposure to subprime collateralized securities[12] – indeed, Lehman Brothers filed for bankruptcy earlier this year – plaintiff alleges no facts to demonstrate that this pervasive decline in the value of major financial

---

[12] *See* Rosen Reply Decl. Ex. C (listing, in Financial Times article, total writedowns and credit losses by major financial institutions since January 2007).

12

institutions was foreseeable when the securities at issue were purchased. In fact, at the time defendants made these purchases – over 90% of them in the first half of 2007 or earlier, and over 50% in the first quarter of 2007 or earlier (*see Id.* Ex. A.) – market regulators and participants viewed the impact of the subprime mortgage market's decline as limited. For example:

- In March 2007, Federal Reserve Director of Banking Supervision and Regulation Roger T. Cole stated that: "at this time, *we are not observing spillover effects from the problems in the subprime market to traditional mortgage portfolios or, more generally, to the safety and soundness of the banking system*." (Rosen Reply Decl. Ex. D, at 1 (emphasis added).)

- In May 2007, Federal Reserve Chairman Ben Bernanke stated that "*the effect of the troubles in the subprime sector on the broader housing market will likely be limited*, and we do not expect significant spillovers from the subprime market to the rest of the economy or the financial system." (*Id.* Ex. E, at 6 (emphasis added).)

- In July 2007, Treasury Secretary Henry Paulson stated: "*I think we're at or near the bottom there.* I don't deny there's a problem with subprime mortgages but I really do believe it's containable, it's quite containable." (*Id.* Ex. F, at 1 (emphasis added).)

And, of course, nearly every market participant and regulator failed to anticipate what we now know, by virtue of hindsight, to be the beginning of a cataclysmic market collapse.

- In March 2008, Federal Reserve Vice Chairman Donald Kohn stated: "I don't know that we fully appreciated all the risks out there. . . . *I'm not sure anybody did*, to be perfectly honest." (*Id.* Ex. G, at 46 (emphasis added).) "We probably didn't recognize [the risk] to the extent it ended up existing. . . . [T]his is a very unusual event, there are no excuses, but I *think it would've been hard to see a year ago where we are today*." (*Id.* at 51 (emphasis added).)

- In October 2008, Former Chairman of the Federal Reserve Alan Greenspan stated: "*We are in the midst of a once in a century credit tsunami* . . . . The crisis . . . has turned out to be much broader than anything I could have imagined." (*Id.* Ex. H, at 15 (emphasis added).) "[I]f you go back and ask yourself how in the early years anybody could realistically make judgments as to what was ultimately going to happen to subprime, *I think you are asking more than anybody is capable of judging*." (*Id.* at 101-102 (emphasis added).)

- In October 2008, SEC Chairman Christopher Cox stated: "I think that *every regulator wishes that he or she had been able to predict the unprecedented meltdown* of the entire U.S. mortgage market which was the fundamental cause of this crisis." (*Id*. at 22 (emphasis added).)

- In November 2008, Former Chairman of the SEC David Ruder stated: "*One key aspect of the credit crisis was the failure of both market participants and regulators to predict the collapse* of the home loan mortgage market. None of the primary market participants predicted the collapse. The risk management systems of most banks, investment banks, ratings agencies, and credit default swap insurers did not predict the collapse. *Regulators, including the Federal Reserve Board, the Federal Deposit Insurance Corporation, the Department of Treasury, the SEC, and the Commodity Futures Trading Commission did not predict the collapse*." (*Id.* Ex. I, at 4) (emphasis added).)

Thus, as discussed in defendants' opening brief, the inference proposed by plaintiff – that defendants "knew or [were] reckless in not knowing that the Securities were unsuitable when purchased" – is not "strong in light of other explanations." *Tellabs*, 127 S. Ct. at 2510. Instead, the more compelling inference is that defendants failed to predict the losses to plaintiff's account, placing them alongside nearly every other market participant. *See Chill* v. *General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (noting that plaintiff must allege conduct that is "highly unreasonable and . . . represents an extreme departure from the standards of ordinary care").

Lastly, plaintiff still fails to offer any plausible motive for defendants' alleged fraud and does not dispute that, because defendants generated fees based on a percentage of assets under management, defendants' incentive was in fact *aligned* with plaintiff's. (*See* Defs. Brief at 19.) Merely alleging that defendants should have foreseen the impact of the subprime mortgage crisis on the account does not sufficiently allege "recklessness" where plaintiff does not allege – or even argue in its opposition – that defendants acted with "intent to cause plaintiff to lose money or assist in [a] fraud being perpetrated." *In re Bayou*, 534 F. Supp. 2d at 417.[13]

---

[13] Plaintiff also argues that this case is not appropriate for resolution on a motion to dismiss because its "asserted claims are document-intensive . . . , [a]nd it is the defendants who have control of that critical documentary evidence." (Opp. Brief at 30-31.) Yet, as plaintiff does not dispute, every document that defendants rely upon in this motion has been quoted or referenced in the complaint and is, therefore, in plaintiff's possession. Additionally, plaintiff's alternative request "to replead its claims" should be denied. (*Id.* at 31.) Pleading "is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges. Rather, plaintiffs have the responsibility to plead their case

14

**CONCLUSION**

For the reasons set forth above, and in their opening brief, defendants respectfully request that the Court dismiss the Second through Tenth Counts of the complaint, with prejudice, and deny plaintiff's request to replead its deficient claims. Defendants further request that, if such counts are dismissed and because the lone remaining count (the First Count, breach of contract) is not being asserted against him, Todd Brown be dismissed from the case, with prejudice.

Dated: New York, New York
December 9, 2008

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  /s/ Richard A. Rosen
Richard A. Rosen (rrosen@paulweiss.com)
H. Seiji Newman (hnewman@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019
Tel.: (212) 373-3000
Fax: (212) 757-3990

*Attorneys for defendants JP Morgan Chase Bank, N.A. and Todd Brown*

---

adequately, without defendants' or the Court's assistance." *Masters* v. *Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911 (HB), 2003 WL 1990262, at *4 (S.D.N.Y. Apr. 29, 2003); *see also Bellikoff* v. *Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *In re Eaton Vance Mut. Funds Litig.*, 403 F. Supp. 2d 310, 318 (S.D.N.Y. 2005). Indeed, it is proper to dismiss a complaint without granting leave to amend even once. *See, e.g.*, *State Trading Corp. of India, Ltd.* v. *Assuranceforeningen Skuld*, 921 F.2d 409, 410, 417-18 (2d Cir. 1990); *Bankruptcy Trust of Gerard Sillam* v. *Refco Group, LLC*, No. 05 Civ. 10072 (GEL), 2006 WL 2129786, at * 6 (S.D.N.Y. July 28, 2006).