USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 30, 2010

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

NM HOMES, INC.,

                Plaintiff,

    -against-

JP MORGAN CHASE BANK, N.A.,
AND TODD BROWN
                Defendants
-----------------------------------------------------X

ORDER
08 Civ. 7679 (PAC)

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff NM Homes One, Inc. ("Plaintiff" or "NMH") brings this action against its investment adviser JP Morgan Chase Bank, N.A. ("JPM") and its fixed income portfolio manager Todd Brown ("Brown") (collectively, "Defendants"). NMH asserts ten claims, including: breach of contract; breach of fiduciary duty; violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), and Section 20(a) of the Exchange Act; common law fraud; negligence; gross negligence; and negligent misrepresentations and omissions.

NMH claims it sustained losses in its $130 million investment management account (the "Account") with JPM, as a result of the declining values of home equity loan asset-backed securities ("ABS"), collateralized mortgaged obligations ("CMO"), and floating-rate notes ("FRN") purchased in the Account. JPM had discretionary trading authority over the Account; and exposed NMH's funds to the subprime market, investing in securities that provided inadequate liquidity, and misrepresenting the value of the securities it purchased for NMH. JPM earned management fees commensurate with the Account's value (a percentage of assets under management).

On November 14, 2008, Defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss all ten claims, except the common law breach of contract claim (Count One), comprising NMH's non-fraud, common law claims for breach of fiduciary duty (Count Two), negligent misrepresentation (Count Eight), negligence (Count Nine), and gross negligence (Count Ten); and NMH's securities fraud claims under § 10(b) of the Exchange Act and Rule 10b-5 (Counts Three through Six), as well as common law fraud (Count Seven).[1]

The Court GRANTS Defendants' motion to dismiss in its entirety and RETAINS supplemental jurisdiction over NMH's breach of contract claim at this time.

**Background**

In October 2006, NMH initiated discussions concerning an investment management account with JPM. (Compl. ¶ 2.)  At that time, NMH informed JPM of their desire to invest in safe, liquid securities that would preserve the principal and mature in a short period of time (Compl. ¶ 2.)  JPM knew that NMH intended to use the funds for near-term development projects and that NMH required liquidity and principal stability (Compl. ¶¶ 23, 79-80.)  JPM offered NMH its "enhanced cash strategy" (the "Enhanced Cash Strategy") which provided income, while preserving capital. (Compl. ¶ 29; Declaration of Richard A. Rosen in Support of Defendants' Motion to Dismiss ("Rosen Decl.") Ex. B.)

In connection with the Enhanced Cash Strategy, JPM provided NMH with Investment Guidelines (the "Guidelines") describing the Enhanced Cash Strategy's objectives.  Additionally, in a letter dated October 24, 2006 (the "October 24 Letter") to Michael Murr, Co-Chairman of NMH's Board of Directors, Brown described the Enhanced Cash Strategy's listing of ABS; CMOs; and FRNs, as three of the typical investments.

---

[1] This case was originally assigned to United States District Judge Kram.  It was reassigned to this Court on September 14, 2009.  Oral argument was heard on March 15, 2010.

The Guidelines state that the "Enhanced Cash Strategy is suited for investors who do not require daily liquidity." (Rosen Decl. Ex. B.)  The Guidelines list each of these securities as potential investments for the Account, (Id.), as does the Investment Management Account Reviews that NMH received. (Id. Exs. C-D.)  The Guidelines also state that "[t]he Investment Manager shall be responsible for selecting the maturities of individual fixed-income securities within the portfolio." (Id. Ex. B.)

In November 2006, the parties executed a Discretionary Portfolio Mandate (the "Mandate") outlining the "philosophy and investment principles" guiding the management of NMH's assets. (Compl. ¶ 33.) The Mandate described the Account as "conservative," indicating that the Account would "seek income and principal stability" and only "low to moderate levels of volatility in the short term." (Compl. ¶ 34.)  The Mandate also reflected NMH's liquidity concerns.  (Compl. ¶ 35 ("This risk profile indicated that NMH was particularly concerned about liquidity and sought an investment strategy that would preserve its ability to purchase or sell assets in the Account at the desired time . . . .").)  The Mandate states that "[t]here are no specific liquidity requirements for this Discretionary Portfolio," and, under "INVESTMENT RESTRICTIONS & INSTRUCTIONS," the Mandate makes no reference to maturities. (Rosen Decl. Ex. B.)  The parties incorporated by reference to the Mandate, "General Terms for Accounts and Services."  These provide that the Defendants' liability is limited to direct damages incurred due to "gross negligence or willful misconduct." (Id. Ex. E.)

Defendants charged fees based on a percentage of assets under management, which includes quarterly realized and unrealized gains.  The more money in the Account, the greater Defendants' fees.  (Id. Ex. A.)

Between November 2006 and August 2007, JPM purchased ABS, CMOs, and FRNs for the Account. (Compl. ¶¶ 38, 49, 62-65.)[2]  Many of the ABS-HELs in the Account were collateralized by subprime mortgage loans. (Compl. ¶ 39.)  Plaintiff alleges that the CMOs were collateralized with Alt-A mortgages, which are riskier than prime mortgages, but not as risky as subprime mortgages. (Compl. ¶¶ 41, 77.) The FRNs in the Account were issued by financial institutions, whose creditworthiness was based on the performance of each institution's investment holdings. (Compl. ¶ 42.)  Many of the financial institutions issuing the securities in the Account held subprime-backed securities. (Compl. ¶ 42.)  Ultimately, NMH entrusted JMP with a total of $130 million. (Compl. ¶ 36.)

Plaintiff alleges that JPM was aware of the risks of investing in the subprime market. (Compl. ¶ 55.) Beginning in the fourth quarter of 2006, various analysts and news media, such as CNNMoney.com, the New York Times, and the International Herald Tribune, reported that the U.S. housing market was in decline. (See Complaint ¶¶ 45, 56-57.) At the same time, several financial institutions began to report financial difficulties and expected losses. (See Complaint ¶¶ 56-57.)

In February 2007, the largest U.S. subprime lenders were announcing unprecedented losses, (Compl. ¶ 51), and in March 2007, Christopher Flanagan ("Flanagan"), global head of JPM's ABS and CMO research, predicted that "a very severe correction [in the subprime market] . . . will last anywhere from six to twelve months, during which many of the leaders who have operated in this market will gradually get pushed out of the business." (Compl. ¶ 55.)  Also, in

---

[2] ABS are debt securities secured by collateralized home equity loans, which are, in turn, secured by residential real estate. (Compl. ¶ 39.) CMOs are debt securities collateralized by mortgage loans, also secured by real estate. (Compl. ¶ 40.) Both ABS and CMOs can be secured by either subprime or non-subprime mortgage loans. (Compl. ¶¶ 39-40.)  FRN's are unsecured debt securities for which coupon rates adjust periodically based on a market reference rate, such as LIBOR. (Compl. ¶ 42.)

March 2007, Brown indicated that JPM would look to reduce the Account's subprime-linked positions. (Compl. ¶¶ 12, 141.)

In the July 2007 "JP Morgan Q&A," J.P. Morgan Securities, Inc. addressed the "Subprime Meltdown." In that Q&A, J.P. Morgan said that it expected "continued deterioration in subprime loan performance well into 2008." J.P. Morgan further wrote that "[i]f [its] analysis is correct, downgrades will be confronting both home-equity asset-backed securities and ABS collateralized debt obligations (CDOs that own ABS tranches from AA down to BB). Downgrades will probably reach as high as the AA part of the capital structure in both sectors." J.P. Morgan acknowledged that "[l]iquidity in the subprime sector has evaporated." (Compl. ¶ 58.)

Flanagan also warned in July, 2007, that the "worst is not over in the subprime mortgage market" and that "home price declines such as we expect would lead to substantial increases in subprime mortgage defaults and losses [and that this] in turn would have significant negative implications for pricings and ratings of subprime securities and asset backed indices." According to Flanagan, "[w]e're on the cusp of a serious pullback in liquidity for this market." (Compl. ¶ 59.)

In the second half of 2007, the subprime mortgage crises intensified. In July 2007, two Bear Stearns subprime hedge funds collapsed; the American Bankers Associate reported that late payments on home equity loans were on the rise; the New York Times reported that the bond rating agencies were downgrading mortgage securities; and J.P. Morgan stated that "liquidity in the subprime sector has evaporated," and that it expected "continued deterioration in subprime loan performance well into 2008." (Compl. ¶ 57-58.) In August 2007, the subprime securities market continued to plummet, forcing Lehman Brothers to close its subprime lender,

Countrywide to draw down its entire bank credit lines, mortgage lender First Magnus to suspend operations, Accredited Home Lenders to halt loan applications and cut 1,600 jobs, and American Home Investment to close. (Compl. ¶ 61.)

Despite these warnings and JPM's recognition of the state of the U.S. housing market, JPM continued purchasing "subprime-linked securities" through August 2007 so that by the end of August 2007, subprime-linked securities comprised more than half of NMH's Account. (Compl. ¶¶ 49, 60-65.)

In addition to purchasing these subprime-linked securities, JPM allegedly misled NMH as to its exposure to the subprime market and the value of its investments. (Compl. ¶¶ 53, 73.) When Michael Murr of NMH requested information from JPM about the subprime-backed ABS, JPM responded that it did not anticipate any issues with the credit quality of NMH's investments. (Compl. ¶ 53.) Additionally, in the fall of 2007, Brown represented that its CMO positions were all prime-mortgage backed, indicating that NMH did not have to be concerned about those securities. (Compl. ¶ 63.) NMH alleges that in fact many of its CMOs were backed by Alt-A mortgages (where the borrowers have an insufficient financial profile to qualify for prime mortgages) that had delinquency rates just as high as subprime-mortgages. (Compl. ¶ 77.)

NMH also alleges that JPM purchased securities incompatible with NMH's liquidity goals. (Compl. ¶¶ 78-90.) Specifically, in March 2007, NMH asked Brown to confirm which of the securities in the Account would qualify as cash equivalents. Brown falsely responded on March 15, 2007 (the "March 15 Letter") that the entire Account was classified as cash equivalent and that the average maturity of the securities in the Account was 0.1 year. (Compl. ¶¶ 85-86.) In fact, however, the average maturity of the securities in the Account was over a decade. (Compl. ¶ 85.) Accompanying Brown's representation, JPM explained the 0.1 year figure by stating:

> Although the floating rate securities for ABS, CMOs, and Corporates may have final maturity dates longer than the one or three month coupon reset periods, we deem that the interest rate risk of these securities is commensurate with the coupon rest [sic.] period and not the final maturity. Additionally, this classification is consistent with how other clients of JPMorgan view similar portfolios.

(Reply Declaration of Richard A. Rosen ("Reply Decl."), Ex. A.)   Additionally, the monthly statements that JPM provided NMH listed the final maturity date for each security in the Account. (Id. Ex. B.)

NMH further alleges that JPM misrepresented the price of the securities in the Account, knowing that NMH relied on these prices when assessing the overall value of the portfolio. (Compl. ¶ 91.)  Specifically, on each month's account statement, JPM assigned a value to each security in the column labeled "price" based on certain "mark[s]" to market. (Compl. ¶¶ 92, 102.)  JPM failed to disclose to NMH, however, that those marks did not represent real prices, so that JPM was unable to sell the securities at the "marks" it had provided to NMH, resulting in unexpected losses and inhibiting NMH's ability to make informed decisions regarding the sale of its securities. (Compl. ¶ 101.)

Finally, NMH alleges that JPM provided inadequate security-specific information and analysis regarding the securities in the Account. (Compl. ¶¶ 109, 111.)   JPM, for example, refused NMH's requests for analytics, prospectuses, and internal ratings. (Compl. ¶¶ 24, 110, 112-114.)

**Pleading Standards for Non-Fraud Claims**

Fed. R. Civ. P. 8(a) provides that a pleading must "contain a short and plain statement of the claim showing that the pleader is entitled to relief."  On a motion to dismiss under Fed. R.

Civ. P. 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 572 (2007); <u>See Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1950 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

Allegations that are no more than legal conclusions, however, are not assumed to be true. <u>Twombly</u>, 550 U.S. at 572. Dismissal of a complaint under Fed. R. Civ. P. 12(b)(6) is appropriate if the plaintiff has failed to offer factual allegations sufficient to render the asserted claim plausible on its face. <u>Iqbal</u>, 129 S.Ct. at 1949. To state a facially plausible claim, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> "[T]he pleading standard <u>Rule 8</u> announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Id.</u> "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> While legal conclusions can form the framework of a complaint, they must be supported by factual allegations. <u>Id.</u>

In ruling upon a motion to dismiss an action for securities fraud, courts must accept the complaint's allegations as true, <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 127 S.Ct. 2499, 2509 (2007); and draw all reasonable inferences in the plaintiff's favor. <u>Caiola v. Citibank, N.A.</u>, 295 F.3d 312, 321 (2d Cir. 2002). The court only "assess[es] the legal feasibility of the complaint," it does not "assay the weight of the evidence which might be offered in support thereof." <u>Levitt v. Bear Stearns & Co.</u>, 340 F.3d 94, 101 (2d Cir. 2003).

**Discussion**

JPM makes two principal arguments in support of its motion to dismiss: (i) New York State's Martin Act preempts NMH's non-fraud, common law claims, and (ii) NMH's securities fraud claims fail to adequately plead scienter.

**i. Martin Act Preemption**

New York's Martin Act preempts NMH's non-fraud common law claims: breach of fiduciary duty (Count Two ); negligent misrepresentation (Count Eight); negligence (Count Nine); and gross negligence (Count Ten) (collectively, the "Non-Fraud Common Law Claims").

The Martin Act prohibits fraudulent and deceitful practices in connection with the distribution, exchange, purchase, and sale of securities. N.Y. Gen. Bus. Law art. 23-A. The Martin Act empowers the New York Attorney General, and only the New York Attorney General, to bring suit for violations of the Martin Act. CPC Int'l Inc. v. McKensson Corp., 70 N.Y.2d 268, 275 (1987) (holding that there is no private right of action under the Martin Act).

The Martin Act preempts common law breach of fiduciary duty claims where the underlying claim implicates a subject covered by the Act. Castellano v. Young & Rubicam, Inc., 257 F.3d 171, 190 (2d Cir. 2001) (allowing claims covered by the Martin Act would effectively provide investors with a private right of action to enforce the conduct prohibited by the statute). Furthermore, many courts have held that the Martin Act preempts breach of fiduciary duty claims arising in the securities context. See e.g., Bayou Hedge Fund Litig. v. Hennessee Group LLC, 534 F. Supp. 2d 405, 422 (S.D.N.Y. 2007) (granting motion to dismiss a breach of fiduciary duty claim, as preempted by the Martin Act, where investor alleged insufficient due diligence before recommending hedge funds operating as a fraudulent Ponzi scheme).[3]

---

[3] See also Abu Dhabi Commercial Bank v. Morgan Stanley & Co., 2009 WL 2828018 (S.D.N.Y. Sep. 2, 2009) (dismissing, based on the Martin Act, claims brought by investors for negligence, negligent misrepresentation, and

The Non-Fraud Common Law Claims are predicated on allegations of nondisclosure and material omissions in connection with the purchase and sale of securities. Not only do these claims arise in the securities context – itself sufficient to dismiss as preempted by the Martin Act under Bayou – but the subject matter of the claim, fraud in the sale of securities, is directly covered by the Martin Act. If the Martin Act preempts a breach of fiduciary duty claim where an investor merely fails to adequately conduct due diligence before recommending hedge funds, as in Bayou, then the Martin Act a fortiori preempts the breach of fiduciary duty claim here, where the claims themselves are premised on fraud.

NMH argues that the Martin Act does not preempt the Non-Fraud Common Law Claims since their claims are not based on dishonesty or deception. (See Pls.' Opp'n 11-15.). In support, Plaintiff points to Louros v. Kreicas, 367 F. Supp. 2d 572, 595-96 (S.D.N.Y. 2005). Louros holds that a claim for breach of fiduciary duty is not preempted by the Martin Act and survives a motion for summary judgment where the breach of fiduciary duty involved investing in securities, but did not allege dishonesty or deception. Id.

The majority of courts, however, hold that the Martin Act precludes all common law, non-fraud securities claims. See Sedona Corp. v. Ladenburg Thalmann & Co., Inc., No. 03 Civ. 3120 (LTS) (THK), 2005 WL 1902780, at *22 (S.D.N.Y August, 9, 2005) ("Indeed the weight of authority holds that common law claims of negligent misrepresentation, negligence, and breach of fiduciary duty arising from securities fraud are preempted by the Martin Act.") (citing examples); see also Aris Multi-Strategy Offshore Fund, Ltd. V. Devaney, 2009 WL 5851192, at

---

breach of fiduciary duty where plaintiffs sought to recover losses resulting from the collapse of their investments amid the 2007 credit crises); Kassover v. UBS Financial Services, Inc., No. 08 Civ. 02753 (LMM), 2008 WL 5331812, at *6-10 (S.D.N.Y. Dec. 19, 2008) (dismissing, as preempted by the Martin Act, plaintiffs' securities-related state law claims, including breach of fiduciary duty, negligence, and negligent misrepresentation); Dujardin v. Liberty Media Corp., 359 F. Supp. 2d 337, 355 (S.D.N.Y. 2005) (dismissing a claim for negligent misrepresentation as preempted by the Martin Act); Nanopierce Tech., Inc. v. Southridge Capital Mgmt. LLC, No. 02 Civ. 767 (LBS), 2003 WL 22052894, at *3 (S.D.N.Y. Sept. 2, 2003) (dismissing a claim for breach of fiduciary duty as preempted by the Martin Act).

*11 (N.Y. Sup. Ct. Dec. 14, 2009) (noting that the vast majority of state and federal courts have found that claims relating to securities fraud that do not include scienter as an essential element are preempted by the Martin Act).

Furthermore, Plaintiffs' reliance on Louros is misplaced.    The claim in Louros is distinguishable from the breach of fiduciary duty claim here.  In Louros, the plaintiffs alleged that an investment manager breached his fiduciary duty by failing to maintain investor accounts in a way that comported with investor needs and by failing to keep investors informed about the market and the trades in the investor accounts.  The breach of fiduciary duty claim did not, however, allege deception and was thus outside the purview of the Martin Act, even though it involved securities.

Here, however, Defendants' Non-Fraud Common Law Claims clearly allege fraud and deception. See Bayou, 534 F. Supp. 2d at 422 (holding that the Martin Act preempted an investor's breach of fiduciary duty claim where the claim was predicated on allegations of deception, and distinguishing Louros, where the allegations did not implicate deception); Heller v. Goldin Restructuring Fund, L.P., et al., 2008 WL 5328430, at *6 (S.D.N.Y. Dec. 22, 2008) (dismissing, as preempted by the Martin Act, plaintiff's breach of fiduciary duty claim since the underlying securities fraud claim alleges dishonesty and deception):

- In support of its claim for breach of fiduciary duty (Count Two), NMH asserts that JPM "failed to act fairly and honestly," and that JPM "misrepresent[ed] the value and maturity date of the securities held in the [NMH] Account." (Compl. ¶¶ 132-33.);

- NMH's negligent misrepresentation claim (Count Eight) deals entirely with misrepresentations made by JPM to NMH. (Compl. ¶ 187 ("Defendants owed a duty to Plaintiff not to negligently misrepresent material facts . . . ."); Complaint ¶ 189 ("Defendants' representation was false . . ."); Complaint ¶ 190 ("Defendants also told Plaintiff that it would seek to reduce the subprime-linked materials in the account. This representation was false . . . .").);

- In support of its negligence claim (Count Nine), NMH alleges that JPM purchased unsuitable and unauthorized subprime-linked securities on NMH's behalf. (Compl. ¶ 196.) In so doing, NMH alleges that JPM failed to disclose to NMH the extent to which its Account was linked to the subprime mortgage market and misled NMH into believing that many of its Subprime-Linked Securities were not at risk. (See Pls.' Opp'n 8 (citing Complaint ¶¶ 73-77.));

- NMH lists no specific instances in support of its gross negligence claim (Count Ten), but NMH incorporates by reference all of the preceding paragraphs in the Complaint, which include numerous allegations of dishonesty and deception. (Compl. ¶ 11 ("[F]rom the outset of its investment advisor relationship with NMH, JPM misrepresented the types of securities it would purchase for NMH and failed to disclose to NMH material information about the securities in the Account."); Complaint ¶ 89 ("JPM omitted the maturities of the Securities in the Account . . . to obfuscate the long term and thus illiquid nature of the Portfolio."); Complaint ¶ 85 (alleging that Brown claimed that the average maturity of the Account was 0.1 year when it was actually more than ten years).)

Since the Non-Fraud Common Law Claims are predicated on fraud and deception, the Martin Act preempts them, and the Court dismisses Counts 2, 8, 9 and 10 with prejudice.

**NMH's Fraud Claims**

NMH brings four separate claims under § 10(b), Rule 10b-5, and § 20(a) of the Exchange Act (Counts Three through Six), alleging that: (1) JPM made several material misrepresentations to NMH regarding the Account; (2) JPM purchased securities that were unsuitable for NMH's investment objectives; (3) JPM purchased securities not authorized by NMH; and (4) Brown is a control person within the meaning of § 20(a) of the Exchange Act. (Compl. ¶¶ 137-74.) NM also brings a fifth claim: state common law fraud (Count Seven) (Compl. ¶¶ 175-85.)

Section 10(b) of the Exchange Act prohibits "any person . . . to use or employ . . . any manipulative or deceptive device or contrivance in contravention" of Securities and Exchange Commission ("SEC") rules. 15 U.S.C. § 78j(b) (2006). Rule 10b-5, promulgated by the SEC under § 10(b), prohibits "any device, scheme, or artifice to defraud" or "any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . ." 17 C.F.R. 240.10b-5 (2008).

To state a claim under Rule 10b-5, a plaintiff must allege that defendants "'(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that the plaintiff's reliance was the proximate cause of their injury.'" Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005).

Unsuitability claims (Count Four) are a subset of a § 10(b) claim. Brown v. E.F. Hutton Group, Inc., 991 F.2d 1020, 1031 (2d Cir. 1993). In addition to alleging facts satisfying Rule 9(b) and the PSLRA, Plaintiffs asserting an unsuitability claim must allege that (1) the securities purchased were unsuited to the buyer's investment objectives; (2) the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) the defendant, with scienter, made material misrepresentations, or, owing a duty to the investor, failed to disclose material information relating to the suitability of the securities; and (5) the buyer justifiably relied to its detriment on the defendant's fraudulent conduct. Brown, 991 F.2d at 1031.

The Court dismisses all of NMH's fraud claims (Counts Three-Seven) for failure to sufficiently allege scienter, an essential element in all of NMH's fraud claims. Since there is no primary liability under Section 10(b) and Rule 10b-5, there can be no control person liability under Section 20(a). S.E.C. v. First Jersey Secs., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996). Accordingly, the Court also dismisses NMH's control person liability claim (Count Six).

**a. Heightened Pleading Standards for Fraud Claims**

Fraud claims must meet the heightened pleading requirements set forth in Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632-33 (S.D.N.Y. 2008). Plaintiff's pleading must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999). Rule 9(b) does not require that knowledge be pled with the same particularity as the elements of the alleged fraud, and a plaintiff is not expected to plead a defendant's actual knowledge. Landy v. Mitchell Petroleum Tech. Corp., 734 F. Supp. 608, 621 (S.D.N.Y 1990).

Private securities fraud actions must also satisfy the Private Securities Litigation Reform Act ("PSLRA"). See 15 U.S.C. § 78u-4(b)(3)(A); ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007s). In an action for money damages requiring proof of scienter, the PSLRA prescribes that "the complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). An inference is "strong" under the PSLRA only if "a reasonable person would deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S.Ct. at 2510.

**b. Standards for Pleading Scienter in Fraud Claims**

The standard for pleading scienter in the common law fraud context is the same as in the federal securities law context. Scone Invs., L.P. v. Am. Third Mkt. Corp., 1998 WL 205338, at *20 (S.D.N.Y. April 28, 1998). A plaintiff claiming fraud can plead scienter "either by (a)

alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006); see also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (noting that Rule 9(b) requires allegations of "facts that give rise to a strong inference of fraudulent intent.").

In considering whether the facts as pleaded give rise to a strong inference of fraudulent intent, courts must "consider plausible nonculpable explanations for defendant[s'] conduct, as well as inferences favoring the plaintiff." Tellabs, 127 S.Ct. at 2510. Thus, "[a] complaint will survive…only if a reasonable person would deem the inference cogent and at least as compelling as any opposing inferences one could draw from the facts alleged." Id.

Recklessness sufficient to establish scienter involves conduct that is "highly unreasonable and … represents an extreme departure from the standards of ordinary care." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996). The allegations must approximate an actual intent to defraud. Id. Where a motive "is not apparent…, the strength of the circumstantial allegations must be correspondingly greater." In re Take-Two, 551 F. Supp. 2d at 270. "Thus, a plaintiff pleading a § 10(b) violation based on defendants' recklessness faces two stiff challenges in this Circuit: the strength of the recklessness allegations must be greater than that of allegations of garden-variety fraud, *and* the inference of recklessness must be at least as compelling as any opposing inferences." Bayou, 534 F. Supp. 2d at 415.

## ii. Adequacy of Scienter Pleadings

Defendants' written disclosures undermine an inference of scienter under the strict Tellabs standard. In light of Defendants' written disclosures, NMH fails to adequately plead scienter since it fails to allege facts that suggest either: (i) circumstantial evidence of conscious

misbehavior or recklessness, or (ii) a motive to purchase unsuitable securities or to mislead NMH.

The complaint alleges that the Defendants defrauded NMH by purchasing unsuitable securities for the Account. NMH attributes its loss to Defendants' misconduct. An equally plausible inference, however, is that Defendants purchased authorized and suitable securities for the Account, which only afterwards declined in value due to market forces that affected all investors. NMH's fraud claims rely heavily on several of JPM's public statements regarding the erosion of the subprime market (alleging Defendants' knowledge of the unsuitability of its investments on behalf of NMH), as well as several statements that Brown made directly to NMH (alleging Defendants' fraudulent misrepresentations). In addition to the investment strategy and decisions, Defendants also provided NMH with account statements. These statements undermine NMH's allegations of fraudulent misrepresentations or omissions. NMH's fraud claim thus fails to adequately plead scienter: the nonculpable inference of a general market decline is cogent and at least as compelling as an inference of intent to defraud. <u>Tellabs</u>, 127 S.Ct. at 2510. In addition to the heightened particularity pleadings of <u>Rule 9(b)</u> for fraud claims, <u>Tellabs</u> requires courts to examine competing inferences when determining whether scienter has been adequately pled. NMH has not met these strict pleading requirements.

NMH relies on the markdown of the securities as a factual basis for inferring scienter. This reliance is misplaced: <u>Novak v. Kasaks</u>, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant"). Hindsight which reveals underperformance of securities cannot be used to support a fraud claim. <u>Shields</u>, 25 F.3d at 1129 ("We have rejected the legitimacy of 'alleging fraud by hindsight'"). Performance is insufficient to support fraud; investors claiming fraud must allege intent.

In addition to disclosing its investment strategy, JPM disclosed all of its investments for the Account to JPM in account statements, undermining the plausibility of NMH's claim that JPM had intent to defraud. And both the Guidelines and the October 24 Letter describe the "[t]ypical investments" and "typical sector ranges" for the Enhanced Cash Strategy: these documents expressly contemplate JPM's purchase of ABS, CMOs, and FRNs for the Account and thus undermine NMH's unsuitability claim.

NMH alternatively alleges that following JPM's purchase of subprime-linked securities, Defendants knew or should have known that the value of these securities would decline and thus should have sold them to avoid a loss. These conclusory allegations are insufficient to plead a securities fraud claim. Shields, 25 F.3d 1124, 1129 (2d Cir. 1994) ("conclusory allegations of what [defendant] must have known or should have known… do not create an inference that [defendant] acted with scienter.").

NMH argues that its allegations are not conclusory, pointing to concrete statements made by Flanagan, showing that in March and July, 2007, JPM was aware of the erosion of the subprime market. (Compl. ¶¶ 55, 58-59.) During the first half of 2007, however, numerous market regulators and participants viewed the impact of the subprime mortgage crisis as limited and failed to anticipate the subsequent market collapse (collected in Def. Reply Br. at 13-14). Furthermore, NMH's alleged post-purchase knowledge of the securities' imminent decline in value fails to support an inference that the securities were unsuitable at the time of the purchase. Eickhorst v. E.F. Hutton Group, Inc., 763 F. Supp. 1196, 1201 (S.D.N.Y. 1990).

Since NMH has failed to adequately plead scienter – on either a conscious misbehavior or recklessness theory – NMH must support its fraud claims by adequately alleging that Defendants possessed a motive to purchase unsuitable securities or to mislead NMH. NMH fails to do so.

There are no allegations that Defendants were churning the securities in the Account to generate fees or that Defendants profited from purchasing unsuitable securities. In fact, Defendants' fees were based on the Account's value (a percentage of assets under management), which aligned the interests of NMH and the Defendants. <u>Zucker v. Sasaki</u>, 963, F. Supp. 301, 310 n.12 (S.D.N.Y. 1997) ("In determining whether motive has been sufficiently alleged, the Court may assume that the defendant is acting in his informed economic self-interest.").

NMH alleges that Defendants misrepresented the liquidity and maturity dates of the securities in the Account. These allegations cannot, however, support an inference of fraud. There were no contractual limitations on the liquidity or maturity dates of NMH's investments with JPM; so there could be no motive for Defendants to misrepresent the liquidity or maturity dates. Regarding liquidity, the Guidelines state that the "Enhanced Cash Strategy is suited for investors who do not require daily liquidity." (Rosen Decl. Ex. B.). The Mandate similarly states that "[t]here are no specific liquidity requirements for this Discretionary Portfolio." (Rosen Decl. Ex. B.)

As with liquidity, so with maturity. The "Investment Restrictions & Instructions," of the Discretionary Portfolio Mandate makes no reference to maturities. The Guidelines state that "[t]he Investment Manager shall be responsible for selecting the maturities of individual fixed-income securities within the portfolio." (Rosen Decl. Ex. B.). Finally, NMH's monthly account statements listed the securities in the Account in order of final maturity date. (Rosen Decl. Ex. B.)

In connection with representations regarding the Account's maturity, NMH repeatedly points to Brown's March 15 Letter stating that that the average maturity of the securities in the Account was 0.1 year when, in fact, the average maturity of the securities in the Account was

over a decade.  Accompanying Brown's representation, however, JPM explained the 0.1 year

figure by stating:

> Although the floating rate securities for ABS, CMOs, and Corporates may have
> final maturity dates longer than the one or three month coupon reset periods, we
> deem that the interest rate risk of these securities is commensurate with the
> coupon rest [sic] period and not the final maturity. Additionally, this
> classification is consistent with how other clients of JPMorgan view similar
> portfolios.

(Reply Decl. Ex. A.)  Thus Defendants were measuring the Account's average maturity by the

coupon reset period, not by the final maturity.  JPM's written explanation of the 0.1 figure

negates an inference of Defendants' fraud or deception.

Finally, in support of allegations giving rise to an inference of bad motive, NMH points

generally to Defendants' desire to earn management fees and to avoid taking a write-down on

their holdings.  Neither of these conclusory allegations adequately support an inference of

motive: While personal interest is sufficient to establish motive, Rombach, 355 F.3d at 177, a

defendant's general desire to earn management fees is insufficient to satisfy a Rule 9(b) claim.

Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008)

("The desire to earn management fees is a motive generally possessed by hedge fund managers,

and as such, does not suffice to allege a concrete and personal benefit resulting from fraud").

Nor do generalized allegations of a defendant's desire to maintain the appearance of corporate

profitability or the success of an investment satisfy the motive prong of a Rule 9(b) claim. In re

JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005).

Accordingly, the Court dismisses NMH's fraud claims (Counts Three through Seven)

since NMH has failed to sufficiently allege either: (i) circumstantial evidence of conscious

misbehavior or recklessness, or (ii) a motive to purchase unsuitable securities or to mislead

NMH.

**Leave to Replead**

NMH has requested leave to amend the complaint to redress any deficiencies the Court might identify therein. (Pl's. Opp'n 31.) Under Fed. R. Civ. P. 15(a)(2), a "court should freely give leave [to amend] when justice so requires." Indeed, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990). This is especially true when a complaint is dismissed for lack of specificity under Rule 9(b). See Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) ("Complaints dismissed under Rule 9(b) are almost always dismissed with leave to amend."). A court may deny leave to amend, however, where amendment would be futile. See Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002).

The Court grants Plaintiff's request to amend the complaint and cure its deficiencies with respect to the securities and common law fraud counts, Counts Three through Seven. As to the common law non-fraud claims, which are preempted by the Martin Act, the Court denies leave to replead Counts Two, Eight, Nine, and Ten. Amendment would be futile.

Since the Court grants Plaintiff's request for leave to replead, the Court retains supplemental jurisdiction over the breach of contract claim at this time. In a letter dated February 2, 2010, Defendants requested leave to file a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). The Court grants this request.

\*       \*       \*

Accordingly, the Court GRANTS Defendants' motion to dismiss in its entirety. Counts Two and Eight, Nine, and Ten are dismissed with prejudice, as preempted by the Martin Act. Counts Three through Seven are dismissed with leave to replead within thirty (30) days from the effective date of this Order. The Court retains supplemental jurisdiction over the breach of

contract claim at this time. The Court grants Defendants' request to file a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) regarding the breach of contract claim. The Clerk of the Court is directed to close out the pending motion in this case (Dkt # 19).


Dated: New York, New York
       March 29, 2009

SO ORDERED

PAUL A. CROTTY
United States District Judge