UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NM HOMES ONE, INC., | 08 Civ. 7679 (PAC) |
| Plaintiff, | ECF CASE |
| v. | **AMENDED ANSWER** |
| JP MORGAN CHASE BANK, N.A. and TODD BROWN, | |
| Defendants. | |

Defendants JP Morgan Chase Bank, N.A. ("JP Morgan Chase") and Todd Brown, by their attorneys, Paul, Weiss, Rifkind, Wharton & Garrison LLP, hereby answer the complaint of plaintiff NM Homes One, Inc. ("NM Homes"), and state as follows:

## Introduction

In this action, NM Homes sues its investment manager JP Morgan Chase and seeks to blame it for investment losses in asset-backed and mortgage-backed securities. NM Homes even goes so far as to also fault JP Morgan Chase for investments in floating rate notes issued by financial institutions such as Goldman Sachs and Citibank, which themselves had exposure to the subprime loan market, referring to such investments in its complaint with the tainted phrase "Subprime-Linked Securities." The lawsuit is a classic example of pleading with the benefit of 20/20 hindsight, and it is legally and factually defective for a variety of reasons:

*First*, six of NM Homes' ten claims in the complaint are deficient as a matter of law and were thus properly dismissed.

*Second*, plaintiff NM Homes is a remarkably sophisticated investor, and its very savvy and experienced principal stockholder worked hand-in-hand with JP Morgan Chase in managing NM Homes' investments.

NM Homes is in the home construction business in California, and was, upon information and belief, itself active in arranging subprime loans for purchasers of its homes. NM Homes was intimately familiar with the market for home construction and subprime lending, in the very part of the country where the problems concerning subprime lending originated.

NM Homes' principal stockholder and the person who represented NM Homes in its dealings with JP Morgan Chase is Michael Murr. Prior to becoming the controlling shareholder of NM Homes (and also manager of a distressed debt hedge fund, Daystar), Murr held a senior position at Bear Stearns, as head of the Financial Institutions Group responsible for the firm's investment banking-related activities in the financial institutions sector. Prior to that, Murr held a senior position in the Mortgages Group of Bear Stearns, which issued mortgage-backed securities for the firm. Indeed, Murr claims that this Group, while he was part of it, actually invented the collateralized mortgage obligation, one of the securities at issue in this lawsuit. Upon information and belief, Murr's net worth is about $400 million.

Mr. Murr's business partner in Daystar (who, upon information and belief, is also an investor in plaintiff NM Homes) is John Sites. Sites is also a former senior executive of Bear Stearns, was head of the Fixed Income Group there, and founded the Mortgages Group in which Murr worked. Upon information and belief, Sites was a

director of Fannie Mae, the large government-sponsored enterprise that provides liquidity to the housing and mortgage markets.

Though NM Homes gave JP Morgan Chase full discretion to manage the account, both Murr and Sites, on behalf of NM Homes, were in fact actively engaged with JP Morgan Chase in the management of NM Homes' portfolio.

At the outset of the account relationship, Murr was presented with three options for the investment of NM Homes' money. After careful and extensive consideration of these three options, Murr himself chose JP Morgan Chase's "Enhanced Cash Strategy" over the more conservative option of a money market fund. Murr then went through the written terms of JP Morgan Chase's Investment Guidelines and Discretionary Portfolio Mandate (together, the "Guidelines") for the Enhanced Cash Strategy with the client portfolio manager, defendant Todd Brown (whom NM Homes has, for no apparent legitimate reason, named personally as a co-defendant), exhaustively and in detail, prevailed upon JP Morgan Chase to adjust many of the standard terms in the Guidelines, and even prevailed upon JP Morgan Chase to discount its investment fees. The Guidelines Murr settled upon with JP Morgan Chase specifically contemplated investments in asset-backed securities, corporate securities (including floating rate notes), and mortgage-backed securities (including collateralized mortgage obligations), among other things.

During the course of the relationship, Murr spoke with Todd Brown approximately 3-4 times a week, and often daily, about the status of the account, and reviewed with Brown the general characteristics (*i.e.*, structure, collateral, subordination, average life) of the asset-backed securities and collateralized mortgage obligations in the

account.  Prior to the market downturn in 2007, Murr indicated approval of the strategy, was consistently complimentary of Brown and the firm, and never objected in any fashion to a particular purchase.  In addition, NM Homes' CEO (Lou Malone) and CFO (Marika Erdely) routinely scrutinized the monthly account statements they received from JP Morgan Chase.  Brown and others at JP Morgan Chase also personally provided in-depth explanations of the details of the account statements to Malone and Erdely, and explained the manner in which the statements are sorted by the maturity dates of the securities in the portfolio.

One notable event in the relationship was a lengthy and comprehensive conference call on August 21, 2007, between Murr, Sites, Brown and asset-backed securities experts at JP Morgan Chase.  In the call Sites boasted to these asset-backed securities experts: "I have forgotten more about this stuff than you will ever know," and interrogated them about the asset-backed securities collateralized by subprime lending in the account.  After carefully reviewing each, Sites identified just one such security that was in his view not performing well, and indicated his approval of the rest.  Murr complimented Brown for the call, and asked that JP Morgan Chase sell the one security out of NM Homes' account, which the firm did.

*Third*, JP Morgan Chase never made an investment for NM Homes' account that was outside the parameters of the Guidelines that Murr negotiated and accepted.  For example, while the Guidelines permitted an investment of up to 60% of the portfolio in asset-backed securities, those securities never exceeded 18% of the account.  Also, although the Guidelines permitted investments in securities with credit ratings as low as A3/A-, JP Morgan Chase (with the exception of one AA rated security that was

sold at the firm's behest at par) always purchased asset-backed securities and collateralized mortgage obligations for the account with the very high rating of AAA/Aaa.

*Fourth*, NM Homes comes to court complaining of investment losses that, even in normal economic times, were actually quite modest. In fact, the realized losses in NM Homes' investment account with JP Morgan Chase were only $2.63 million, or just <u>1.87</u>% of the $141 million turned over to JP Morgan Chase to manage.

*Fifth*, the accusations of fraud and misleading statements in the complaint are after-the-fact attempts by NM Homes to manufacture a basis for a claim.

NM Homes now claims it only wanted securities with short-term maturities in its portfolio (though the Guidelines contain no such limitation), and that it was unaware that securities with longer term maturity dates (*i.e.,* 30 years) were in its portfolio. To support this claim, NM Homes points to certain portfolio review reports customized and generated for Murr at his request, which NM Homes alleges were  misleading in the description of maturity dates. NM Homes claims to have been defrauded by this practice. However, Murr well knew that the dates in columns under the heading "maturity dates" in these documents were in fact the dates upon which the coupon rate for floating rate notes is calculated and paid (commonly referred to in the industry as the "reset date"). Brown disclosed and explained this to Murr, and there is no doubt that Murr, given his background, fully understood this. Moreover, Brown explained this to NM Homes' CFO, Marika Erdely, on numerous occasions, including in writing. The monthly account statements Erdely and Malone received, reviewed and asked numerous questions about also disclosed the final maturity date for each security in the portfolio.

NM Homes also claims that JP Morgan Chase misrepresented the price at which certain securities in the portfolio could be sold.  However, JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist.  Murr was fully aware of this standard industry practice. Thus, it should have come as no surprise to Murr and NM Homes that a security sold out of its portfolio in a distressed market may sell at a price less than the value assigned by the independent service.

*Lastly*, and most incredible, though NM Homes accuses JP Morgan Chase of fraud, gross negligence and breach of fiduciary duty, NM Homes continued to entrust its money in the very same Enhanced Cash account with JP Morgan Chase after making those accusations, and even after bringing this lawsuit.  It was only after JP Morgan Chase told NM Homes that it should take its business elsewhere, that NM Homes directed the transfer of its investments to another firm.

### Specific Responses

For their detailed responses to NM Homes' complaint, defendants hereby incorporate by reference all of the above, and further state:

1.      Defendants deny the allegations in paragraph 1 of the complaint.

2.      Defendants deny the allegations in paragraph 2 of the complaint, except admit that in or about October 2006, Michael Murr, NM Homes' principal stockholder, informed JP Morgan Chase that he was interested in investing NM Homes' money in a discretionary cash management portfolio, that in response JP Morgan Chase provided Murr with a variety of investment options of varied risk tolerances, including the Enhanced Cash Strategy, and that Murr selected the Enhanced Cash Strategy option.

3.      Defendants deny the allegations in paragraph 3 of the complaint, except admit that after considerable discussion and negotiation, Murr selected the Enhanced Cash Strategy for NM Homes, and opened an account with JP Morgan Chase for that purpose in November 2006 with an initial transfer of $60 million.

4.      Defendants deny the allegations in paragraph 4 of the complaint, and state that defendants made clear to Murr that JP Morgan Chase used reset dates, rather than maturity dates, for purposes of reporting certain securities' characteristics. Defendants also admit that Brown sent Murr a sample portfolio in November 2006 that identified, among other things, asset-backed securities collateralized by home equity loans ("ABS-HELs"), collateralized mortgage obligations ("CMOs"), and corporate floating-rate notes ("FRNs") as proposed investments.

5.      Defendants deny the allegations in paragraph 5 of the complaint, and refer the Court to the Guidelines that were agreed to and signed by NM Homes and JP

Morgan Chase. Defendants also state that Murr was, at all times along with his business partner John Sites, fully engaged in the management of the account.

6.     Defendants deny the allegations in paragraph 6 of the complaint, and refer the Court to the Guidelines for its content.

7.     Defendants deny the allegations in paragraph 7 of the complaint, reject plaintiff's characterization of securities issued by financial institutions issuing and holding subprime collateralized securities as "subprime-linked securities,"[1] and state that defendants invested NM Homes' money in securities in a manner consistent with NM Homes' investment objectives, the Guidelines, and the ongoing dialogue that defendants had with Murr regarding the account.

8.     Defendants deny the allegations in paragraph 8 of the complaint, and admit that in or about the last quarter of 2006, the housing market weakened and inflationary pressures rose.

9.     Defendants deny the allegations in paragraph 9 of the complaint.

10.     Defendants deny the allegations in paragraph 10 of the complaint, and state that in early 2007 JP Morgan Chase sold an AA rated security at par out of the account, and that Murr, at times along with his business partner John Sites, was fully engaged in the management of the account.

11.     Defendants deny the allegations in paragraph 11 of the complaint.

12.     Defendants deny the allegations in paragraph 12 of the complaint, except admit that in March 2007, JP Morgan Chase sold an AA rated security at par out of

---

[1]     Defendants' rejection of the term "Subprime-Linked Securities" above should be deemed incorporated in any response to an allegation in the complaint that contains that phrase.

the account, and state that at all times Murr, at times along with his partner John Sites, was fully engaged in the management of the account.

13.    Defendants deny the allegations in paragraph 13 of the complaint, and state that at the outset of the relationship, plaintiff was specifically offered the option of investing in securities with short-term maturity dates and rejected that option. Defendants also state that Murr, on behalf of plaintiff NM Homes, was fully aware of the long-term nature of the final maturity dates of the floating-rate securities in the account.

14.    Defendants deny the allegations in paragraph 14 of the complaint, and state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr, on behalf of plaintiff NM Homes, was fully aware of this standard industry practice.

15.    Defendants deny the allegations in paragraph 15 of the complaint.

16.    Defendants deny the allegations in paragraph 16 of the complaint.

17.    Defendants, upon information and belief, admit the allegations in paragraph 17 of the complaint.

18.    Defendants deny the allegations in paragraph 18 of the complaint, and state that JP Morgan Chase Bank is a national banking association with its main office in the State of Ohio, as designated in its articles of association, and its principal place of business in New York, New York.

19.    Defendants deny the allegations in paragraph 19 of the complaint.

20.     Defendants deny the allegations in paragraph 20 of the complaint, except admit that plaintiff purports to assert that this Court has subject matter jurisdiction over this action.

21.     Defendants deny the allegations in paragraph 21 of the complaint, except admit that plaintiff purports to assert that this Court has venue over this action.

22.     Defendants admit the allegations in paragraph 22 of the complaint.[2]

23.     Defendants deny the allegations in paragraph 23 of the complaint.

24.     Defendants deny the allegations in paragraph 24 of the complaint, and refer the Court to the letter that Brown sent to Murr on or about October 24, 2006 for its contents.

25.     Defendants deny the allegations in paragraph 25 of the complaint, and state that Murr agreed to JP Morgan Chase's "Enhanced Cash Strategy" after extensive consideration of this strategy and others offered by defendants, and refer the Court to the letter that Brown sent to Murr on or about October 24, 2006 for its contents.

26.     Defendants deny the allegations in paragraph 26 of the complaint, and refer the Court to the letter that defendant Brown sent to Murr on or about October 24, 2006 for its contents.

27.     Defendants deny the allegations in paragraph 27 of the complaint, and refer the Court to the letter that Brown sent to Murr on or about October 24, 2006 for its contents.

28.     Defendants deny the allegations in paragraph 28 of the complaint.

---

[2]     Defendants deny the allegations in the section heading that precedes paragraphs 22-37 of the complaint.

29.     Defendants deny the allegations in paragraph 29 of the complaint, state that in or about early November 2006, JP Morgan Chase provided Murr with the Guidelines, which were discussed extensively by Brown and Murr and amended by mutual agreement, and refer the Court to the Guidelines for its content.

30.     Defendants deny the allegations in paragraph 30 of the complaint, state that in or about early November 2006, JP Morgan Chase provided Murr with the Guidelines, which were discussed extensively by Brown and Murr and amended by mutual agreement, and refer the Court to the Guidelines for its content.

31.     Defendants deny the allegations in paragraph 31 of the complaint, and state that Brown provided Murr with a sample portfolio of securities in or about early November 2006.  At or before the time Brown provided this sample portfolio to Murr, Brown explained to Murr that "maturity dates" identified in the portfolio were in fact reset dates for floating-rate securities.  As a sophisticated investor and businessman, Murr fully understood what he was being told.

32.     Defendants deny the allegations in paragraph 32 of the complaint.

33.     Defendants deny the allegations in paragraph 33 of the complaint, except admit that the Guidelines were executed on November 6, 2006, by plaintiff, and on November 8, 2006, by JP Morgan Chase, and refer the Court to the Guidelines for its content.

34.     Defendants deny the allegations in paragraph 34 of the complaint, and refer the Court to the Guidelines for its content.

35.     Defendants deny the allegations in paragraph 35 of the complaint, and refer the Court to the Guidelines for its content.

36.     Defendants admit the allegation contained in the first sentence of paragraph 36 of the complaint, and deny the allegation contained in the second sentence of paragraph 36 of the complaint.

37.     Defendants deny the allegation in paragraph 37 of the complaint, except admit that as of May 21, 2008, plaintiff paid a total of $151,617.37 in investment management fees with respect to the account.

38.     Defendants deny the allegations in paragraph 38 of the complaint.[3]

39.     Defendants deny the allegations in paragraph 39 of the complaint, except admit that the account contained ABS-HELs in accordance with the Guidelines.

40.     Defendants deny the allegations in paragraph 40 of the complaint, except admit that the account contained CMOs in accordance with the Guidelines.

41.     Defendants deny the allegations in paragraph 41 of the complaint.

42.     Defendants deny the allegations in paragraph 42 of the complaint, except admit that the account contained FRNs in accordance with the Guidelines, and with the knowledge of Murr, who was fully aware of the nature and risk of these securities.

43.     Defendants deny the allegations in paragraph 43 of the complaint, and state that the activity in the account during the time alleged speaks for itself.

44.     Defendants deny the allegations in paragraph 44 of the complaint.

45.     Defendants deny the allegations in paragraph 45 of the complaint, except admit generally the characterizations of the housing market described therein, but

---

[3]     Defendants deny the allegations in the section heading that precedes paragraphs 38-44 of the complaint.

state that for plaintiff and defendants, the full severity of the housing market crisis was not apparent in the last quarter of 2006.[4]

46.     Defendants deny the allegations in paragraph 46 of the complaint.

47.     Defendants deny the allegations in paragraph 47 of the complaint.

48.     Defendants deny the allegations in the first sentence of paragraph 48 of the complaint, and deny knowledge or information sufficient to form a belief as to the truth of the allegation in the second sentence of paragraph 48.

49.     Defendants deny the allegations in paragraph 49 of the complaint, and state that the activity in the account speaks for itself.

50.     Defendants deny the allegations in paragraph 50 of the complaint.

51.     Defendants deny the allegations in paragraph 51 of the complaint, except admit generally the characterizations of the housing market described therein, but state that for plaintiff and defendants, the full severity of the housing market crisis was not apparent in the first quarter of 2007.

52.     Defendants deny the allegations in paragraph 52 of the complaint.

53.     Defendants deny the allegations in paragraph 53 of the complaint, except that defendants do not dispute the existence or content of any emails exchanged between Brown and Murr on or about March 14, 2007, and state that Murr is a very sophisticated investor and businessman who was at all times fully engaged in the management of the account.

54.     Defendants deny the allegations in paragraph 54 of the complaint, and state that that all securities in the account were purchased with the full knowledge of

---

[4]    Defendants deny the allegations in the section heading that precedes paragraphs 45-65 of the complaint.

Murr at or around the time they were purchased, and state that Murr is a very sophisticated investor and businessman, who was cognizant of the risks inherent in all investments made for the account.

55.    Defendants deny the allegations in paragraph 55 of the complaint, except admit that on March 3, 2007, *USA Today* published an article containing these quotes from Christopher Flanagan.

56.    Defendants deny the allegations in paragraph 56 of the complaint, except admit generally the characterizations of the housing market described therein, but state that for plaintiff and defendants, the full severity of the housing market crisis was not apparent in the second and third quarters of 2007.

57.    Defendants deny the allegations in paragraph 57 of the complaint, except admit generally the characterizations of the housing market described therein, but state that for plaintiff and defendants, the full severity of the housing market crisis was not apparent in July, 2007.

58.    Defendants deny the allegations in paragraph 58 of the complaint, except admit that on July 2007, JP Morgan Securities, Inc. published a report entitled "Q&A" containing these quotes.

59.    Defendants deny the allegations in paragraph 58 of the complaint, except admit that on July 2007, JP Morgan Securities, Inc. published a report entitled "Q&A" containing the quotes in the first sentence. Defendants also deny knowledge or information sufficient to form a belief as to the accuracy of the last sentence of paragraph 59 of the complaint.

60.     Defendants deny the allegations in paragraph 60 of the complaint, and state that the activity in the account speaks for itself.

61.     Defendants deny the allegations in paragraph 61 of the complaint, except admit generally the characterizations of the housing market described therein, but state that for plaintiff and defendants, the full severity of the housing market crisis was not apparent in August of 2007.

62.     Defendants deny the allegations in paragraph 62 of the complaint, and state that the activity in the account speaks for itself.

63.     Defendants deny the allegations in paragraph 63 of the complaint, except defendants do not dispute the existence of content of any emails exchanged between Brown and Murr in or about late August, 2007, and state that Murr is a very sophisticated investor and businessman who was at all times fully engaged in the management of the account.

64.     Defendants deny the allegations in paragraph 64 of the complaint, except admit that in or about late August, 2007, Brown gave a presentation to NH Homes' Board of Directors.

65.     Defendants deny the allegations in paragraph 65 of the complaint, and state that the activity of the account speaks for itself.

66.     Defendants deny the allegations in paragraph 66 of the complaint, and state that there was an AA-rated ABS-HEL security sold out of the account in or about March 2007.[5]

67.     Defendants deny the allegations in paragraph 67 of the complaint.

---

[5]     Defendants deny the allegations in the section heading that precedes paragraphs 66-72 of the complaint.

68.     Defendants deny the allegations in paragraph 68 of the complaint, and state that the activity of the account speaks for itself.

69.     Defendants deny the allegations in paragraph 69 of the complaint.

70.     Defendants deny the allegations in paragraph 70 of the complaint.

71.     Defendants deny the allegations in paragraph 71 of the complaint.

72.     Defendants deny the allegations in paragraph 72 of the complaint.

73.     Defendants deny the allegations in paragraph 73 of the complaint.[6]

74.     Defendants deny the allegations in paragraph 74 of the complaint.

75.     Defendants deny the allegations in paragraph 75 of the complaint, and further state that in or about August 2007, at the request of Murr and Sites, JP Morgan Chase sold one ABS-HEL out of the account, and that plaintiff never requested that JP Morgan Chase sell any other securities in the account.

76.     Defendants deny the allegations in paragraph 76 of the complaint, and state that all securities in the account were purchased with the full knowledge of Murr at or around the time of the purchase, and state that Murr is a very sophisticated investor and businessman who was cognizant of the risk inherent in all investments made for the account, and state that Murr was aware that the CMOs were not prime mortgage-backed.

77.     Defendants deny the allegations in paragraph 77 of the complaint.

78.     Defendants deny the allegations in paragraph 78 of the complaint, and refer the Court to the Guidelines, which include a paragraph reviewed and edited by Murr entitled, "Maturity and Duration," for their content.[7]

---

[6]    Defendants deny the allegations in the section heading that precedes paragraphs 73-77 of the complaint.

[7]    Defendants deny the allegations in the section heading that precedes paragraphs 78-90 of the complaint.

79.     Defendants deny the allegations in paragraph 79 of the complaint, except admit that "duration" is defined in the Guidelines as "the price sensitivity of a bond or portfolio to movements in interest rates," and that this definition was included in the Guidelines at the request of Murr.

80.     Defendants deny the allegations in paragraph 80 of the complaint, and state that in or about late October 2006, Brown and Murr discussed the different risk levels available for the account, and Murr preferred not to invest in the most conservative risk level of money market funds, and opted to invest in the less conservative Enhanced Cash Strategy designed to obtain a higher return.

81.     Defendants deny the allegations in paragraph 81 of the complaint, and state that in or about late October 2006, Brown and Murr discussed the Enhanced Cash Strategy, and Brown told Murr that the "maturity dates" indicated for the floating-rate securities were, in fact, the reset dates.

82.     Defendants deny the allegations in paragraph 82 of the complaint, and refer the Court to the Guidelines, which specify that the "effective or modified duration of the portfolio should be within 0.10 and 1.0 year," that "selecting the maturities of individual fixed-income securities within the portfolio" is within the discretion of the Investment Manager, and which include a paragraph entitled, "Maturity and Duration," describing the two indicators and providing a definition of duration (included at the request of Murr). In addition, defendants refer the Court to the executed Mandate, which, in the section entitled "INVESTMENT RESTRICTIONS & INSTRUCTIONS" expressly provides that "[NM Homes] specifies a duration of approximately 1 year (Enhanced

Cash)," and provides no restriction or instruction relating to the maturity of a security. Defendants acted in full accordance with the Guidelines.

83.     Defendants deny the allegations in paragraph 83 of the complaint, except admit that in or about early May 2007, consistent with the Guidelines, defendants purchased two FRNs, one from Lehman Brothers and one from Goldman Sachs.

84.     Defendants deny the allegations in paragraph 84 of the complaint, except admit that the two FRNs, one from Lehman Brothers and one from Goldman Sachs, purchased in May 2007 were referred to as "perpetuals."

85.     Defendants deny the allegations in paragraph 85 of the complaint.

86.     Defendants deny the allegations in paragraph 86 of the complaint.

87.     Defendants deny the allegations in paragraph 87 of the complaint, and state that defendants made it clear to Murr, a very sophisticated investor and businessman, that JP Morgan Chase used reset dates, rather than maturity dates, for purposes of reporting characteristics of floating-rate securities.

88.     Defendants deny the allegations in paragraph 88 of the complaint, and state that defendants made it clear to Murr, a very sophisticated investor and businessman, that JP Morgan Chase used reset dates, rather than maturity dates, for purposes of reporting characteristics of floating-rate securities.

89.     Defendants deny the allegations in paragraph 89 of the complaint.

90.     Defendants deny the allegations in paragraph 90 of the complaint, and state that Murr, a very sophisticated investor and businessman, acting on behalf of NM Homes, was fully engaged in the management of the account, and state that defendant

Brown explained the distinction between reset dates and maturity dates to plaintiff's CFO, Marika Erdely, on numerous occasions.

91.    Defendants deny the allegations in paragraph 91 of the complaint.[8]

92.    Defendants deny the allegations in paragraph 92 of the complaint, except admit that JP Morgan Chase routinely sent plaintiff a monthly account statement, and that Brown and other employees of JP Morgan Chase spent an enormous amount of time communicating with Murr, Lou Malone (plaintiff's CEO), and Marika Erdely (plaintiff's CFO) about the activity and the nature of the securities within the account. Defendants further state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr was fully aware of this standard industry practice.

93.    Defendants deny the allegations in paragraph 93 of the complaint, and state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr was fully aware of this standard industry practice.

94.    Defendants deny the allegations in paragraph 94 of the complaint.

95.    Defendants deny the allegations in paragraph 95 of the complaint.

96.    Defendants deny the allegations in paragraph 96 of the complaint, except admit that JP Morgan Chase issued a press release on April 19, 2007 and refer the Court to the press release for its content.

---

[8]    Defendants deny the allegations in the section heading that precedes paragraphs 91-108 of the complaint.

97.     Defendants deny the allegations in paragraph 97 of the complaint, except admit that JP Morgan Chase issued a press release on October 17, 2007 and refer the Court to the press release for its contents.

98.     Defendants deny the allegations in paragraph 98 of the complaint, except admit that JP Morgan Chase issued a press release on January 16, 2008 and refer the Court to the press release for its contents.

99.     Defendants deny the allegations in paragraph 99 of the complaint, except defendants do not dispute the existence or content of any emails exchanged between Brown and Murr in or about March and May 2007, and state that Murr is a very sophisticated investor and businessman who was at all times fully engaged in the management of the account.

100.    Defendants deny the allegations in paragraph 100 of the complaint.

101.    Defendants deny the allegations in paragraph 101 of the complaint.

102.    Defendants deny the allegations in paragraph 102 of the complaint, and refer the Court to the account statements for their contents.

103.    Defendants deny the allegations in paragraph 103 of the complaint, and state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr was fully aware of this standard industry practice.

104.    Defendants deny the allegations in paragraph 104 of the complaint.

105.    Defendants deny the allegations in paragraph 105 of the complaint.

106.     Defendants deny the allegations in paragraph 106 of the complaint, and state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr was fully aware of this standard industry practice.

107.     Defendants deny the allegations in paragraph 107 of the complaint.

108.     Defendants deny the allegations in paragraph 108 of the complaint.

109.     Defendants deny the allegations in paragraph 109 of the complaint.[9]

110.     Defendants deny the allegations in paragraph 110 of the complaint, and refer the Court to the letter from Brown to Murr sent on or about October 24, 2006 for its content.

111.     Defendants deny the allegations in paragraph 111 of the complaint, and refer the Court to the communications between Todd Brown and Murr in November 2007 for their content.

112.     Defendants deny the allegations in paragraph 112 of the complaint, and state that JP Morgan Chase offered to provide Bloomberg information for each security in the account, which Murr found acceptable and was pleased to receive at the time.

113.     Defendants deny the allegations in paragraph 113 of the complaint, and state that JP Morgan Chase does not routinely provide to clients individual prospectuses for the securities within their portfolios, as these are readily accessible on the website of each company.

---

[9]     Defendants deny the allegations in the section heading that precedes paragraphs 109-116 of the complaint.

21

114.   Defendants deny the allegations in paragraph 114 of the complaint.

115.   Defendants deny the allegations in paragraph 115 of the complaint.

116.   Defendants deny the allegations in paragraph 116 of the complaint, and refer the Court to the account statements for their contents.

117.   Defendants deny the allegations in paragraph 117 of the complaint.[10]

118.   Defendants deny the allegations in paragraph 118 of the complaint, and state that at no time did Murr or anyone on behalf of NM Homes direct JP Morgan Chase to move out of any securities, with the exception of the one ABS-HEL sold at the request of Murr following the August 2007 conference call.

119.   Defendants deny the allegations in paragraph 119 of the complaint.

120.   Defendants deny the allegations in paragraph 120 of the complaint.

121.   Defendants deny the allegations in paragraph 121 of the complaint.

122.   Regarding the allegations in paragraph 122 of the complaint, defendants repeat and reallege the responses in paragraphs 1-121 of this answer as if fully set forth herein.

123.   Defendants deny the allegations in paragraph 123 of the complaint, and refer the Court to the Guidelines for its content.

124.   Defendants deny the allegations in paragraph 124 of the complaint, and refer the Court to the Guidelines for its content.

125.   Defendants deny knowledge or information sufficient to form a belief as to the allegations of paragraph 125 of the complaint.

---

[10]   Defendants deny the allegations in the section heading that precedes paragraphs 117-21 of the complaint.

126.   Defendants deny the allegations in paragraph 126 of the complaint, and refer the Court to the Guidelines for its content.

127.   Defendants deny the allegations in paragraph 127 of the complaint.

128.   Defendants deny the allegations in paragraph 128 of the complaint.

129.   Regarding the allegations in paragraph 129 of the complaint, defendants repeat and reallege the responses in paragraphs 1-128 of this answer as if fully set forth herein.

130.   Defendants deny the allegations in paragraph 130 of the complaint.

131.   Defendants deny the allegations in paragraph 131 of the complaint.

132.   Defendants deny the allegations in paragraph 132 of the complaint.

133.   Defendants deny the allegations in paragraph 133 of the complaint, state that JP Morgan Chase, like most financial institutions, relies on independent third party pricing services to provide an objective valuation of securities that may not be traded frequently and for which a liquid market may not always exist, and state that Murr was fully aware of this standard industry practice. Defendants further state that defendants made it clear to Murr, a very sophisticated investor and businessman, that JP Morgan Chase used reset dates, rather than maturity dates, for purposes of reporting characteristics of floating-rate securities.

134.   Defendants deny the allegations in paragraph 134 of the complaint.

135.   Defendants deny the allegations in paragraph 135 of the complaint.

136.   Defendants deny the allegations in paragraph 136 of the complaint.

137-193.    The third through eighth counts of the complaint, which encompass the allegations in paragraphs 137 to 193 of the complaint, have been dismissed and thus no response is required.

194.    Regarding the allegations in paragraph 194 of the complaint, defendants repeat and reallege the responses in paragraphs 1-193 of this answer as if fully set forth herein.

195.    Defendants deny the allegations in paragraph 195 of the complaint.

196.    Defendants deny the allegations in paragraph 196 of the complaint.

197.    Defendants deny the allegations in paragraph 197 of the complaint.

198.    Defendants deny the allegations in paragraph 198 of the complaint.

199.    Defendants deny the allegations in paragraph 199 of the complaint.

200.    Defendants deny the allegations in paragraph 200 of the complaint.

201.    Regarding the allegations in paragraph 201 of the complaint, defendants repeat and reallege the responses in paragraphs 1-200 of this answer as if fully set forth herein.

202.    Defendants deny the allegations in paragraph 202 of the complaint.

203.    Defendants deny the allegations in paragraph 203 of the complaint.

204.    Defendants deny the allegations in paragraph 204 of the complaint.

205.    Defendants deny the allegations in paragraph 205 of the complaint.

206.    Defendants deny the allegations in paragraph 206 of the complaint.

207.    Defendants deny the allegations in paragraph 207 of the complaint.

**Affirmative Defenses**

### FIRST AFFIRMATIVE DEFENSE

The complaint fails to state a claim upon which relief may be granted against defendants with respect to each cause of action.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred because the alleged conduct challenged in the complaint was entirely fair to plaintiff.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because the defendants acted at all times in good faith, in accordance with applicable law, and without knowledge of any wrongful acts or intent.  Any and all acts taken by the defendants were lawful, proper and consistent with their duties and obligations to the plaintiff.

### FOURTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiffs because the purchases defendants made were entirely suitable for the account at the time of purchase.

### FIFTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiff because they had no duty to disclose any facts that were allegedly not disclosed.

### SIXTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiff because defendants made no material false statements or omissions in any communication with the plaintiff.

### SEVENTH AFFIRMATIVE DEFENSE

Defendants are not liable to plaintiff because defendants did not act with the requisite scienter.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, because to the extent plaintiff has suffered injury or loss, all or part of the damages were not proximately caused by any act or omission of defendants and/or resulted from causes other than any act or omission of defendants, including intervening acts beyond the control of the defendants and market forces.

## NINTH AFFIRMATIVE DEFENSE

The complaint is barred by plaintiff's assumption and acceptance of the risk of loss regarding each of the investments in its account.  Plaintiff assumed the risk of these investments and was fully advised of and understood the nature of and risks inherent in its investments.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff also had full, complete, accurate, and contemporaneous knowledge of the transactions complained of in the complaint, and thus is estopped from asserting these claims.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's acts, and the acts of its agents, constitute a ratification of any alleged wrongdoing by defendants, thus precluding its recovery.  Plaintiff received account statements in a timely fashion indicating the securities purchased, sold, or transferred, as well as the net worth and quantity of securities for the account.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's acts, and the acts of its agents, constitute a waiver of any alleged wrongdoing by defendants, thus precluding its recovery.  At all times, plaintiff was fully

informed of the account's status, and continued dealing with defendants without complaining of the positions in or status of the account.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff failed to exercise due diligence and timely disaffirm the transactions that allegedly gave rise to its losses. By virtue of its status as a sophisticated investor, plaintiff and its agents have an independent duty to perform due diligence with regard to their investments, thus their claims are barred.

### FOURTEENTH AFFIRMATIVE DEFENSE

To the extent that plaintiff has incurred any damages, which defendants deny, such damages were not proximately or legally caused by any act or omission of defendants or any of its agents, but by general economic conditions, and other events and conditions outside the control of defendants.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff and its agents have failed to mitigate damages, thus their claims are barred in whole or part.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to relief because it has failed to assert its rights in a timely manner and thus is barred by the doctrine of laches. Plaintiff's delay in asserting the claim has unnecessarily increased the potential damages to be awarded.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff has failed to allege fraud with the required particularity.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's alleged damages are speculative and not legally cognizable.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to recover attorney's fees, accountant's fees, experts' fees, or other costs and disbursements.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff is not entitled to punitive damages.

## RESERVATION OF RIGHT TO AMEND

Defendants reserve the right to amend their Answer and to assert additional defenses and/or affirmative defenses as may be appropriate.

## REQUEST FOR RELIEF

Accordingly, for all of the reasons set forth above, plaintiff's complaint should be denied in its entirety and dismissed with prejudice, with attorneys' fees and costs assessed against plaintiff, and awarding defendants such other relief as the Court deems just and proper.

Dated:  April 4, 2011
      New York, New York

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By: /s/ Richard A. Rosen
    Richard A. Rosen (rrosen@paulweiss.com)
    John F. Baughman (jbaughman@paulweiss.com)
    Farrah R. Berse (fberse@paulweiss.com)
    Jennifer K. Vakiener (jvakiener@paulweiss.com)

    1285 Avenue of the Americas
    New York, New York  10019
    Tel.:  (212) 373-3000
    Fax:  (212) 757-3990

    *Attorneys for defendants JP Morgan*
    *Chase Bank, N.A. and Todd Brown*